**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-mc-__________

In re Application of

STOCKBRIDGE FUND, L.P.; STOCKBRIDGE ABSOLUTE RETURN FUND; OME HOLDINGS LLC; PEMBROKE WAY LLC; STANDISH ROAD LLC; QUADRE INVESTMENTS, L.P.; TABLET HOLDINGS, LLC,

Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding.

## *EX PARTE*[1] APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Stockbridge Fund, L.P.; Stockbridge Absolute Return Fund; OME Holdings LLC; Pembroke Way LLC; Standish Road LLC; Quadre Investments, L.P.; and Tablet Holdings, LLC ("Petitioners") respectfully request an order, pursuant to 28 U.S.C. § 1782 ("Section 1782"), in the form attached hereto (a) granting Petitioners leave to serve the subpoena attached hereto as Exhibit 1 (the "Subpoena"), on Affiliated Manager Group, Inc. ("Respondent" or "AMG"); (b) directing Respondent to file any objections with this Court that it may have to the requested documents (the "Requests") and testimony within 7 days from the date it is served, and, in the event that no objections are filed, directing Respondent to produce documents responsive to the

[1] *See, e.g.*, *In re Appl. of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1267 (11th Cir. 2014) ("[T]he district court granted the ex parte application."); *In re Appl. of Alves Braga*, 789 F. Supp. 2d 1294, 1303 (S.D. Fla. 2011) ("There is nothing inappropriate about an ex parte application under this statute. In fact, in the Court's experience, most applications filed here in this district are submitted on an ex parte basis.").

Requests within 14 days of the date the Subpoena is served, and sit for deposition within 28 days of the date that the Subpoena is served; and (c) in the event that Respondent files an objection, ordering the parties shall appear before this Court and present argument as to why an order should not be issued in favor of Petitioners (i) granting Petitioners leave to serve the subpoena on Respondent, and (ii) directing Respondent to produce documents responsive to the Requests within 14 days of the date of the Court's order, and sit for deposition within 21 days of the date of the Court's order.[2]

In support of their application, Petitioners submit (i) the proposed Subpoena, (ii) the Declaration of Anthony Heaver-Wren, which is attached hereto as Exhibit 2 ("Heaver-Wren Declaration"), (iii) Expert Declaration of Nigel Keith Meeson QC, which is attached hereto as Exhibit 3 (the "Meeson Declaration"), and (iv) the proposed Order, which is attached hereto as Exhibit 4, and further state as follows:

## PRELIMINARY STATEMENT

Petitioners seek an order from this Court granting their application to take limited discovery from AMG, a corporation found in this district that owns a stake of Baring Private Equity Asia Group Limited ("Baring"). Baring is the majority and controlling shareholder of Nord Anglia Education, Inc. (the "Company" or "Nord Anglia"). Petitioners also hold shares of the Company. Nord Anglia is a company organized under the laws of the Cayman Islands that had previously been publicly traded. Baring took Nord Anglia private last fall. Through the going-private merger, Baring was able to force the Company to go private (for a second time) at an inadequate value, and did so by means of a flawed sale process, including the failure to

[2] Expedited consideration of this application and compliance with the Subpoena is necessary because, *inter alia*, the discovery will be utilized by the experts in the foreign proceeding in connection with the November 23, 2018 submission of questions to the management of the Company (as defined below).

condition the transaction on the approval of a majority of the minority shareholders. Petitioners seek this discovery for use in an appraisal proceeding pending in the Cayman Islands, in which the Grand Court of the Cayman Islands will determine the "fair value" of Petitioners' shares (the "Appraisal Proceeding").

In the Appraisal Proceeding, Petitioners and other Nord Anglia shareholders (the "Dissenting Shareholders") are exercising their statutory right to dissent from the going-private merger, and are seeking to establish that the merger grossly undervalued the Dissenting Shareholders' shares of the Company (the "Shares"). As of the date of the vote on the proposed transaction, the Dissenting Shareholders held approximately 23.7% of the Company's issued and outstanding shares. However, as the Company chose to go private without requiring the minority shareholders' approval, the going-private merger was a foregone conclusion. The Dissenting Shareholders' only recourse is through the Cayman Appraisal Proceeding.

Due to the limited nature of discovery in the Appraisal Proceeding, the only discovery the Dissenting Shareholders can receive is party discovery from the Company, subject to narrow exceptions explained in the Meeson Declaration. The Cayman courts, however, have been receptive to both the introduction of third-party valuation evidence and evidence obtained pursuant to Section 1782. Petitioners thus submit this Section 1782 application seeking this Court's leave to obtain discovery from respondent AMG, which is a global asset management company with over $860 billion in assets under management.

The Dissenting Shareholders and their expert (Harvard Business School Professor Paul Gompers) were provided access to the data room containing the Company's document disclosures in the Appraisal Proceeding in August 2018. These disclosures reflect the Company's documents relevant to the question of fair value, but the data room does not contain valuations of

Nord Anglia that Baring (the primary counterparty to the transaction) prepared internally or otherwise maintained. Baring has virtually no physical presence in the U.S. and is therefore not subject to a Section 1782 application for discovery. However, Respondent is an equity investor in Baring, and therefore has a significant interest in the potential financial performance of Baring's asset acquisitions, such as Nord. Accordingly, Respondent is likely to have documents relevant to the Appraisal Proceeding, as Baring is likely to have provided AMG with information regarding the valuation of Nord Anglia, and AMG may also have prepared its own financial analyses of Nord Anglia. These documents likely include forecasts of the Company's performance, cash flow projections, and any valuations of the Company. Documents in AMG's possession, however, are not in the data room.

This discovery will assist the Dissenting Shareholders' valuation expert in performing a complete analysis of the fair value of the Shares. The expert will be submitting written questions to the Company's management in November 2018 in advance of a meeting with Company management in December 2018, at which the participants will discuss issues relating to the fair value of the Shares. The experts will exchange valuation reports in January 2019 opining on the fair value of the Shares. Petitioners seek to obtain the discovery from Respondent sufficiently in advance of that exchange of questions and subsequent meeting. Accordingly, Petitioners request that the Court grant the Application *ex parte*, and require Respondent to provide any objections and produce documents on an expedited basis.

## FACTUAL BACKGROUND

Nord Anglia and its Shareholders

Nord Anglia has operated premier private schools for over 40 years, in a number of foreign markets worldwide that primarily cater to expatriate communities with high incomes. (*See* Heaver-Wren Decl. ¶ 9 & Ex. 2 at 2). The Company was listed on the London Stock

Exchange for over a decade until Baring took it private in 2008. In 2014, the Company commenced an initial public offering, after which the Company's ordinary shares were publicly traded on the New York Stock Exchange (the "NYSE"). (*Id.* ¶ 10). Baring remained the Company's controlling shareholder and, as of February 2017, it held approximately 66.8% of the Company's ordinary shares. (*See id.* Ex. 1). Petitioners were also holders of the Company's ordinary shares prior to it going private in September 2017.

Baring Seeks to Take Nord Anglia Private Again

The Company began exploring a potential business combination with Baring as the lead investor in the fall of 2016, less than three years after going public for a second time. (*See id.* Ex. 3 at 11). The Company's board of directors established a special committee in January 2017, which was tasked with evaluating a potential acquisition of the Company by Baring. Around the same time, Canada Pension Plan Investment Board ("CPPIB," and together with Baring, the "Buyer Group") entered into discussions with Baring and the Company to participate as an investor in the acquisition. (*Id.* at 12).

Over the course of many months, the Buyer Group, the Company, and the Company's advisors engaged in a series of in-depth negotiations regarding the structure and terms of the transaction. The parties also conducted due diligence in order to evaluate the potential transaction. This included certain increases to the proposed share price, as well as negotiations regarding a majority of the minority approval and the "go-shop" period during which the Company is to solicit additional bids.

On April 25, 2017, the Company announced that it had entered into a merger agreement whereby it would be taken private by the Buyer Group. (*Id.* Ex. 2). Upon the closing of the merger agreement, the Company's outstanding shares would be canceled in exchange for $32.50 in cash per share (other than those held by Baring's affiliate and incentive payment shares). (*See*

*id.* ¶ 13; *id.* Ex. 3 at 3). The merger's $32.50 share price valued the Company at approximately $4.3 billion. (*See id.* Ex. 2 at 1).

As disclosed in the Company's proxy statement, the Buyer Group "stressed" during the final days of negotiation of the merger that its offer was subject to the Company dropping a condition in the merger agreement that a majority of the minority shareholders vote in favor of the merger. (*See id.* Ex. 3 at 24). However, pursuant to Section 238 of the Companies Law (2016 Revision) of the Cayman Islands ("Section 238"), the Company's shareholders would have the right to dissent from the merger. Dissenting from the merger does not prevent the merger from going ahead, but rather entitles the dissenter to be paid fair value (as determined by the Cayman Court) for the shares.

The merger agreement provided for only a mere thirty-day "go-shop period." (*See id.* Ex. 3 at 7). Due to Baring holding over two-thirds of the Company's shares, other bidders did not attempt to compete with the Buyer Group's offer.

<u>The Minority Shareholders Dissent from the Going-Private Merger</u>

Petitioners and the other Dissenting Shareholders delivered written objections to the merger pursuant to Section 238 between August 14 and August 18, 2017. (*Id.* Ex. 4 ¶ 28). The Company held an extraordinary general meeting of shareholders on August 21, 2017. (*Id.* ¶ 16). As of the date of the shareholders meeting, the Dissenting Shareholders were the registered owners of a total of 24,660,390 shares, or approximately 23.7% of the Company's issued and outstanding shares. (Heaver-Wren Decl. ¶ 15). The merger was approved at the shareholders meeting, thanks in large part to Baring holding 66.8% of the Company's shares. (*Id.* Ex. 4 ¶ 25).

On September 1, 2017, the merger agreement became effective. (*Id.* ¶ 16). The Company thereafter offered to purchase the Dissenting Shareholders' shares at a value of $27.70 per share. All of the Dissenting Shareholders rejected this offer. (*Id.* ¶¶ 32-33).

The Appraisal Proceeding

As required by Section 238, the Company filed a Petition with the Grand Court of the Cayman Islands on November 9, 2017, seeking a determination of the fair value of the Shares as of the valuation date of August 21, 2017 (the "Appraisal Proceeding"). (*Id.*).

The Company and the Dissenting Shareholders have each retained an expert to opine on the fair value of the Shares. (Heaver-Wren Decl. ¶ 22). The Dissenting Shareholders were provided access to the Company's disclosures in a data room in August 2018, reflecting "all documents (of whatever description etc.) which are relevant to the question of fair value created in the five year period ending with August 21, 2017." (*Id.* ¶ 20). These disclosures are limited to documents in the Company's possession, custody, or power, and discovery cannot (subject to limited exceptions) be sought from third parties to the Appraisal Proceeding. (*Id.* ¶ 19; Meeson Decl. ¶ 9). On August 27, 2018, the Cayman court entered an order setting forth the timetable for the Appraisal Proceeding, pursuant to which expert reports are to be exchanged by January 18, 2019, and the Company's management is scheduled to meet with the Dissenting Shareholders' expert and the Company's expert on December 14, 2018. (Heaver-Wren Decl. ¶ 21 & Ex. 7).

Petitioners (along with other Dissenting Shareholders) are pursuing Section 1782 discovery from other participants in the transaction, namely (i) the financial advisor to the special committee of the Company's board, (ii) banks providing debt financing on the merger, and (iii) the financial advisor to CPPIB. (*See* Heaver-Wren Decl. ¶ 33). As non-parties to the transaction, these targets served specific roles assigned to them by either the Buyer Group or the Company. Their interest in Nord Anglia's future financial performance either ended upon the closing of the merger transaction or, as to the banks, upon repayment of their credit offerings.

AMG, however, is an equity investor in Baring. AMG was also a shareholder of the Company. (Heaver-Wren Decl. ¶¶ 28-29). Therefore, AMG had a financial motivation to request

Baring's valuations of the Company, to vet any valuations received, and to conduct its own independent valuations and financial analyses of the Company. AMG also had a financial motivation to make sure that Baring was negotiating the lowest share price possible in the going-private transaction. Baring and AMG both had the strongest possible interest in getting the valuation right.

## ARGUMENT

### I. The Discovery Sought Meets the Statutory Requirements of Section 1782

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person . . . ." 28 U.S.C. § 1782(a). To obtain discovery under Section 1782, an applicant must satisfy four statutory requirements: (1) the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence in the form of "testimony or statement" of a person or must be the production of "a document or other thing"; (3) the discovery is for use before a foreign tribunal; and (4) the discovery must be directed at someone found within the District. *In re Clerici*, 481 F.3d 1324, 1331–32 (11th Cir. 2007). Petitioners' application satisfies these requirements.

#### A. Petitioners Are Interested Persons

Petitioners are "interested persons" under Section 1782 because they are dissenting shareholders that are parties to the Appraisal Proceeding. (*See* Heaver-Wren Decl. Ex. 4). *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782"). Accordingly, the first statutory requirement is satisfied.

B. Discovery Request Seeks Evidence in the Form of Testimony and Document Production

The Subpoena seeks discovery from Respondent that is related to the Nord acquisition, such as valuations. *See In re Pinchuck*, 2013 WL 5574342, at *2 (S.D. Fla. Sept. 20, 2013) (finding petitioner's request for documents such as board materials, documents revealing corporate parents and shareholder identities, financial statements and related valuations and appraisals, and testimony regarding the respondents' financial condition and related matters were permissible under the second statutory factor). Accordingly, the second requirement is satisfied.

C. The Discovery Sought is Intended for Use in a Foreign Proceeding

The third statutory requirement is that the discovery sought is intended "for use" in a foreign proceeding. *See, e.g.*, *Intel*, 542 U.S. at 258. To meet the "for use" test, the materials sought need not be either discoverable, *id.* at 243, or even be shown to be admissible as evidence in the foreign jurisdiction. *In re Roz Trading Ltd.*, 2007 WL 120844, at * (N.D. Ga. Jan. 11, 2007) ("§ 1782 aid [is] appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a)."); *In re Appl. of Grupo Qumma*, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005). Nor must the discovery be necessary for the party seeking it to prevail in the foreign proceeding. Rather, it merely needs to consist of materials that can "be employed with some advantage or serve some use in the proceeding." *In re Ferrer*, 2018 WL 3240010, at *5 (S.D. Fla. July 3, 2018) (quoting *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015)); *see also Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) ("Section 1782 does not require that every document discovered be actually used in the foreign proceeding.").

As set forth in detail in the Heaver-Wren Declaration, the discovery Petitioners seek is for use in the Appraisal Proceeding. Indeed, the discovery sought relates to the fair value of the Shares,

and will be utilized in the Appraisal Proceeding by the Dissenting Shareholders' expert and the Cayman Court in determining the fair value of the Shares pursuant to Section 238. (*See* Heaver-Wren Decl. ¶¶ 17-22). In determining the fair value of the Shares, Cayman courts have emphasized the need to consider all facts and matters which may have a bearing on the determination of fair value. For example, the Cayman Island Court of Appeal in *Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund et al* (Unreported CICA 10 April 2018) held that "it should be a general obligation of the Company to search for and produce all documents relevant to fair value." (*See* Meeson Decl. Ex. 1 ¶ 45). The Court of Appeal in *Qunar* continued, explaining that

> [V]alue, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "getting it right" is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.
>
> [I]f dissenters have in their possession, as they are likely to so, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words, documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies; and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. …"

(*Id.* ¶¶ 74-75; *see generally* Meeson Decl. ¶¶ 31-33).

This need was also succinctly expressed by the Cayman Islands Court of Appeal in *Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) Martin JA, as follows: "The sole

task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information." (Meeson Decl. Ex. 2).

Accordingly, the Dissenting Shareholders' expert (as well as the Company's) can and indeed should consider all of the available evidence in establishing opinions regarding the fair value of the Shares.

Petitioners have thus satisfied the third statutory requirement. *See In re Appl. of Temporary Services Ins. Ltd.*, 2009 WL 2843258, at *2 (W.D.N.Y Aug. 28, 2009) (finding discovery sought for use in Cayman proceeding satisfied this prong).

D. Respondent is Found in this District

Respondent is found in this District. (*See generally* Heaver-Wren Decl. ¶ 27 & Ex. 8). In fact, AMG's headquarters and principal executives' offices are located here. *See Ahmad Hamad in Appl. of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014) (holding that, despite JAS USA being incorporated in another state, it was still "found" in the Southern District of Florida because it did business in Miami and had an office there); *see also In re Appl. of MTS Bank*, 2017 WL 3276879, at *7 (S.D. Fla. Aug. 1, 2017) (finding that even though respondent's property had been sold in the state in 2014, it still could be "found" in the state because it maintained a corporate address with a corporate agent, had a Florida bank account, and litigates in Florida state courts). Accordingly, the fourth statutory requirement is satisfied.

**II. The Discretionary Factors Favor Granting the Application**

Once the four statutory factors are satisfied, the Court should determine, in its discretion, whether to order the requested discovery. *See Intel*, 542 U.S. at 264. In *Intel*, the Supreme Court identified four factors that the Court could consider in determining when discovery is permissible under Section 1782. The four factors are: (1) whether "the person from whom

discovery is sought is a participant in the foreign proceeding" such that the "foreign tribunal has jurisdiction over [it];" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court juridical assistance;" (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the requests are "unduly intrusive or burdensome" and if so, whether those requests can be "trimmed." *Id.* at 264-66; *see also In re Ferrer*, 2018 WL 3240010, at *3.

In considering these factors, the Court is required to keep in mind "the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *In re Pinchuk*, 2013 WL 5574342, at *2 (S.D. Fla. Sept. 20, 2013) (*citing Intel*, 542 U.S. at 252). As the Supreme Court noted, "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. "Congress intended [] that 28 U.S.C. § 1782 would provide an avenue for judicial assistance to foreign or international tribunals whether or not reciprocal arrangements existed. . . . [Section 1782] is a one-way street." *In re Furstenberg Finance SAS*, 2018 WL 735670 at *2 (S.D. Fla. Jan. 10, 2018). "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). *See also Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011) ("[A] party to litigation in a foreign country can seek discovery relating to that litigation in a federal district court, and, in the discretion of that court, can obtain *as much discovery as it could*

if the lawsuit had been brought in that court rather than abroad.") (internal citations omitted) (emphasis added).

Petitioners readily satisfy the discretionary *Intel* factors.

A. The Discovery is Sought from a Non-Party to the Appraisal Proceeding

The first *Intel* factor looks at whether the Respondent is a participant in the Appraisal Proceeding. "It is well established that '[t]he need for § 1782 assistance is more apparent when discovery is sought from a non-participant.'" *In re Appl. of MTS Bank*, 2017 WL 3276879, at *7 (quoting *In re Sergeeva*, 2013 WL 12169388, at *10 (N.D. Ga. Nov. 22, 2013)). Indeed, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also In re Clerici*, 481 F.3d at 1335.

Here, Respondent is not a party to the Appraisal Proceeding and Cayman procedural law does not provide Petitioners any applicable or efficient means by which it can obtain the discovery sought in its Application. (Heaver-Wren Decl. ¶ 19; Meeson Decl ¶ 19). This factor weighs in favor of granting the Application.

B. Cayman Courts are Receptive to Section 1782 Discovery

The second *Intel* factor requires courts to consider whether the "nature, attitude and procedures" of the foreign tribunal indicate that it is receptive to Section 1782 assistance. As to this factor, courts have repeatedly emphasized that the inquiry into "the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of Section 1782." *Weber v. Finker*, 2007 WL 4285362, at *5 (M.D. Fla. Nov. 30, 2007) (quoting *Euromepa*, 51 F.3d at 1100). Absent such proof, courts are inclined to grant the application for discovery. *See In re Appl. of MTS Bank*, 2017 WL 3276879, at *11 ("[A] suspicion that the evidence gathered would ultimately be rejected is not enough to

overcome the presumption that district courts should allow for discovery to proceed under section 1782 to promote the statute's goals of efficiency and comity."); *In re Ferrer*, 2018 WL 3240010, at *9 (respondents failed to provide "authoritative proof" that the foreign court would reject the United States evidence being sought). As such, the burden is on the party opposing the discovery to show that a foreign court is not receptive to federal court assistance. *In re Emergency Ex Parte Appl. of Godfrey*, 2018 WL 1863749, at *9 (S.D. Fla. Feb. 22, 2018) ("[Respondent] has provided no authoritative proof that the English court would reject this discovery.").

As set forth in the Meeson Declaration, Cayman courts will generally consider any evidence that has a bearing on determining the fair value of a company's shares, and Petitioners are unaware of any authority suggesting that such evidence will be inadmissible as a matter of law. Indeed, the Cayman Islands Court of Appeal has recently underscored that third-party valuation materials may be considered in a Section 238 proceeding, reasoning:

> [I]n my judgment, if third party valuations in the possession of the Company are relevant, so are third party valuations not in the possession of the Company, but, for instance in the possession of the Dissenting Shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the Company (or for the Company as a whole): and that question is closely related to valuations conducted within the market generally.

(*See* Meeson Decl. Ex. 1 (quoting *Re Qunar Cayman Islands Limited* (unreported, 10 April 2018, CICA NO 24 of 2017) at paragraph 60)). The same reasoning extends to the materials Petitioners seek in this application, as Respondent likely possesses knowledge and documentary evidence relevant to the "question of fair value" the parties in the Appraisal Proceeding are currently litigating. This is particularly so given its equity interest in the primary counter-party to the merger that acquired an interest in Nord Anglia. Accordingly, Petitioners have a good faith basis

for believing that it will be able to use the documents in the Appraisal Proceeding. *See In re Appl. of Hill*, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007).

Furthermore, as set forth in the Meeson Declaration, Cayman courts are receptive to a party to a Cayman proceeding utilizing Section 1782 applications to obtain discovery for use in that proceeding. (*See* Meeson Decl. ¶ 42 & Ex. 5). Indeed, the Cayman appellate court in *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited*, [2009] CILR 553, expressly held that the right to obtain full discovery, pre-trial deposition testimony as well as documents, "is a right conferred by U.S. law-it is *not a right* conferred by, or *to be withheld under Cayman law*." (emphasis added). (*Id.* Ex. 5 (upholding trial court determination to allow the use of discovery obtained through 28 U.S.C. § 1782)). The *Lyxor* Court ruled that, where a party has a right to avail itself of legitimate foreign process, such as that provided by Section 1782, there must be a compelling reason to prevent it from doing so. The Cayman Court ruled that such a prohibition would only be appropriate where it would be unconscionable to allow the use of discovery obtained through foreign process.

Multiple courts have also recognized that "Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018); *see Gushlak v. Gushlak*, 486 Fed. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 applications in connection with Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting applications seeking documents for use in Cayman proceedings); *In re Penner*, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman court "is open to receiving § 1782 discovery"). In particular, as established

above, Cayman courts in appraisal proceedings are not only receptive to, but welcome receiving information concerning third party valuations, such that the discovery Petitioners seek will be relevant in the Appraisal Proceeding. *Qunar*, at paragraph 60. Accordingly, this factor also weighs in favor of granting the Application.

### C. Petitioners are not Circumventing Foreign Restrictions

The third *Intel* factor requires the Court to weigh whether the application is meant to "circumvent foreign proof-gathering restrictions," and is meant to preclude bad faith misuse of the Section 1782 process. *Intel*, 542 U.S. at 264-65. The information sought need not be discoverable or admissible in the foreign forum. *Id.* at 253 ("We now hold that § l782(a) does not impose [] a [foreign-discoverability] requirement."); *In re Appl. Of Mesa Power Group, LLC*, 878 F. Supp. 2d 1296, 1304-05 (S.D. Fla. 2012) ("Absent a persuasive showing that a section 1782 applicant . . . is actively seeking to circumvent the foreign tribunal's discovery methods and restrictions . . . this factor does not counsel against section 1782 relief."). Further, even if there were an alternative means to obtain the requested materials in the Cayman Proceeding, an applicant is not required to exhaust all discovery mechanisms in the foreign court before seeking aid of section 1782. *In re: Appl. of Bracha Foundation*, 663 Fed. App'x 755, 765 (11th Cir. 2016) ("[E]ven when the requested documents may be available in the foreign jurisdiction, there is no requirement to first seek discovery from the non-US tribunal or exhaust other options before applying to a district court for section 1782 discovery."); *see also Weber*, 2007 WL 4285362, at *5 (noting that there is no "quasi-exhaustion requirement" in section 1782 that would "force litigants to seek information through the foreign or international tribunal before requesting discovery from the district court") (quoting *Euromepa*, 51 F.3d at 1098).

As set forth in the Meeson Declaration, there are no feasible or practical means in the Appraisal Proceeding by which Petitioners could obtain the discovery that it seeks. (Meeson

Decl. ¶¶ 18-26). This is not because Cayman courts wish to exclude such evidence, but because the Cayman courts generally only have the power to order discovery from the parties to the action.[3] As noted above, the Cayman Courts welcome relevant valuation information from third parties.

Moreover, Petitioners are making the Section 1782 Application only after having been provided with access to the Company's disclosures as provided in the data room in the Appraisal Proceeding, and after the Cayman Court has ruled on the scope of discovery in the Appraisal Proceeding. (*See* Heaver-Wren Decl. Exs. 5 & 6; Heaver-Wren Decl. __). The discovery Petitioners are seeking is relevant to the Appraisal Proceeding and granting the Application would not conflict with or circumvent any proof-gathering restrictions in the Cayman Islands.

D. The Requests are Narrowly Tailored

The fourth *Intel* factor requires this Court to determine whether the Subpoena is "unduly intrusive or burdensome." *See Intel*, 542 U.S. at 265. Respondent will not be able to establish that the Requests are unduly intrusive or burdensome, as the Requests in the Subpoena are each narrowly tailored in time and scope to seek only information relevant to the Appraisal Proceeding. The Requests focus on analyses of the Company in the possession of Respondent, including forecasts of the Company's performance, cash flow projections, and any valuations of the Company. Further, the Requests use a narrow time period that is limited to the period during which AMG was an investor in Baring and shareholder of the Company's stock and thus would have reason to conduct such analyses. (*See* Heaver-Wren Decl. ¶ 31).

[3] Further, the Cayman appellate court itself expressly held that to the extent that the Cayman litigant "has taken the view that its interests are best served by seeking to obtain the information which it needs by" use of Section 1782, "rather than by proceeding by way of" any procedural devices available in the Cayman action, "it cannot be said that, in making that choice, it is acting oppressively or unconscionably or that its choice amounts to an abuse of the process of the Cayman Courts." (Meeson Decl. Ex. 5 (*Lyxor*, 2009 CILR 553, ¶¶ 57-58)).

To the extent that the Court has concerns that any request may be overly broad, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101; *see also In re Appl. of Mesa*, 878 F. Supp. 2d at 1307 (denying respondent's motion to quash but limiting discovery to communications between respondent and defendant in foreign proceeding); *Weber*, 2007 WL 4285362, at *6 (noting that the discovery requests may be overly broad but as respondents failed to convince the court that the requests were "so unduly intrusive or burdensome to deny the discovery altogether" the court permitted discovery to proceed); *see also In re Emergency Ex Parte Appl. of Godfrey*, 2018 WL 1863749, at *11 (permitting discovery to proceed but limiting relevant time period of subpoena). Accordingly, this factor weighs in favor of granting the Application, and Petitioners are entitled to the limited discovery sought from Respondent.

**III. The Evidence Sought is Relevant and Appropriate**

ln addition to the *Intel* factors, the Eleventh Circuit instructs that courts should also consider whether the application is "made in bad faith," "for the purpose of harassment," or is part of a "fishing expedition.'" *In re Kivisto*, 521 Fed. App'x 886, 888 (11th Cir. 2013). That is, the Court "can deny discovery where the information sought is irrelevant to the causes of action." *Kang v. Noro-Moseley Partners*, 246 Fed. App'x 662, 664 (11th Cir. 2007). In this regard, Petitioners are seeking Section 1782 discovery from a target that was an investor in Baring; it is undoubtedly in possession of documents and information that will assist the Cayman Court's determination of fair value in the Appraisal Proceeding. The Subpoena seeks discovery about a single company on a single issue, thus meeting the standard of whether the discovery sought "could be used" in the Appraisal Proceeding. *Gyptec, S.A. v. Hakim-Daccach*, 2017 WL 6557425, at *9 (S.D. Fla. Sept. 27, 2017), *aff'd sub nom. In re Gyptec S.A. for an Order to Take*

*Discovery Under 28 U.S.C. §1782*, 2017 WL 6559792 (S.D. Fla. Oct. 19, 2017); *In re Gushlak*, 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) (holding that a Section 1782 request, like any other discovery request, is "reasonably calculated" to lead to relevant information if there is "any possibility that the information sought may be relevant to the subject matter of the action"); *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding reasonableness of subpoena that only sought documents which concern "the precise subject matter of the underlying [proceedings]"); *Minatec Finance S.A.R.L. v. SI Grp. Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (granting application with respect to "specifically and narrowly tailored" requests). Nor is the Application based on speculation. *In re O'Keeffe*, 184 F. Supp. 3d 1362, 1371 (S.D. Fla. 2016), *aff'd* 660 Fed. Appx. 871, 874 (11th Cir. 2016); *see In re Ferrer*, 2018 WL 3240010, at *10 (holding that petitioner's section 1782 application contained requests that were relevant and went to the heart of the matter, thus the court permitted discovery and any disputes regarding confidentiality could be dealt with using a traditional protective order); *In re Furstenberg Finance SAS*, 2016 WL 10707012, at *6–7 (S.D. Fla. July 27, 2016) (holding the 1782 application was not a "fishing expedition" as petitioners would soon initiate a foreign proceeding and the discovery requested would aid in that foreign proceeding); *In re NRC Holding, Ltd.*, 2015 WL 541770, at *2 (S.D. Fla. Feb. 10, 2015) (rejecting respondent's argument that the 1782 application was a "fishing expedition" to supplement "claims they have yet to define in the Irish Proceedings" because § 1782 "does not purport to impose a requirement that a foreign proceeding be at a certain stage prior to discovery being granted").

As an extremely sophisticated asset management firm, Petitioners' inference that AMG possesses documents analyzing the value of the Company is eminently reasonable. In fact, as a

publicly traded company, AMG likely owes its investors a duty to undertake such analyses of its investments.

**IV. Expedited Consideration of Petitioners' Application is Warranted**

This Court may grant Petitioners' Application on an *ex parte* basis. *See, e.g., In re Appl. of Consorcio Ecuatoriano*, 747 F.3d at 1267 ("[T]he district court granted the ex parte application."); *In re Appl. of Alves Braga*, 789 F. Supp. 2d 1294, 1303 (S.D. Fla. 2011) ("There is nothing inappropriate about an ex parte application under this statute. In fact, in the Court's experience, most applications filed here in this district are submitted on an ex parte basis."). Petitioners additionally request that this Court require Respondent to raise objections, if any, to the perceived burdensomeness of Petitioners' subpoena within seven days, instead of the time by which the Respondent may otherwise respond to the subpoenas once served. *See* Fed. R. Civ. P. 45(d). Such expedited relief is necessary in light of the rapidly approaching deadlines affecting the Dissenting Shareholders' expert discovery. Specifically, as set forth in the Heaver-Wren Declaration, the experts in the Appraisal Proceeding will submit written questions to the Company's management on November 23, 2018, the meeting between the Company's management and the experts will take place in mid-December 2018, and the experts will exchange valuation reports in January 2018. (Heaver-Wren Decl. ¶ 23). Petitioners further request that this Court order that Respondent's time to comply with the Subpoena's Requests for the production of documents shall be within 14 days of this Court's order.

**CONCLUSION**

Accordingly, for the above stated reasons, Petitioners respectfully request that this Court grant their application for judicial assistance pursuant to 28 U.S.C. § 1782, and issue an order in substantially similar form to the proposed order attached hereto as Exhibit 4.

Dated: Miami, Florida
October 18, 2018

NELSON MULLINS BROAD AND CASSEL

By: */s/ Mark Raymond*
Mark Raymond
Fla. Bar No. 373397
Mark.Raymond@nelsonmullins.com
Jonathan Etra
Fla. Bar No. 686905
Jonathan.Etra@nelsonmullins.com
2 South Biscayne Boulevard
21st Floor
Miami, FL 33131
*Attorneys for Petitioners Stockbridge Fund, L.P.; Stockbridge Absolute Return Fund; OME Holdings LLC; Pembroke Way LLC; Standish Road LLC; Quadre Investments, L.P.; and Holdings, LLC*

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
*Attorneys for Petitioners Stockbridge Fund, L.P.; Stockbridge Absolute Return Fund; OME Holdings LLC; Pembroke Way LLC; Standish Road LLC; Quadre Investments, L.P.; and Holdings, LLC*

LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0864
*Attorneys for Petitioner Tablet Holdings, LLC*