UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br><br>QUADRE INVESTMENTS, L.P.,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 18-mc-______ |

**EXPERT DECLARATION OF NIGEL KEITH MEESON QC IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

I, NIGEL KEITH MEESON QC, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Nigel Keith Meeson QC and I am a partner in the offshore law firm Conyers Dill & Pearman and the head of Asia Disputes and Restructuring based in the Hong Kong Office at 29th Floor, One Exchange Square, 8 Connaught Place, Central.

2. I was called to the Bar of England and Wales in 1982 and appointed Queen's Counsel in 2002. I am also admitted to practice in California (1990), the Cayman Islands (2007), and BVI (2008). I am a Registered Associate in Bermuda (2015) and a Registered Lawyer with the Singapore International Commercial Court (2015).

3. I graduated with first class honours in jurisprudence from Magdalen College, Oxford in 1981. I am a Fellow of the Chartered Institute of Arbitrators (2006) and accredited as a mediator by CEDR (1993). I was a visiting lecturer at University College London from 1994 to 2005, a Recorder in England and Wales from 2002 to 2013 and an acting Grand Court Judge in the Cayman Islands from 2007 to 2015. I am a member of the panel of arbitrators for both HKIAC and SIAC.

4. Between 2007 and 2015 I was head of the Cayman Islands litigation and restructuring practice for Conyers Dill & Pearman, and I continue to advise and provide expert evidence on Cayman Islands law from Hong Kong.

5. I have been engaged by Messrs. Mourant Ozannes and Appleby to provide expert evidence of Cayman Islands law to be used in an application under the provisions of 28 U.S.C. §1782 in connection with an action in the Cayman Islands concerning Nord Anglia Education, Inc. (the "**Company**") Cause no. FSD 235 of 2017 (IKJ) (the "**Cayman Proceedings**").

6. That action is brought by the Company, pursuant to section 238 of the Companies Law ("**s.238**"), for the purposes of seeking the Court's determination of the fair value of the shares of those shareholders who have exercised their right to dissent from the merger of the Company and Bach Acquisitions Limited (the "**Dissenters**").

7. I am instructed that the application under 28 U.S.C. §1782 will seek the following:

a. documentary evidence which is relevant to a determination of the fair value of the Dissenters' shares in the Company, valued as a going concern as at the valuation date, from persons or entities located in the United States that are not parties in the Cayman Proceedings (**"Target Documents"**);

b. depositions of such persons or entities pursuant to rule 30(b)(6) of the Federal Rules of Civil Procedure of relevant witnesses with sufficient knowledge to both authenticate those Target Documents and testify as to the assumptions and other inputs used to calculate the values that are reflected therein, the circumstances under which they were prepared and how they were utilised in the Merger (**"Oral Testimony"**); and

c. written transcripts of such Oral Testimony (**"Transcripts"**).

8. I have been requested to explain for the benefit of the US Court the following aspects of Cayman Islands law:

a. the scope of discovery in the Cayman Islands civil litigation, such as s.238 proceedings, including against non-parties;

b. whether the Dissenters would be able to obtain the Target Documents or Oral Testimony in the Cayman Proceedings, and, if so, how;

c. the nature of s.238 litigation, including the respective roles of the opposing experts and the Court, as well as the Court's expressed views on the nature and breadth of the evidence the Court should consider when determining fair value; and

d. whether the Grand Court would be receptive to judicial assistance from the US Courts and in particular whether the Target Documents, Oral Testimony or Transcripts would be admissible in the Cayman Proceedings.

**The Scope of Discovery**

9. In section 238 proceedings there is no automatic discovery, but the Court may order any party to provide discovery of "*documents which are in their possession, custody or power relating to any matter in question between them in the action*." (Grand Court Rules ("GCR") Order 24 rule 3).

10. "Possession" and "custody" refers to documents which are physically in the hands of the party giving discovery, whatever the capacity in which they are held. For example a bailee or an agent has possession, but a servant would only have custody. Company documents held by an employee or a director or officer of a company would be disclosable under one or other of these two bases.

11. The word "power" broadens the obligation to cover documents which the party does not have in his hands, but has the legal right to obtain them from the person who

does hold them. In *Lonrho v Shell* [1981] 1 WLR 627 (HL) Lord Diplock defined "power" for the purposes of Order 24 as follows at page 635:

> "*a presently enforceable legal right to obtain from whoever actually holds the document inspection of it without the need to obtain the consent of anyone else. Provided that the right is presently enforceable, the fact that for physical reasons it may not be possible for the person entitled to it to obtain immediate inspection would not prevent the document from being within his power; but in the absence of a presently enforceable right there is, in my view, nothing in Order 24 to compel a party to a cause or matter to take steps that will enable him to acquire one in the future.*"

12. The phrase "relating to any matter in question between them in the action" is given a very wide meaning. The Cayman Islands follows the principle set out in the 19th Century English case *Campagnie Financiere et Commerciale du Pacifique v Peruvian Guano Co.* (1882) 11 QBD 55 in which it was held by the Court of Appeal that the rule was not confined to documents which would be evidence for or against a party in the action, but included any document which it is not unreasonable to suppose contains information which may, either directly or indirectly, enable a party either to advance his own case or to damage the case of his adversary. This principle was expressed by Brett LJ in the following way at page 63:

> "*It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which may - not which must - either directly or indirectly enable the party ... either to advance his own case or to damage the case of his adversary. I have put in the words "either directly or indirectly," because, as it seems to me, a document can properly be said to contain information which may enable the party ... either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences*"

13. The "*train of inquiry*" test or "*Peruvian Guano*" test has been adopted in the Cayman Islands see e.g. *Algosaibi Bros v Saad Invs* [2013 (1) CILR 202] and *Renova Resources v Gilbertson* [2011 (2) CILR 148].

14. Although the scope of discovery is broad, it is not unlimited and parties are not permitted to embark upon what the courts have pejoratively termed "fishing expeditions".

15. Section 238 proceedings are no different in principle from any other civil proceedings as far as discovery is concerned. The only unusual aspect is that the issue in the proceedings is a single one, namely the valuation of the shares of the dissenting shareholders. However, within the context of valuation the Courts have said that all documents which may be relevant to valuation should be provided.

16. The Court of Appeal in *Qunar Cayman Islands Limited v Athos Asia Event Driven Master Fund et al* (Unreported CICA 10 April 2018) approved the statement of Parker J at first instance that "*it should be a general obligation of the Company to search for and produce all documents relevant to fair value*" [Paragraph 45]. A true and correct copy of the Court of Appeal's *Qunar* opinion is annexed hereto as Exhibit 1.

17. Similarly in *Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) Martin JA at paragraph 19: "*The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs all information*". A true and correct copy of the Court of Appeal's *Qihoo* opinion is annexed hereto as Exhibit 2.

18. Relevance, as stated above, extends to "train of inquiry" documents, that is to say documents which enable the Dissenters either to advance their own case on valuation or to damage the case of the Company on valuation, or which may fairly lead them to a train of inquiry, which may have either of these two consequences.

19. As far as non-parties are concerned, the court does not have the power to order discovery against a non-party. The power to order discovery is limited to parties.

**Can the Target Documents and Oral Testimony be obtained in the Cayman Proceedings?**

20. Although the Court has no power to order discovery against non-parties, it does have power to order a non-party within the jurisdiction of the Court to produce specified documents or to provide oral evidence at trial.

21. The means by which it would do so is under GCR Order 38 rule 14, pursuant to which the Court may issue a writ of *subpoena ad testificandum* and a writ of *subpoena duces tecum*. However, these must be served personally (Order 38 rule 17). As I am instructed that none of the persons or entities are within the jurisdiction of the Court in the Cayman Proceedings, these provisions are not relevant to the instant application under 28 U.S.C. §1782.

22. I should note in passing that the Court has additional powers to order oral discovery under GCR Order 24 Part II in actions begun by writ, but this does not apply to section 238 proceedings which are begun by petition.

23. In relation to persons both within and outside the jurisdiction, the Court does have power under GCR Order 39 rule 1 to order a deposition to be taken, and may order documents to be produced which it considers are necessary for the purposes of the deposition.

24. Where the person to be deposed is outside the jurisdiction then an application may be made for a letter of request to the judicial authorities of the country where that person's evidence is to be taken or, if the government of that country allows a person to be examined before a person appointed by the Court, the Court may appoint a Special Examiner to take the evidence.

25. However, this power is discretionary and the Court will only exercise it if satisfied that it is necessary in the sense that the witness can give substantial evidence material to the issue and that the evidence cannot be obtained in other ways, such as by a

witness within the jurisdiction or by admissions or documents or an order that evidence may be given by affidavit.

26. In relation to documents, although the Court may issue a letter of request which seeks only documents, the party making the application is not entitled to what is in substance discovery, but "*The letter of request must be confined to particular documents, although these may be described compendiously ...*" see per Nicholls V-C in *Panayiotou & Ors. v Sony Music Entertainment* [1994] Ch.142, 153.

27. Such applications are not common in the Cayman Islands, and where there is evidence located in the United States in my experience it is far more common for litigants in the Cayman Islands to use 28 U.S.C. §1782. This is a route which is often used by Cayman Islands liquidators of Cayman companies, such as investment funds, where the managers and other service providers to such funds are often located in the United States.

28. Thus the power would be both of limited application to the present case and, as I show below, has not limited the Cayman Courts' receptivity to the use by parties before it of the tools provided by 28 U.S.C. §1782.

**The nature of s.238 litigation**

29. Section 238 litigation is unusual in that the Court is under a statutory obligation to determine the fair value of the shares of the Dissenters and that is the only issue in the case, but otherwise it is no different in principle to any other civil litigation.

30. This was made clear by the Court of Appeal in *Shanda Games Limited* (unreported 6th March 2018 CICA), a true and correct copy of which is annexed hereto as Exhibit 3, where Martin JA said:

> *"Essentially, the proceedings affect only those who have taken issue with the merger price, so that there is in reality a lis between them and the company. The purpose of the proceedings is to resolve that lis, and in that respect a section 238 petition is no different from ordinary litigation. Moreover, Shanda's argument ignores the process by which the determination of fair value is to occur. Since the fair value is not necessarily the same as the*

> *merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of section 238 proceedings is no different in nature from carrying it out in ordinary inter-partes litigation. In ordinary litigation, and in section 238 proceedings, the court will determine generally, or on an issue by issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts. The process, however, is one that will be familiar to most judges. The fact that the outcome of the process in a section 238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input."*

31. Unlike the Vice Chancellors in Delaware, the Cayman Islands Financial Services Division Judges do not consider themselves to be experts in valuation and so are very much guided by the valuation experts called by the parties to give evidence. In *Qunar Cayman Islands Limited v Maso Capital Investments Limited and Others* (Unreported 20th July 2017 Parker J), a true and correct copy of which is annexed hereto as Exhibit 4, the Court explained it thus:

> *"in determining fair value the Court is not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically require access to relevant historical data, documents and information relating to the Company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to trading in the future and not only those that have been publicly disclosed (or disclosed to advisers in the course of the take-private process)."*

32. It follows from this passage that the scope of discovery in s.238 proceedings is broad. It encompasses anything that has any bearing on the value of the company or could lead an expert on a train of inquiry regarding an issue relevant to valuation.

33. The Court of Appeal in *Qunar* (referenced above) made clear that documents in the hands of persons other than the Company are relevant and that for the Court to arrive at the right valuation it must be exposed to all the relevant material. The Court was considering whether the Dissenters should give discovery. Rix JA put it as follows:

> "65. … *The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. …*
>
> 74. … *value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "getting it right" is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.*
>
> 75. *if dissenters have in their possession, as they are likely to so, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words, documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies; and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. ..."*

These remarks are of obvious applicability not only to Dissenters, but to any Third Parties who may hold such relevant documents.

**Receptivity to Judicial Assistance and Admissibility of Evidence**

34. Under Cayman Islands law evidence is admissible in civil proceedings if it is relevant and is not otherwise subject to an exclusionary rule of evidence.

35. The threshold for relevance is low. In *Vernon v Bosley* [1994] PIQR P337, Hoffman LJ said at page 339 that:

> "*The cardinal principle of admissibility is relevance. But relevance is always a matter of degree. How relevant must evidence be in order to be admissible?*

> *Ordinarily, the threshold is very low. ... But there are limits to the extent to which the parties can be allowed free rein*".

36. The only exclusionary rules which could have any real application to s.238 proceedings would be the rules regarding privilege and possibly, in an unusual case, the rule against self-incrimination.

37. Thus *prima facie* any evidence obtained through the mechanism of an application pursuant to 28 U.S.C. §1782 will be admissible in the Cayman court.

38. The Cayman court has in fact considered the use of 28 U.S.C. §1782 in connection with Cayman Islands proceedings and held that it is permissible for a litigant to exercise any rights it may have under 28 U.S.C. §1782 to obtain relevant evidence for use in proceedings in the Cayman Islands.

39. In *Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* [2009 CILR 553] the Court of Appeal upheld the decision of the Chief Justice (reported at [2009 CILR 342]) to refuse an injunction to prevent a party from exercising its rights under US law to seek evidence under 28 U.S.C. §1782 for use in the Cayman Islands proceedings. A true and correct copy of the *Lyxor* opinion is annexed hereto as Exhibit 5.

40. The Court of Appeal was particularly influenced by two factors. First, that there was a procedure for oral discovery available in Cayman under Order 24 so that it could not be said that Cayman law was hostile to pre-trial cross-examination. Secondly that the US courts would provide adequate protection against potential abuse of the depositions or oppression of the witnesses. Protection was provided by the Federal Rules of Civil Procedure with the depositions taking place before a court reporter and the deponents would be accompanied by counsel, who could object to any question on the ground that it was embarrassing or oppressive.

41. The Court of Appeal identified the relevant applicable principle being that *prima facie* a party who could invoke a legitimate right under foreign law would be entitled to do so unless it was acting oppressively by trying to rely upon it.

42. It follows that the Cayman Court is certainly receptive to the judicial assistance offered by the application of 28 U.S.C. §1782, and that any relevant evidence obtained thereby will indeed be admissible.

43. It should be noted that in *Phoenix v Lyxor* the Court was concerned with an application under 28 U.S.C. §1782 to depose the other side's witnesses before trial and so there was at least some basis for an argument that to do so could be oppressive. In fact the Court held that the use of 28 U.S.C. §1782 in this manner rather than limit itself to the discovery tools available under Cayman law was not oppressive.

44. In the present case the application under 28 U.S.C. §1782 relates only to third parties and so there is no basis upon which it could sensibly be suggested by the Company that it was oppressive.

45. The question of the admissibility of the transcripts of depositions obtained under 28 U.S.C. §1782 was also considered by the Court of Appeal in *Phoenix v Lyxor*. The Court said:

> "47 *The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court. … no transcript of depositions would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of the deposition transcripts in the course of any cross-examination of Mr. Rosenberg and Mr. Phlipponneau at the trial."*

46. That case concerned a § 1782 application seeking the depositions of persons who were the key witnesses for the Defendant at trial in the Cayman proceeding, so that the hearsay statements of those witnesses would not ordinarily be admissible in evidence, but could form the basis of cross-examination as evidence of previous inconsistent statements.

47. However, in the present case, as the deponents are not witnesses at trial, then the Transcripts may be admissible as hearsay statements under the Cayman Islands Evidence Law provided the requisite notices are given under the provisions of GCR Order 38 Part III.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 7, 2018 at 29F, One Exchange Square, Central, Hong Kong.

**Nigel K Meeson QC**

# EXHIBIT 1

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**
**ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CICA NO 24 OF 2017**
**FSD CAUSE NO 76 OF 2017 (RPJ)**

**IN THE MATTER OF THE COMPANIES LAW (2016) REVISION**
**AND IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED**

**BETWEEN**

**QUNAR CAYMAN ISLANDS LIMITED**

***Appellant***

**and**

1. **ATHOS ASIA EVENT DRIVEN MASTER FUND**
2. **FMAP ACL LIMITED**
3. **BLACKWELL PARTNERS LLC – SERIES A**
4. **MASO CAPITAL INVESTMENTS LIMITED**
5. **SENRIGAN MASTER FUND**
6. **PAG ASIA ALPHA LP**
7. **PAG QUANTITATIVE STRATEGIES TRADING LIMITED**
8. **PAG-P ASIA FUND LP**

***Respondents***

**Appearances:** Petitioner/Appellant: represented by Thomas Lowe QC, Paul Madden and Lachlan Greig instructed by Harney Westwood & Riegels
1st, 2nd and 5th Respondents: represented by Paul Girolami QC and Andrew Jackson, instructed by Appleby
3rd and 4th Respondents: represented by Robert Levy QC and Rocco Cecere and Jessica Bush, instructed by Mourant Ozannes
6th, 7th and 8th Respondents: represented by Nigel Meeson QC and Erik Bodden, instructed by Conyers Dill & Pearman

**Before:**

**THE RT HON SIR JOHN GOLDRING *President***
**THE RT HON SIR BERNARD RIX, JA**
**THE HON SIR RICHARD FIELD, JA**

**Date of Hearing:** **13 November 2017**

**Date of Delivery:** **10 April 2018**

## DISCLOSURE JUDGMENT

**Sir Bernard Rix, JA**

1. This appeal concerns three aspects of disclosure which formed part of a Judgment dated 20 July 2017 and an Order dated 31 August 2017, both of the Hon Mr Justice Parker.

2. The appeal arises in the context of proceedings pursuant to section 238 of the Companies Law (2016 Revision) by which dissenting shareholders (the Respondents) challenge the price offered for their shares in a merger by which Qunar Cayman Islands Limited, the Appellant, a NASDAQ quoted company, was taken private by Ocean Management Merger Sub Limited, a wholly owned subsidiary of Ocean Management Holdings Limited. The Appellant (the "**Company**") continues as the surviving company.

3. The Respondents (the "**Dissenting Shareholders**") between them owned 5.2% of the issued share capital of the Company. The Dissenting Shareholders fall into three groups (the judge below said there were four) each of which has been separately represented. As a result there was a certain unevenness in the quantity of the submissions made on behalf of the Company and the Dissenting Shareholders respectively.

4. The merger was proposed on 23 June 2016, a finalised merger agreement was executed on 19 October 2016, and the merger was approved on 24 February 2017 by a special resolution of the Company's shareholders at an AGM called for that purpose. The Dissenting Shareholders had already given notice in writing of their objection prior to the AGM (pursuant to section 238(2)). As of 28 February 2017 the merger was certified as effective by the Assistant Registrar of Companies.

5. The value of the Company according to the merger price was some US$4.6 billion. This reflected a price per share of US$10.13 (or US$30.39 for American Depository Shares, each representing three ordinary shares). Despite their dissent, the Dissenting Shareholders' shares were cancelled, pursuant to section 238, in exchange for the right to receive the "*fair value*" of their shares.

6. On 24 April 2017 two petitions were filed pursuant to section 238(9) seeking a determination of the fair value of the Company's shares. It was agreed that the proceedings should be consolidated.

7. Directions Summonses were heard on 23 June 2017 before Mr Justice Parker. The Company's appeals concern three aspects of the outcome of those summonses, two of which relate to the disclosure to be given by the Company and the third of which relates to the disclosure to be given by the Dissenting Shareholders. In brief, the Company complains that the Company is being required to give too much disclosure, and that the Dissenting Shareholders are being required to give no disclosure at all.

*Section 238*

8. For present purposes the critical parts of section 238 are as follows:

> *"(7) Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of his shares and the rights referred to in subsections (12) and (16)...*
>
> *(11) At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be fair value."*

*The experts*

9. For the purposes of assisting the parties in relation to disclosure, the Company and the Dissenting Shareholders each appointed experts. My understanding is that these will not be the experts who will ultimately give respective opinions on fair value.

10. The Company appointed Mr Timothy James Reid, of Singapore, and the Dissenting Shareholders appointed Mr Bruno Arboit, of Hong Kong. For the purposes of the Directions Summons, each expert produced two affidavits.

11. In his first affidavit sworn 23 May 2017, Mr Reid spoke to a schedule of documents to be disclosed by the Company. This schedule came to be called Schedule A (because it was so-called as attached to the Company's Summons for Directions). Mr Reid said of this Schedule:

> "*The Schedule is intended to be equally relevant and applicable to both the company and the dissenting shareholders in any given section 238 action. That is, the categories of documents listed are sufficient for either side's expert to produce a robust valuation analysis. In preparing this, I have been careful to acknowledge and take into account the inherent imbalance between the information available to the company and that available to the dissenting shareholders.*"

12. Mr Reid went on to say this about the process of valuation:

> "*...there are five widely recognised and accepted valuation methodologies used to value the total assets of a company or the equity in that company. A decision of which methodology or methodologies to use will be influenced by the purpose of the valuation, the nature of the assets being valued and the relevant available information. In theory all valuations are based on cash flows that are then discounted to reflect the time value of money. Valuations methodologies which do not use the discounted cash flow methodology are, in theory, surrogates for cash flow based valuations. The other four basis recognised methodologies are:*
> *(a) Capitalisation of future maintainable profits;*
> *(b) Notional realisation of assets;*
> *(c) Value of net tangible assets;*

*(d) Capitalisation of future maintainable dividends."*

13. In his first affidavit sworn 9 June 2017, Mr Arboit acknowledged Appendix A as broadly following the categories of documents ordered in other section 238 cases in the Cayman Islands, but he emphasised that such categories should not be regarded as closed. It was "*a good starting point*". He also said this:

> "*28. In my opinion, it is an essential and critical requirement that the Experts be allowed the opportunity to request further documents/information and to have reasonable access to Company management, particularly those involved in the production and finalisation of any management projections or heavily involved in the strategic planning of the business…*
>
> *29. Additionally, companies in different sectors may require different documents in order to produce a report. It is only after an expert has done extensive research on the company, its business model, and competitors within the sector, that the relevance of certain documents might become clear to him/her…*
>
> *36. Additionally, it is unclear why Appendix A limits information to those from within the last three years prior to the date of valuation. I consider that information from a longer time period (usually five years) will be required to clearly demonstrate historical patterns of growth…*
>
> *45. …The experts may also reference fair value by way of comparison with peers (where appropriate) but often directly comparable companies do not exist.*
>
> *46. In my professional opinion, a review of documents is required in order to determine the appropriate methodology/ies…"*

14. Mr Arboit also referred extensively to Cayman Island jurisprudence on section 238 valuations, inter alia to Mangatal J in *Homeinns Hotel Group*, from whose judgment he quoted this:

> "*I am of the view that the additional requirements should relate not only to documents, but also to information…experts are the best judge of what is relevant when it comes to disclosure…*"

15. Mr Arboit next turned to a so-called Schedule B, also attached to the Company's Summons for Directions, in which documents sought from *the Dissenting Shareholders* were set out. As to Schedule B he said this:

> "*53. I do not consider that the documents listed in Qunar's Request for Information – Appendix B, that is documents and information relating to the Dissenters' investment in the Company and internal analysis, are relevant to the determination of fair value of a publicly listed company's shares. The rationale and motivations of each dissenting shareholder in making investment in the Company are not factors that I would take into account in forming my own independent determination of fair value and would have no bearing on my opinion thereof.*
>
> *54. To this end I would not consider any analysis produced by dissenting shareholders to be relevant to a valuation and would not factor their analysis into my valuation (in order to ensure that my valuation was wholly my own). Analyses produced by dissenting are no doubt produced for a variety of purposes, and are likely to be informed by their own methodologies.*"

16. In sum, Mr Arboit, as the expert appointed by the Dissenting Shareholders, was anxious to get the widest possible disclosure from the Company, but repeatedly asserted the irrelevance of the Dissenting Shareholders' documents relating to their investment in

the Company. For this he gave no reason other than his personal anxiety to distance his own opinion from anything revealed from such documentation. He said, no doubt plausibly, that dissenters' analyses are likely to be informed by their own methodologies – but given his own evidence that at this stage methodology remains open and that "*a review of documents is required in order to determine the appropriate methodology/ies*", the fact that dissenters may adopt methodologies of their own can hardly be a factor negative to the relevance of their analyses. It may be noted moreover that among the categories of documents Mr Arboit sought from the *Company* were third-party market and industry reports relevant to the markets in which the Company operates which were included in the order made by the judge in Appendix 2 to his Order as item (l). It is not immediately clear why such third party and industry reports in the possession of the Company are relevant for disclosure by the Company, and not if in the possession of Dissenting Shareholders, even though they may be incorporated in and/or relevant to their own analyses of the Company and its operations.

17. Mr Arboit's first affidavit elicited a response from Mr Reid in his second affidavit, sworn 16 June 2017. He there stated as follows:

> "*14. As an expert valuer it is helpful to consider all forms of valuations of the Company and especially those conducted at or around the time of merger and particularly those that were participating in the market at that time as willing buyers and sellers.*
>
> *15. I understand that all of the Dissenters are hedge funds or private equity firms who specialise in investing in companies prior to a merger or management buy-out. The strategy of these firms is to identify companies where the merger or buy-out has been 'mis-priced', allowing them to make a profit for their investors and clients. Such firms will usually employ experienced securities analysts to identify suitable companies for this type of event-driven investment.*

> 16. *Securities analysts are finance professionals who gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities. They employ a wide range of techniques, from conducting comparisons of similar companies to modifying the figures in a company's annual statements where the analyst spots items in those statements that can be questioned. A securities analyst will typically produce detailed research and valuation reports to justify his or her recommendations in relation to a particular investment opportunity.*
>
> 17. *In my opinion, the views of securities analysts employed by the Dissenters are potentially highly relevant to the issue of the fair value of the Company. While the analysts do not have access to all of a company's internal information, they are able to rely on the large quantity of information that is available generally...It is highly likely that the Dissenters have produced their own sophisticated and informed valuations and analyses of the Company, and in my opinion these are potentially highly relevant due to the experience and expertise of the securities analysts."*

18. Appendix A also includes "*External projections and reports relating to the Company's long-term plans*" and "*Third-party market and industry reports relevant to the markets in which the Company operates*". While such documents would not have been prepared internally by the Company, they can still be relevant for many reasons, including as a cross-check and to compare any inputs and/or assumptions employed. I note again that Arboit 1 does not dispute the relevance of these documents. In my opinion any valuations relied on by the Dissenters would be just as relevant for an expert valuer's purposes as third-party valuations or reports in the Company's possession. As with third-party reports used by the Company, the fact that the reports or valuations originate

outside the Company itself does not prevent them from being useful or relevant for valuation purposes.

19. Mr Arboit also made a second affidavit, sworn 20 June 2017. On the subject of disclosure by the Dissenting Shareholders, he had this further to say:

> "5. *I re-iterate that "the valuers should be valuing as if they are 'inside the company', rather than outsiders" (Arboit 1, paragraph 30). Relevant information for these purposes entails the universe of both public information and private information available to the Company…*
>
> 6. *…to the extent that third-party market reports have been relied upon by the Company (and may have informed the views of the Company's management on the question of valuation), I would consider these reports relevant because in valuing from "inside the company", the Experts will necessarily require full access to the information that may have influenced Company management in its business planning or may underpin the assumptions in any projections.*
>
> 7. *That is not to say that in a determination of fair value I would not seek access to publicly available information beyond that which is known to be (or have been) in the possession of the Company, however this information is available, as it is in the public domain, and can (and should) be sourced independently. Whilst the public documents themselves may be relevant, the opinions of specific investors derived from these public sources are of no relevance and would not inform my valuation. The Experts should develop their own deeper understanding of the true drivers of the intrinsic value of the Company…*

> 8. *...They* [the Dissenters] *will have necessarily performed their analysis disclosure on the basis of publicly available information. That is, they have no more information than the experts would already have access to in the public domain. I consider the request for disclosure in Appendix B to be irrelevant for the purposes of determining fair value because the valuation opinion of the Dissenting Shareholders is precisely that – simply an opinion. That is, an opinion based on less relevant and complete information than the Experts would already have access to by way of the information supplied by the Company..."*

20. I add to these extracts the observation that both Mr Arboit and Mr Reid, beginning with Mr Arboit, cited some jurisprudence, both in the Cayman Islands and elsewhere. However, I will consider that jurisprudence below. The experts may be experts in valuation, but they are not lawyers.

*Schedules A and B*

21. Reference has been made above to Schedules A and B. Schedule A became a document agreed between the experts listing disclosure to be made by the Company: it was annexed to the judge's Order as Appendix 2 thereto. Schedule B, however, was not annexed because the judge determined that anything in the possession of the Dissenting Shareholders was irrelevant. I will refer to the judge's judgment below. It is relevant, however, to set out Schedule B, as proposed by the Company and supported by Mr Reid's evidence:

    1. All documents reflecting or relating to any valuations or similar analyses of the Company that the Respondents prepared, reviewed, or considered, including but not limited to:

1.1 all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company shares;

1.2 any internal valuations of the Company or the Company's shares; and

1.3 any valuations of the Company or Company stock reviewed or considered by the Respondents in connection with this action.

2. A list of any communications that the Respondents had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger;

3. Confirmation of the date the Respondents purchased any or all of their shares in the Company, including the method of purchase;

4. A history of the Respondent's trades in the shares of the Company;

5. Confirmation as to whether the Respondents have ever taken a short position in the Company's shares; and

6. All documents, information and material issued or shared between the Respondents' investment manager and/or investment advisor and the Respondents' Investment Committee for their consideration of the Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications.

22. In effect Mr Arboit was saying that because, in his opinion, Company documents would be *more* relevant or more persuasive than Dissenting Shareholders' documents, therefore the latter had no relevance at all. That is not, to my mind, a sound argument.

*The three issues on appeal*

23. There are three issues raised on this appeal by the Company concerning the judge's Judgment and Order. The first two relate to the extent of the Company's disclosure.

The second relates to the complete absence of any disclosure required from the Dissenting Shareholders.

24. Thus the Company complains about the terms of paragraphs 6 and 11 of the judge's Order. Under paragraph 6, the Company is required to give general disclosure of all relevant documents, beyond that required by Schedule A or Appendix 2 which is the separate subject-matter of paragraph 5. The Company complains that there is no case for such general disclosure. And under paragraph 11, the Company is required to provide such further disclosure and/or information as the experts might require after they have assimilated the first rounds of disclosure. The Company complains that there is no call for such further disclosure, nor, separately, for the right to obtain further information from the Company. The Company submits that this is, inappropriately, to delegate powers to the experts, and to do so on a flimsy basis.

25. I shall set out the terms of paragraphs 6 and 11 below. These are the basis of the Company's first two issues on appeal, which it is convenient to call the "*paragraph 6 issue*" and the "*paragraph 11*" issue respectively.

26. As for disclosure from the Dissenting Shareholders, the Company submits that the judge was wrong to rule that any such disclosure was irrelevant and on that ground to decline to order it.

*The Order and the judgment*

27. The relevant paragraphs of the Order made by the judge are as follows:

> "*5. By 4.00 pm on 4 September 2017 (Cayman Islands time), the Company shall upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents*

*prepared or created in the five year period ending with 24 February 2017 (the* ***"Valuation date"****) set out in* ***Appendix 2*** *together with an index of the same.*

6. *In addition to paragraph 5 above, by 4pm (Cayman Islands time) on 18 September 2017, the Company shall upload any additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date and shall include any such documents in the index.*

...

11. *The Company shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by any Expert for the purpose of preparing his/her own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such requests for information of any Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 5 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party or parties to the email addresses notified in paragraph 10.*

> 12. *The Company by consent agrees to procure that appropriate members of its management team shall be available to meet both Experts, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions..."*

28. Thus it will be seen that the judge provided for disclosure by the Company (i) pursuant to Appendix 2 (by para 5), (ii) 2 weeks later in respect to "*any additional documents...relevant to the determination of the fair value*" (by para 6), and (iii) by subsequent request "*by any Expert for the purpose of preparing his/her own opinion*", albeit "*unless otherwise agreed or directed by order of the Court*" (by para 11). Any expert could also (by para 11) request "*information*", and para 12 "*by consent*" of the Company provides for the manner in which such information might be provided, in addition to the documentary form in which it was to be given or copied to an opposing party's expert under para 11.

29. The judgment explained these orders for production of documents and information as follows.

30. The judge referred to prior cases under section 238, such as *In the matter of Homeinns Hotel Group* (FSD 75 of 2016, unreported 12 August 2016: "*I accept that the experts are to have regard to all relevant documents and information, not just publicly available information*" *per* Mangatal J at para 20); and *In the matter of Integra Group* (FSD 92 of 2014, unreported 28 August 2015, Jones J), from which the judge derived a number of propositions including that "*The experts are the best judges of what information is or is not relevant for their purposes and so a Company should not control what information should be made available to the experts, based upon its own assessment of relevance*" (*per* Parker J at para 17); and *In the matter of Shanda Games Limited* (FSD 14 of 2016, unreported 25 April 2017: where, albeit by consent, the disclosure order "*also provided that all additional documents or information needed*

*and requested by the parties' experts would be made available within fourteen days of receipt of a request*" at para 55 *per* Segal J).

31. The judge also spoke (at para 20 of his judgment) of a submission made by Mr Terence Mowschenson QC on behalf of the Company that there was no power to order general discovery (under Order 24 rule 1) in actions begun by petition (as distinct from actions begun by writ) and that disclosure should therefore be confined to disclosure by request for specific categories of documents under rules 3 and 8 – such as the requests made in Schedule A, which were agreed, and which were all that was necessary, and that "*Further documents would only be provided on request by an expert*" (at para 21).

32. The judge decided otherwise, however (at paras 22ff). He said that disclosure of "*all documents that are relevant to fair value*", on a "*catch-all basis*", after production of specific classes of document agreed, "*is the usual order*" (as indeed the authorities he had cited demonstrate). He rejected the submission that there was no power under the GCR to order general discovery in actions begun by petition. That was in respect of the paragraph 6 issue.

33. The judge then turned (at para 32 of his judgment) to the paragraph 11 issue, which he described as the issue "*whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the Company, to state (and if necessary verify) why the information and documents were relevant.*" Mr Mowschenson had submitted that this requirement was necessary, in the interests of proportionality and to prevent abusive requests.

34. The judge answered this issue, however, in the negative. He said:

> "*36. I approach this case on the basis that all parties will comply with the orders of the Court. They will in their conduct ultimately be regulated by the Court, in the sense that the Court will rule, as it must when asked to do so, on all matters relating to the law and procedure leading up to the trial...*

> 37. *I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr Mowschenson QC has suggested, in order to give the Company some added protection. Since the question of fair value is a matter for the Court's judgment to be reached in the light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to harass the Company, the Court will step in if asked to do so…"*

35. Thirdly, the judge addressed the disputed question of whether the Dissenting Shareholders should give disclosure of their documents (at paras 55ff). Mr Mowschenson submitted that they should, and pointed to the fact that, in a similar situation of the assessment of fair value in Delaware, dissenters were required to give disclosure: *In re Appraisal of Dole Foods Company, Inc*, CA No 9079 (December 9, 2014). On the other side, however, Mr Robert Levy QC said that the decision of Mangatal J in *Homeinns*, to the effect that "*it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery"* (*Homeinns* at para 20), was an end to the matter, and that judges of one division should speak with the same voice.

36. On this issue too, the judge decided in favour of the Dissenting Shareholders. He said that he preferred the evidence on this subject of Mr Arboit over that of Mr Reid. It will be recalled that Mr Arboit said that the Dissenting Shareholders' documents were "*not…relevant*". The judge agreed. He said (at para 69) that "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value*". He said (at para 70) that he preferred the evidence of Mr Arboit that the Dissenting Shareholders' internal analyses "*are not relevant*". He said (at para 73) that "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery*". As for the Delaware case of *Dole*,

he said (at para 75) that he would pay close attention to the decisions of the Courts in Delaware on matters of substantive law "*given the similarity of the jurisprudence and the actual words used in section 238*". But not on matters of procedure, where care had to be taken that Delaware law was consistent with Cayman law and practice. He concluded (at para 76):

> "*Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a section 238 case. This is in keeping with the approach both in* ***Integra*** *and* ***Homeinns****. It follows that in my respectful opinion that Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way…*"

*The first issue, concerning paragraph 6 of the Order: submissions*

37. On this appeal, Mr Mowschenson QC, although present in court to present a different appeal on behalf of the Company, was replaced by Mr Thomas Lowe QC. It was suggested that this was because Mr Mowschenson had conceded the paragraph 6 and paragraph 11 issues below, before the judge.

38. Be that as it may, Mr Lowe submitted on behalf of the Company that there should not be automatic or "*blanket*" disclosure of all relevant documents in an action begun by petition; that discovery should be by requested categories under Order 24 rules 3, 8 and 14, not rule 1, and that such requests had to be justified as necessary and proportionate; and that in any event production should not be ordered unless so justified.

39. On behalf of the Dissenting Shareholders, Messrs Girolami QC, Mr Levy QC and Mr Meeson QC all submitted that the judge was right, inter alia because paragraph 6 had been agreed below between the parties. It was true that in para 20 of his judgment, Parker J had mistakenly suggested that paragraph 6 was in issue: but that reflected an earlier stage of skeleton argument, whereas by the time of the court hearing the parties

had agreed on the terms of a "*catch-all*" provision in paragraph 6 of the draft order, in addition to the Schedule A categories for disclosure which had been agreed pursuant to paragraph 5 of the draft order. In any event counsel submitted that the judge had been right, for the reason he proposed, to conclude that a catch-all provision was necessary, as had previous judges before him in section 238 cases.

*The first issue: discussion and decision*

40. To some extent, in their oral submissions the three counsel appearing for one or another of the Dissenting Shareholders, sought to divide up their fire-power so as not to overlap on the three issues. But there was no complete success in this endeavour. In any event, all three had filed full written skeleton arguments. This had the effect of somewhat overwhelming the advocacy.

41. Be that as it may, this first ground of the Company's appeal was wholly undermined by clear evidence that the Company had conceded the catch-all provision of paragraph 6 below. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier section 238 cases.

42. Thus, a travelling draft of what was ultimately agreed as paragraph 6 demonstrated that the Company had accepted paragraph 6 and had made some (albeit relatively small) changes to it.

43. In any event, it is clear that rule 3 applies in any proceedings ("*whether begun by writ, originating summons or otherwise*") and allows the court to make an order for general discovery. It is unlike rule 7 which is concerned with discovery of particular documents. Whereas rule 7 requires an affidavit from the requesting party, rule 3 does not. And although it is true that production goes beyond discovery and inspection, and that production will only be ordered where necessary, it is likely to be an unusual case where the documents discovered as being relevant go beyond what is necessary for production – even if that can of course happen where disclosure is vast and goes well beyond what is necessary for a fair trial of the proceedings, especially on matters of only tangential interest. Because of discovery by list, it will be open to the parties to anticipate how

much actual production will be necessary. Where there is a dispute, rule 14 makes it clear that the burden is on the party seeking production.

44. In the present case, however, it was agreed that the relevant documents, whether under paragraph 5 (Appendix 2 documents) or under paragraph 6 (the catch-all provision) were not merely to be discovered by list but "*uploaded*" ie produced.

45. In a section 238 fair value proceeding, moreover, such an attitude to the Company's disclosure obligations is entirely understandable. It is the Company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment. Although independent experts may make a good start at categorising likely documents for disclosure, as has been done in Schedule A/Appendix 2, and, subject to the second issue concerning paragraph 11 of the Order discussed below, those experts may usefully be able to follow through with further requests for documentation, it makes good sense for the standard obligation on a party, to make disclosure of its relevant documents, to stand behind such initiatives. The judge said (at para 25 of his judgment):

> "*This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*"

46. In these circumstances, the appeal with respect to paragraph 6 of the Order is dismissed.

*The second issue, concerning paragraph 11 of the Order: submissions*

47. Mr Lowe submitted on behalf of the Company that the process contemplated in paragraph 11 of the judge's Order was "*wholly outside Order 24*". The judge had no power to delegate his powers under Order 24. Rule 7 was the regular process for seeking further specific documents, and that process required support in the form of an affidavit

and was subject to well recognised limitations. In the present case, the Dissenting Shareholders' (new) expert had produced two long lists of additional materials which had every appearance of being an unrestrained catch-all. Moreover, the reference to "*information*" in paragraph 11 was an additional error: it effectively allowed an expert to administer interrogatories, which usually required the specific permission of the court. By delegating its functions to the experts, the court had put it out of its power to control the process of disclosure and interrogatories in a way that circumvented recognised safeguards.

48. On behalf of the Dissenting Shareholders, however, it was again submitted that the Company had agreed to the essential terms of paragraph 11 in the run-up to the hearing before the judge below. This was demonstrated by the travelling drafts of the draft order prior to the hearing, from which it was clear that the Company had agreed both to the concept of further experts' requests for documents and to their requests for information, and had only disagreed on how such requests might be policed. Thus the Company sought protection in the form below (with emphasis added by me):

> "*11. Each expert personally and not through parties' attorneys, can make a request for such additional documents or information as he/she reasonably believes to be relevant to the determination of the fair value of the shares in the Company at the Valuation date and for the purposes of preparing his/her own opinion…*
>
> *12. The Company or Respondent shall respond to the expert request…within 21 days of receipt of such a request unless otherwise agreed. In responding to such request the Company or Respondent may, if they consider appropriate, request further clarification of the request from the expert if the Company or the Respondent is concerned that the request is too broad, disproportionate or not relevant to the determination of fair value…and for the purposes of the expert preparing their own report…*

> 13. *The expert shall respond to any request for clarification…within 7 days of such request providing the clarification requested…*
>
> 15. *The Company may, on 5 days' notice, apply to the Court for an order that the Dissenters' Expert certify by affidavit that the documents sought are both relevant and necessary for him/her to prepare his/her report.*"

49. Ultimately, however, the judge decided in effect, with the aid of prior cases, that the experts were less likely to abuse their position than the Company was. He also inserted into his Order at para 11 the words "*unless…directed by order of the Court*" and made specific reference in his judgment (at para 41) to a liberty to apply, in these terms: "*All parties have liberty to apply to the Court at any stage if the process is not being followed or is being circumvented in some way.*"

50. During submissions, Mr Lowe accepted that the words inserted into paragraph 11, understood as the Court made clear it understood them, namely as a further protection on the part of the Court against any abuse on the part of the experts and maintaining the ultimate control of the Court over the paragraph 11 process, went far and perhaps the whole way to meet the Company's objection to that process.

*The second issue: discussion and decision*

51. In the circumstances, there is little that needs to be said under this heading. Mr Lowe effectively withdrew the Company's appeal against paragraph 11 during the course of submissions. In my judgment, the Company cannot in any event successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the Parties and the Court not only in paragraph 11 of the Order, but also in paragraph 6 (dealt with above) and in paragraph 12 (against which there has been no appeal).

52. In sum, I would dismiss the Company's appeal on the paragraph 11 issue.

*The third issue, concerning disclosure by the Dissenting Shareholders: submissions*

53. In the event, this was the issue which most divided the Parties on this appeal.

54. On behalf of the Company, Mr Lowe submitted that the Dissenting Shareholders' own documents concerning the valuation of the Company were relevant and it was for the Dissenting Shareholders to show why they should not be disclosed. The Company's expert had asked for these documents, as set out in Appendix B, on the basis they were relevant for the purposes of a report on fair value. There was no logic in the judge's rejection of the Company's expert's views in favour of relevance. The judge was wrong to say that the requested documents were irrelevant.

55. On behalf of the Dissenting Shareholders, Counsel supported the judge's decision refusing any disclosure from the Dissenting Shareholders for the reasons he had given. In essence: it was a matter of precedent in the Cayman Islands where in all previous section 238 cases "*disclosure has been a one-way process*"; a conflicting view from Delaware in the *Dole* case could be explained on the basis of a different and broader view about disclosure there, inter alia because disclosure was allowed simply on the basis that it was relevant to credit in cross-examination, which was not the case in the Cayman Islands, and reference was also made to what Segal J had to say about Delaware authorities in *Shanda* at paras 73-80, and in any event it was the law of the forum which prevailed; the question of fair value was a matter for independent experts examining objective data; the views of the Dissenting Shareholders were subjective, based on merely public and incomplete information, and in any event irrelevant as mere opinion, and what was worse opinion from non-experts and non-independent sources; there was no need for any "*reality check*" since experts could be trusted; any documents were likely to be privileged; the judge's decision was a case management decision within his discretion and could not be faulted on any of the limited grounds on which an exercise of discretion could be attacked.

*The third issue: discussion and decision*

56. It was somewhat anomalous that the Dissenting Shareholders devoted much more energy to responding to this branch of the Company's appeal than the Company itself devoted to advancing it. That was not only due to the fact that the Dissenting Shareholders had three separate skeleton arguments and three separate leading counsel duplicating their submissions. However, the point is of substantial importance in section 238 proceedings generally, and arises in the Court of Appeal substantially for the first time.

57. I approach this issue from the point of view that one sided disclosure on the central issue of a case (a fortiori where that issue is one of fair value and the Dissenting Shareholders are only shareholders in the first place because, as professional and sophisticated investors, they have taken a decision to invest in the Company whose value is in issue), is anomalous, unprecedented outside section 238 cases in the Cayman Islands, and prima facie counter-intuitive, and therefore the argument in favour of such one-sided disclosure has to be considered with the greatest of care.

58. I ask myself first what can be learned from previous cases in the Cayman Islands. It appears that, whatever may have been done in practice, the *issue* has only risen in two cases, one of which is cited by the judge and the other of which emerges from one of the skeleton arguments before the Court. The case cited by the judge is *Homeinns*, a decision of Mangatal J which he cited at para 12 of his judgment and referred to again at paras 61 and 75. I repeat the relevant part of her judgment (at para 20 thereof):

> "*Further in my judgment it is not appropriate to make a standard order under order 24 of the GCR for disclosure by both parties. In my judgment, it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery.*"

59. The case relied on in Mr Levy's skeleton is *Trina*. The court does not have a judgment in that case, but Mr Levy has annexed to his skeleton an email dated 25 July 2017 (5 days after the judgment of Parker J in the present case) sent by Segal J to the parities in that case, in which the following appears:

> *"As regards the Petitioner's application for a direction that the Dissenting Shareholders upload to the Data Room and provide discovery of the documents listed in paragraph 7 of the draft directions order dated 4 July, I am not persuaded by the evidence relied on by the Petitioner that valuations of third parties based on public information are relevant to a determination of fair value. It seems to me that once an expert has the Petitioner's full records he does not need to see and nothing helpful could be gained by reviewing such third-party valuations. Nor do I consider that the other documents referred to in paragraph 7 (being information relating to the Dissenting Shareholders' investment in the Petitioner and the Dissenting Shareholders' internal analyses) are relevant to the determination of fair value of a publicly listed company's shares."*

60. The trouble with these views, as it seems to me, are as follows. Mangatal J's only reason for her conclusion is that discovery from dissenters "*is not in keeping with the purposes of section 238*". However, she does not explain, and I can find nothing within section 238 to explain, why any discovery from dissenters is inappropriate or not in keeping with the purposes of section 238. As for Segal J's views, he is equally against disclosure of "*valuations by third parties*" and dissenters' "*internal analyses*". As for the former, he says that the experts do not need them; as for the latter he says simply that they are "*not relevant*". Nevertheless, both experts in this case are agreed that third party valuations are relevant and helpful, and, where in the possession of the Company, should be disclosed; and at any rate Mr Reid is of the opinion that Schedule B documents, which include the Dissenting Shareholders' analyses, are also relevant and will assist him for the purposes of a report. Segal J gives no reason for his statement that such documents are irrelevant. In my judgment, if third party valuations in the possession of the Company are relevant, so are third party valuations not in the possession of the Company, but, for instance in the possession of the Dissenting Shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the Company (or for the Company as a whole): and that question is closely related to valuations

conducted within the market generally. And if that is the case, then analyses and valuations conducted by the Dissenting Shareholders, which may well in any event be based in part on "*third party*" valuations, assessments and analyses, are as relevant as any such valuations, assessments and analyses, or even more so for the very reason that the Dissenting Shareholders are not merely potential investors, but actual investors in the Company. They are active members of the market who are willing to put their money where their analysis is.

61. I conclude therefore that prior decisions in the Cayman Islands are of very little assistance to this Court.

62. I also remind myself that the Dissenting Shareholders' counsel, when asked, could cite no other jurisprudence, in the Cayman Islands or in the United Kingdom, in which wholly one-sided discovery has been tolerated or practised, outside section 238 in the Cayman Islands.

63. Next I go to the jurisprudence of Delaware, which has had long familiarity with the concept of fair value in the context of dissenting shareholders and a statute with similar wording to section 238. Reference was made to the case of *Dole* before the judge, and in the Dissenting Shareholders' skeleton arguments before this Court. A significant part of the judge's judgment below consisted in setting *Dole* aside as throwing any light on the issue before this Court. Mr Lowe did not refer to it in his submissions, but that as it seems to me does not relieve this Court of the need to consider whether the judge was justified in what amounts to his disparagement of that case for present purposes. I do not, however, take any account of *Dole* as constituting any authority or precedent. In any event it comes from a separate jurisdiction. However, I cannot ignore considerations which are addressed in *Dole* as though such matters did not exist in the world. That would be to shut my eyes to the realities of life.

64. What I find in *Dole* is a sophisticated, well-informed, modern, judgment (delivered in 2014), with extensive citation of jurisprudence. The current issue, of disclosure by dissenting shareholders, is considered in real depth, unlike the brief assertions made in the Cayman Islands jurisprudence cited above. I assume that the Delaware law of

discovery is broader than the law in the Cayman Islands, and that it also allows discovery going to credit, which is not the law in the Cayman Islands or in English law. I therefore fully understand that in these respects Delaware jurisprudence will be an unsafe guide. I will also assume, for the sake of argument, that experts in Delaware may be less conscious of the need to assist the Court as distinct from promoting the interests of the party appointing them, than will be the case in the Cayman Islands (or from wherever the experts in Cayman Islands cases may be brought). Nevertheless, a reading of *Dole* demonstrates that its reasons for requiring normal cross-party disclosure go much deeper than could be explained by those factors. I cite passages in Vice Chancellor Laster's Opinion to exemplify the power of its reasoning (but omitting the extensive footnotes):

> "*Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners. These decisions recognize that the pre-litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They are also relevant to issues of such as the appropriate inputs and considerations for valuation methodologies…*
>
> *The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts…In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden…*
>
> *…In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when the parties have retained valuation experts and the court relies on their opinions when determining fair value, the court*

*has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible...*

*...Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be "helpful to...the determination of a fact in issue," namely the determination of the fair value of Dole..."*

*Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel...*

*The petitioners' internal, contemporaneous valuations are real-world assessments by "astute investors" who must "back their beliefs with their purses". Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts...*

*Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly,*

*academic studies have shown that experts unconsciously reach higher or lower results depending on whether they represent the plaintiff or the defendant due to cognitive phenomena like attachment bias. It is helpful to check an expert's litigation-driven work or a party's litigation-inspired arguments against other valuations, particularly pre-litigation analyses...*

*Discovery into the petitioners' analyses also should help promote settlement...Access to both sides' pre-litigation valuations should help de-bias the litigation positions, constrain the range, and promote settlement..."*

65. Irrespective of the foreign source of these remarks, I consider there is wisdom in them. It has been my experience in cases in which experts, and share valuation experts, play a significant or dominant role, that such experts, however professional and loyal to Court or tribunal rather than party, always tend to diverge from each other in favour of their appointing party. It has also been my experience in share valuation cases that there can be much room for issues on the facts of a company's history, its financial performance, the validity of its predictions, projections as to the state of an industry, or markets, or products, or technological developments, and so on. However important a company's own documents may be on such matters, the company and its personnel and advisors have no monopoly on understanding of or insight into the world in which the company operates. The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. Moreover, it must be remembered that the documents of investors prior to litigation are not driven by the litigation itself but by their willingness to put their own cash to work in support of those findings and evaluations. There is a reality to that which must not go unrecognised.

66. I turn next to the evidence of the experts involved in the current stage of these proceedings, Mr Reid and Mr Arboit. In a nutshell, Mr Arboit says that the Dissenting Shareholders' documents cannot be relevant, Mr Reid says that they are likely to be highly relevant. Mr Arboit says that he would prefer to distance himself from them (because as I understand it, they are the documents of his appointing party), whereas Mr Reid says that he would use them as being relevant for the purposes of his report. The judge accepted the evidence of Mr Arboit and rejected the evidence of Mr Reid. Why? In my respectful opinion, there is something unbecoming about an expert appointed by one party opining that its appointing party's documents *cannot* be relevant; and there is something unfortunate in a judge at a merely interlocutory stage choosing between the differing views of the experts, when it will only ultimately be at trial, and in the light of adequate disclosure and of experts' reports that an objective position is capable of satisfactory evaluation.

67. It is often the case that at the *procedural and interlocutory* stage of disclosure, one or other party to a dispute seeks to take up an extreme position about the irrelevance of some category of documents, when what it is really doing is making an unwarranted assumption about the final outcome of the *substantive* arguments raised in the parties' dispute. Courts have to be wary of that approach, for otherwise they may find themselves taking up a final position about some aspect of the argument before they are in a position to do so. Something of that kind seems to me to be going on in this case. The Dissenting Shareholders, who want to focus on the Company's own internal documents, almost to the exclusion of any other documents (I will revert to that "*almost*"), does so because that approach best suits their case that the Company is the most knowledgeable judge of its own affairs. No one else can be privy to as much of its own information as itself. Public information is all very well, but that is only half the story. Because only the Company is privy to all the information, both public and internal, the Dissenting Shareholders point to the Company's own submission (even if that is not accepted) that its view of its own value has a precedence which cannot be challenged by anyone with only a partial view. Therefore the views of others are irrelevant. And saying that the views of others are irrelevant, involves also saying, albeit implicitly, that their views of everything which goes to make up a business's value is irrelevant: not only their ultimate view of value, but every ingredient which goes to

make up that ultimate view, such as the state of the industry, the state of the market, the position of competitors, the state of the Company's products and competing products, the ability to predict the future, the discount which has to be made for that uncertainty, the cost of capital, both loan and equity, and so on and so on. But the implicit theory of the Company's submissions, supported by Mr Arboit, is that everyone's views on all these matters are irrelevant.

68. Except, (and I now come to that "*almost*"), that Mr Arboit, although he seeks to make that case of total irrelevance, inter alia by talking about valuers valuing "*as if they are 'inside the company'*" (see above at para 18) – in itself an arguably controversial concept, unless all it means is that the Company's internal documents have to be considered as of significant importance, but I doubt that that is all it means – nevertheless still has to accept that he would take into consideration as potentially relevant both (a) "*third-party market reports…relied upon by the Company*", and (b) "*publicly available information beyond that which is known to be (or have been) in the possession of the Company*": but even so *not*, he says, (c) the reports of specific investors, which "*are of no relevance*" (*ibid).* This does not make sense to me: if the reports of third parties should be taken into account, I do not understand why the reports of specific investors should not also be taken into account. They are part of the market, they are third parties so far as the Company is concerned and were in every sense third parties immediately before their investment, and their reports are likely to be all the more pertinent in that they are likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers but ready to act on their own research and scholarship (see Mr Reid's second affidavit cited at para 17 above). In these circumstances, I do not understand Mr Arboit's view that only these reports are irrelevant, or, with respect, why the judge was willing to act on that view. I respectfully consider that the judge was wrong to do so, and wrong in principle to find any support in Mr Arboit's view for a totally exceptional exclusion of any obligation of disclosure from one party.

69. Mr Arboit, of course, had to accept that third party reports were relevant, because he had put his agreement to asking the Company to produce inter alia "*third party and*

*industry reports relevant to the markets in which the Company operates*" (ex Schedule A/Appendix 2).

70. Moreover, I find it inconsistent that the judge was willing to accept, under the regime provided for in paragraph 11 of his Order, that the view of *either* expert as to further documents or information to be provided by the Company was sufficient, subject to the order of the Court, for the Company to have an obligation to provide such material, whereas he was not willing to accept Mr Reid's well-reasoned evidence that *he* would require the documents of the Dissenting Shareholders on value to assist him in the preparation of a report on fair value, even if Mr Arboit would choose to ignore them. It is a strong thing indeed, in the face of a general regime for mutual disclosure, or even in the absence of such a regime, to rule at an interlocutory hearing that documents that an expert says that he would find useful in the preparation of his report would not be permitted to him.

71. I would next refer to the oddity of the contrast between the Dissenting Shareholders', Mr Arboit's and the judge's views that *all* factors are relevant to the Court's finding of fair value, and the selection of the Dissenting Shareholders' documents as alone being excluded from that totality. The judge's judgment is replete with references to the width of the investigation leading to the Court's determination of fair value (section 238(11): "*the Court shall determine the value of the shares*"). Thus the judge cites (i) Mangatal J in *Homeinns* that "*In particular I accept that the experts and the Court are to have regard to <u>all</u> relevant documents and information, not just publicly available information*" (at para 12 of his judgment); (ii) Mr Levy's submission that the section 238 cases of *Perfect World; Shanda; Mindray; Bona;* and *Qihoo* demonstrated that "*the Court <u>should not limit in advance</u> the types of documents which the expert should be entitled to see and to call for*" (at para 13); (iii) the proposition which (inter alia) the judge derived from the judgment of Jones J in *Integra* to the effect that "*Section 238 does not dictate any particular valuation methodology...fair value should be proved by <u>any</u> techniques or methods which are generally considered acceptable in the financial community*" (at para 17); (iv) his own view that "*it should be a general obligation of the Company to search for and produce <u>all</u> documents relevant to fair value*" (at para 25); (v) Jones J in *Integra* that "*The one true rule is to consider <u>all the evidence</u> that*

*might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgement that can be brought to bear on* *all the evidence and all the factors. I emphasise: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the Courts not by a formula that can be stated in the legislation"* (at para 30); (vi) his own view that "*Since the question of fair value is a matter for the Court's judgement to be reached in the light* of *all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to limit in advance the expert's line of enquiry*" (at para 37: and I would add that what applies to the Company or its expert applies equally to the Dissenting Shareholders or their expert); and (vii) his own view that "*I accept that there may be different approaches and what one expert considers necessary and relevant another expert may not*" (at para 39) (emphasis added).

72. What is then striking is the contrasting approach that the judge takes to (a much smaller number of) documents identified by an expert as relevant documents in the hands of Dissenting Shareholders, a contrasting approach which the judge asserts on the a priori conception that *all* the relevant documents will be held by the *Company* (a proposition which not even Mr Arboit accepts), and that dissenters' documents relating to fair value are irrelevant. Thus the judge repeatedly assumes the conclusion at which he arrives, for he states: (i) "*Since the Company will likely hold all the relevant information which will go to a determination of fair value…*" (at para 31); (ii) "*The Court would require very clear grounds upon which to make such an order [discovery from dissenters]*" (at paras 64/65); "*material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of the merger, is irrelevant…*" (at para 67); (iii) "*although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds"* (at para 68); (iv) "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant*" (at para 69: but he ordered the disclosure by the Company of such third party valuations on the basis that they were relevant, as they were agreed to be by both experts); (v) "*I prefer the evidence of Mr Arboit that* [the requested documents] *are not relevant… "* (at para 70).

(vi) "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery…*" (at para 73); (vii) "*Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way…* "(at para 76).

73. It seems to me that all these statements are at root the same simple assertion of irrelevance. Rather inconsistently, the judge allowed that in exceptional cases some (unidentified) documents might have a special case made for their disclosure from dissenters. But that perhaps merely reflects the judicial caution of "*Never say never*". On the judge's assertion of irrelevance, however, no case could be made, and even if in theory it could be, no one could ever know of what documents to ask for.

74. I have stated my reasons above for respectfully disagreeing with the judge's a priori assertion of irrelevance. In sum, dissenters live in the same world as companies whose fair value has to be assessed. Such companies may have internal information and projections which are not in the public domain, albeit in the case of a listed company like Qunar the room for such private information may be more limited than in the case of unlisted companies. In any event, no one disputes the relevance and potential importance of such companies' documents. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "*getting it right*" is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.

75. In my judgment, it is unhealthy in such a context, and in litigation especially, to form a priori assumptions about relevance. The normal rule is that disclosure is a mutual obligation. Mutuality in this respect is equity and fairness. Of course some litigants may have more of what needs to be disclosed than other litigants. And it is always possible

that the documents of one party will turn out to be of greater influence than those of the other side. But I would need to be clearly persuaded that section 238 litigation is the unique field in which one-sided disclosure ought to be practised, and I would in principle regard that as a heavy task. Counsel have not suggested that there is one-sided disclosure in any other field. I am not persuaded of that extreme and unique position by repeated assertions that only the companies concerned, and not its sophisticated investors, have disclosure relevant to fair value. It seems to me that if dissenters have in their possession, as they are likely to do, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies: and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. In this context I find the evidence contained in Mr Reid's second affidavit, which merits repeated re-reading (see at para 18 above) highly persuasive. At any rate it is arguably highly persuasive, and that is all that is needed at this stage of the proceedings.

76. It is submitted for the Dissenting Shareholders that the judge's decision is an exercise of discretion and not readily amenable to appeal, subject to the usual limited grounds on which the exercise of discretion can be attacked. There are three answers. First, the ruling is not so much an exercise of discretion (for instance in relation to particular documents) as a decision of law (as to relevance) and/or principle. The fact that the judge allowed the remote possibility that in some (unexplained) case a dissenter could be made to disclose a document in exceptional circumstances does not change the reality of the judge's rationale. Secondly, however, even if his decision were a matter of discretion, the judge has erred fundamentally and in principle, by creating a unique field for one-sided disclosure. Thirdly, the judge wrongly considered himself to be following in the line of established precedent, in the form of Mangatal J in *Homeinns*, and even if not strictly binding on him: but it is clear to me that her assumption, that section 238 somehow makes disclosure by dissenters inappropriate, cannot carry weight.

77. Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in section 238 proceedings, albeit judgments only at the permission to appeal stage. The first is *Qihoo 360 Technology Co Ltd v. Maso Capital Investments Limited & Ors* (CICA no 20 of 2017, 9 October 2017), where permission to appeal against disclosure by the company concerned was refused, but this Court (Martin JA, Newman JA and Morrison JA) ended by warning of the possibility of abuse by dissenters conducting "*a 'drains up' inspection of the entire business regardless of the relevance to fair value*" (at para 27). The second is to the permission to appeal judgment of Martin JA in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of section 238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a section 238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the Company, provided that they are properly held subject to the control of the Court, which will wish to prevent anything abusive or disproportionate. However, there would to my mind be a danger of abuse in a situation where one sided disclosure is demanded of a company, on matters of relevance to fair value, but dissenters are given carte blanche to address any arguments on fair value they wish or can, free of any discipline that would be imposed by having, where necessary, to present to the experts and ultimately to the Court their own documents on matters of relevance to fair value, which must inevitably exist.

78. Thus Dissenting Shareholders in this case have not submitted that they do not possess the documents which they have been requested to disclose pursuant to Schedule B. The list of documents within Schedule B is a short list, and certainly not a difficult list to answer, and there is nothing disproportionate about that list. It has not been suggested that there is. The list has been sanctioned by the Company's expert.

79. Even so, item 5 is not so much a request for documentation as a request for information, and I would not allow that. Item 4 could be reflected in documentation, but it is much simpler if the position is simply scheduled, as requested. If the schedule is challenged, the Dissenting Shareholders should stand ready to confirm it by documents.

(Incidentally, the idea that Dissenting Shareholders should not be required to disclose their dealings in the shares of a section 238 company seems to me to be inexplicable.) Item 4 may incidentally answer the question in item 5. Item 2 should be confined to communications regarding the value of the Company or its shares. Item 1.3 should be amended to read "*in connection with the above*" rather than "*in connection with this action*".

80. Subject to the above paragraph, I would therefore allow the Company's appeal under this third issue.

*Conclusion*

81. In sum, I would dismiss the Company's appeal on the first two issues, against paragraphs 6 and 11 of the Order, but allow the Company's appeal on the third issue, concerning discovery from the Dissenting Shareholders, so as to grant discovery as set out in Schedule B to the draft order, subject to the detailed comments at para 79 above.

**Sir Richard Field JA**

82. I agree.

**Sir John Goldring P**

83. I also agree



# EXHIBIT 2

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**

**ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CICA NO. 20 OF 2017**

**(ON APPEAL FROM CAUSE NO FSD 129 OF 2016 (IMJ))**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**AND IN THE MATTER OF QIHOO 360 TECHNOLOGY CO. LTD.**

**BETWEEN:-**

**QIHOO 360 TECHNOLOGY CO. LTD.**

**Petitioner/Proposed Appellant**

**-and-**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC- SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR AND ON BEHALF OF CROWN/MASO SEGREGATED PORTFOLIO**

**Respondents/Proposed Respondents**

BEFORE:

**The Honourable John Martin QC, Justice of Appeal**
**The Honourable Sir George Newman, Justice of Appeal**
**The Honourable Dennis Morrison, Justice of Appeal**

Appearances:

Madeleine Heal, James Elliott and Dhanshuklal Vekaria of Harneys for the Proposed Appellant. Robert Levy QC instructed by Nicholas Dunne and Rupert Bell of Walkers for the Respondents.

Hearing and Judgment: 31 August 2017
Reasons released: 9 October 2017

MARTIN JA:

1. On 31 August 2017 we refused the applicant Company leave to appeal against an order ("the Order") dated 27 July 2017 of Mangatal J. These are our reasons for that decision.

2. The Order was made in the context of a petition brought by the Company under section 238 of the Companies Law (2016 Revision). That section entitles members of certain Cayman companies who dissent from a merger or consolidation to be paid the fair value of their shares. In default of agreement, the fair value is to be determined by the Court. The respondents are members of the Company who have dissented from a merger of the Company. They are referred to in these reasons as "the Dissenting Shareholders".

3. Proceedings under section 238 present two particular difficulties to the courts. First, all or nearly all of the financial information necessary to enable the Court to determine the value of a company's business, and hence of its shares, will inevitably be held by the company itself. The proper conduct of the valuation exercise will accordingly require

that the company make adequate disclosure of that information. Secondly, although the task of determining the value is one for the Court alone, the Court will not usually be equipped to derive a value from the financial information without expert assistance. The consequent importance of the expert evidence means that the Court must have confidence that the valuations proposed are based on sufficient information; and that in turn means that the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations. Although care must be taken to ensure that this autonomy is not abused (a point to which we return at the end of these reasons), in general we agree with the statement of Jones J in *In the matter of Integra Group* [2016] (1) CILR 192 at [11] that "the experts are the best judge of what information is or is not relevant for their purposes".

4. In the present case, these two difficulties were initially addressed by the making of a consent order (dated 25 October 2016), which in relevant part was in the following terms:

"IT IS ORDERED that:

1. The Petitioner shall, by 4.00 pm on 1 November 2016 (Cayman Islands time), open an electronic data room (the "Data Room").
2. The Data Room shall be accessible to each of the parties and the parties' respective advisors, consultants and experts for inspection of the documents contained therein each upon the entry into [a confidentiality agreement].
3. ...
4. By 4.00 pm on 18 November 2016 (Cayman Islands time), the Petitioner shall upload to the Data Room all documents (of whatsoever description, whether electronic, hardcopy or any other format) and communications (whether by email or otherwise) and other materials which are or have been in their respective possession, custody or power and which are

relevant to the determination of the fair value of the shares in the Petitioner as at 30 March 2016 (the "Valuation Date").

5. Provided that such documents are within the possession, custody or power of the Petitioner, paragraph 4 shall include for the avoidance of doubt the following categories, namely all documents and communications (including, without limitation, emails):

   (a) previously provided to or obtained from J. P. Morgan Securities (Asia Pacific) Limited or its affiliates (the "Financial Adviser") in relation to the fair value opinion, including those passing between the Financial Adviser and:

      (i) the independent directors or Special Committee of the Petitioner; and

      (ii) the Petitioner's other directors, management, employees, counsel and/or advisers; and

      (iii) the bidding consortium,

   for the purposes of compiling the fair value opinions; and/or

   (b) previously provided to or obtained from the Petitioner's financiers (whether to or from any of the persons mentioned in 5(a) above) for the purposes of securing finance for the merger transaction (including but not limited to all management forecasts provided to the same); and/or

   (c) previously provided to or obtained from the bidding consortium or former members thereof (whether provided to or from any of the persons mentioned in 5(a) or (b) above) or passing between such persons for the purposes of undertaking due diligence on the Petitioner (including but not limited to all management forecasts provided to the same).

6. ...

7. The (a) Petitioner and (b) Dissenting Shareholders shall each have leave to separately instruct an expert witness in the field of valuation in order to opine upon the fair value of the shares in the Petitioner as a going concern at the Valuation Date (both such experts together, the "Experts"). The Experts shall be appointed by no later than 1 November 2016, and on that date each of the Petitioner and the Dissenting Shareholders should advise the other in writing of the identities and email addresses of the respective Experts so appointed.
8. The Petitioner shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by either expert for the purpose of preparing their own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such request for information of either Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 4 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party to the email addresses notified in paragraph 7.
9. The Petitioner shall procure that appropriate members of its management team be available to meet with both Experts together, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions ...".

The consent order then went on to provide for the exchange of experts' reports, for a meeting between the experts, for the provision of a joint memorandum of the experts identifying areas of agreement and disagreement, for the provision of supplemental reports and for the holding of a case management conference after exchange of supplemental reports.

5. The consent order was subsequently amended by further order dated 21 December 2016. The amendments are not relevant to the issues on this application.

6. On 3 March 2017 the Dissenting Shareholders issued a summons for relief in terms of a draft order attached to it. In essence, the draft order provided for preservation of electronic devices and data; for specific discovery "pursuant to Order 24, rule 7 of the Grand Court Rules [and to] paragraphs 4, 5 and 8 of the [consent order]" of documents listed in a schedule containing 44 categories of document, and the appointment of a forensic expert to conduct a search in the Company's IT systems and on its electronic devices for documents containing certain keywords. The 44 categories of document were summarised by the judge at paragraph [28] of her judgment as being documents and communications related to the 2025 Projections; documents and communications to and from, or in the possession of, JP Morgan; documents and communications to or from the Company's financiers; meeting file notes; documents and communications to and from the Buyer Group; internal employee communications, documentation and analysis; Skadden emails; and tax analysis.

7. It was this summons that led to the making of the Order, which is in the following terms:

> "IT IS ORDERED that
>
> 1. The Company shall forthwith take all steps necessary to preserve all computers, servers, network systems, cloud storage,

laptops, back-up tapes, archives, handheld electronic devices or other means of transmitting or receiving or storing data ("Electronic Devices") and all or any data in the Company's possession, custody or power which may be relevant to these proceedings which is held or stored on or by Electronic Devices or similar means in any jurisdiction whatsoever until the conclusion of the cause or further Order of the Court.

2. The Company shall, in the manner hereinafter appearing, give specific discovery pursuant to Order 24, rule 7 of the Grand Court Rules, of (a) all correspondence between the Company and J.P. Morgan Securities (Asia Pacific) Limited ("JP Morgan") regarding JP Morgan's refusal to provide documentation; and (b) all emails from Skadden, Arps, Meagher & Flom LLP in their native format (the actual electronic email with any attachments).

3. The Company shall prepare and serve a list of documents by 21 August 2017, such list to identify all relevant documents including of any electronic file type (and for the avoidance of doubt such documents must include inter alia (whether in hard copy or electronic form on any Electronic Device wherever they may be) memoranda, graphic files, office based documents, drafts, notes of meetings and discussions, including telephone conversations and e-mails (including attachments) or other data sent to or from any e-mail address used by any of the directors, officers or employees or anyone else on its behalf, which relate in any way to the determination of the fair value of the shares in the Company as at the Valuation Date (as defined in the Order for Directions dated 25 October 2016 (the "First Directions Order")) ("Documents") which are or have been in the possession, custody or power of the Company (the "List").

4. The List shall be verified by an affidavit sworn by a director of the Company and such director shall attend in person at the trial of the cause to be cross-examined unless the director's attendance

is not required by the written agreement of the Dissenters or further Order of the Court.

5. Within 7 days following the provision of the List, the Dissenters and the Company shall designate specific key words to be used to search all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for the Documents (the "Keywords").

6. Subject to the provision of appropriate confidentiality undertakings (which, in the event that there is no agreement, the Court shall determine such terms), the Company and the Dissenters shall jointly appoint an independent forensic technology expert (the "Forensic Expert") to conduct an audit of the Company's information technology systems and all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for documents (including but not limited to any documents and/or information in Schedule A to the Summons, save for paragraph 40 of Schedule A to the Summons) containing the Keywords (the "Forensic Audit").

7. The Forensic Expert shall be a person with considerable experience of conducting forensic examination of electronic sources and the appointment shall be approved in advance by agreement of the parties, failing which the Court shall determine the identity of the Forensic Expert on the application of any of the parties.

8. The Company shall provide all such assistance and access as requested by the Forensic Expert, including but not limited to providing access to the Company's information technology systems and all Electronic Devices referred to in paragraph 6 above and to allow the Forensic Expert to take forensic copies and/or image any emails (including attachments) and/or other electronic Documents.

9. The Forensic Expert shall report to the Court and the Dissenters' Cayman Islands attorneys ("Walkers") on a weekly basis, such report to contain details of the progress of the Forensic Audit, including but not limited to what has been searched, the Keywords used, the results of the Forensic Audit, the assistance and access provided by the Company pursuant to paragraph 8 above and any impediments to the Forensic Audit.

10. The Forensic Expert shall provide all results of the Forensic Audit to the Company's Cayman Islands attorneys (“Harneys") on a rolling basis.

11. Harneys shall review the documents obtained from the Search for privilege and shall cause all non-privileged documents to be uploaded to the Data Room (as defined in the First Directions Order) within 3 days of receipt from the Forensic Expert.

12. The Forensic Expert shall give notice to the Court, Walkers and Harneys when the Search has been completed.

13. The time for exchange of experts' reports in accordance with paragraph 11 of the First Directions Order be extended to the date falling four weeks after either the final document has been uploaded to the Data Room pursuant to paragraph 11 above or the Forensic Expert has given notice pursuant to paragraph 12 above, whichever is later.

8. It can be seen that this order has four elements: (a) an order for preservation of electronic devices and data (paragraph 1); (b) an order for specific discovery of two categories of documents, including emails from Skadden, Arps in native format (paragraph 2); (c) an order for service of a verified list of documents (paragraphs 3 and 4); and (d) the appointment of an expert to conduct a search of the Company’s IT systems and electronic devices for documents containing certain key words (the rest of the order).

9. The Company challenges each of these elements, although elements (a) and (d) are dealt with together. It does so on three grounds: that the judge erred in law by failing properly to apply the test for specific discovery set out in Order 24, rule 8; that she was wrong in law to treat the Company's verifying affidavit as not conclusive; and that she was wrong in law to regard the appointment of an independent forensic technology expert as a remedy available under Order 24, rule 7. We deal with these grounds in turn.

*Ground 1: specific discovery*

10. Specific discovery is dealt with by Order 24, rule 7, of the Grand Court Rules. Order 24, rule 8 provides so far as relevant that on the hearing of an application under rule 7 the Court "shall in any case refuse to make such an order if and so far as it is of the opinion that discovery is not necessary either for disposing fairly of the cause or matter or for saving costs".

11. The judge largely rejected the Dissenting Shareholders' application for specific discovery. At paragraph [107] of the judgment, she said that "save for the correspondence regarding JP Morgan's refusal to provide documentation, and the Skadden documents, in my judgment the Dissenters have not satisfied the standard required for the Court to order the specific discovery sought in paragraph 2 of the Summons and as set out in Schedule A. This is because they have not demonstrated objectively the existence of these specific documents or categories of documents".

12. In relation to the two categories of documents in respect of which she did order specific discovery, her reasoning was as follows. As to the JP Morgan correspondence, she said at paragraph [103] of the judgment that "in order to properly understand the context of JB Morgan's letter of 7 April 2017, which has been disclosed, it does seem to me that the correspondence between the Company and JP Morgan's refusal to

provide documentation should be discovered. This is in my view relevant, necessary and proportionate". As to the Skadden emails, she referred at paragraph [104] to the reason given by the Dissenting Shareholders for asking for the documents in native format, namely that the versions disclosed were in PDF format and only if the emails were uploaded in their native format would the experts be able to see the attachments. At paragraph [105] she rejected the Company's assertion that the Skadden emails were not in its power, possession or custody on the grounds that, since Skadden were the Company's former attorneys, the Company was entitled to seek the documents from its attorneys. She then set out as follows two reasons quoted as to Skadden's stance:

> *"It is not protocol to provide "native" files, especially not to an adversarial party in litigation, due to various reasons:*
>
> *(1) If the documents are provided in their native format, there is no way to place identifying markers on them (e.g. dates stamping is not possible), so there is no way to maintain appropriate control over the documents and what is being claimed or discarded as part of the production set.*
>
> *(2) Additionally, when documents are provided in their native format, all of the information related to the documents, (i.e. the forensics) are inevitably provided, including but not limited to each time it was edited, saved, opened, what edits were made, and the author of the edits. Such information could potentially be privileged and cannot be removed from the documents. We do not provide the forensics unless ordered to do so by a court."*

Finally, at paragraph [106], the judge said this:

> "However, in my judgment, any question of privilege attaching would be the privilege of the client, the Company, to waive, and I therefore accept Mr. Levy QC's submission that the Company ought to be able to compel Skadden to hand over the documents for uploading to the Data Room in their native form. In my judgment

discovery of these documents is relevant, reasonable, necessary and proportionate."

13. The Company complained that, having regard to the evidence filed on behalf of the Company, there was no proper foundation for the judge's conclusion that an order for specific discovery was reasonable, proportionate or necessary. The only possible basis for that view was a statement by the expert engaged by the Dissenting Shareholders, James Nicholson, in a letter dated 10 March 2017, that the information and documents set out in the schedule to the Dissenting Shareholders' summons (which included the JP Morgan and Skadden documents) was "relevant to my assessment of fair value as at the Valuation Date". But, in the words of paragraph [15] of the Company's written submissions, "the learned Judge also failed to take account or any proper account of the fact that the [Dissenting Shareholders] had not said why specific discovery of such documents was necessary for the fair disposal of the proceedings or how their perceived deficiencies in [the Company's] discovery are preventing their expert from preparing his report. Nor did they say how they are relevant to the question of fair value."

14. The judge dealt with this issue extensively between paragraphs [77] and [89] of her judgment. She stated that although in ordinary cases of discovery relevance was not a matter of opinion but was determined by the pleaded issues, in a section 238 petition the sole issue was fair value. The discovery exercise was absolutely central to the proper determination of the value, and experts had a special role to play. She accepted that an expert must express his views as to relevance with independence, and must not allow the instructing party or its attorneys to dictate relevance; but she held at [85] that it would be highly speculative for her to come to the view on this interlocutory application, without cross-examination, that the view expressed in Mr Nicholson's letter was not his own opinion and considered view of

what was relevant for his assessment, and what was needed to complete his work. She considered the Company's submission that it was not enough for Mr Nicholson simply to state that the documents were relevant, but held that the matter had to be viewed against the backdrop of the repeated requests made by Mr Nicholson's firm. She considered also the relevance of the fact that the Company's expert had indicated that he was able to complete his report without the additional documents, but said that that did not have the effect of convincing her that Mr Nicholson was being unreasonable in requesting to see the documents and to obtain the information. She pointed out that experts may differ in approach and also as to the degree of detail or information required in order to give a valuation. Ultimately, she concluded at paragraph [89] that the court was "not in a position to second-guess or to sift through Mr Nicholson's assertion of relevance".

15. In our view, the judge's reasoning on this aspect of the matter is clear, cogent and persuasive, and her conclusion eminently within the range of conclusions open to her. We do not consider that this ground raises any realistic possibility of challenge to her decision.

*Ground 2: verifying affidavits conclusive*

16. The foundation of this ground of appeal is the assertion that affidavits verifying discovery are ordinarily conclusive. The Company relied in particular upon *Lonrho v Fayed (No 3)*, The Times, 24 June 1993, a decision of the Court of Appeal of England and Wales, in which Stuart-Smith LJ gave the leading judgment. The relevant part of the report is as follows:

> "His Lordship concluded that on whatever grounds the order for a further affidavit was made, whether because of some admission by the deponent or the belief of the opposite party that other documents existed, the deponent's oath was conclusive; it could not be contravened by a further contentious affidavit and could not

> be the subject of cross-examination. ... The reasons for the rule were not far to seek. In the great majority of cases where it was alleged that one party or the other had suppressed documents, that issue would be crucially relevant to the issues in the trial and could only be properly determined after the judge at trial had heard all the evidence. To try the issue at an interlocutory stage could involve injustice to both sides."

17. The judge dealt with this aspect of the case between paragraphs [92] and [102] of her judgment. She started by accepting the Company's submission that the verifying affidavits sworn on the Company's behalf would normally be conclusive as to whether or not the Company had in its custody, possession of power any relevant documents other than those disclosed. She said, however, that they would not be conclusive if there had been an insufficiency of discovery which could be established from (a) the pleadings, the list, the affidavit, or documents referred to in them; (b) any other source that constituted an admission of the existence of discoverable documents not previously disclosed; and (c) an apparent exclusion of documents from discovery under a misconception. She said that what had caused her concern was the Company's approach to the discovery process, which had been in instances somewhat careless and cavalier, resulting in incomplete and ineffective discovery. There were areas where the Company had given inconsistent responses to requests, examples of which she identified; and she remarked that some of the variations in the responses were hard to reconcile without full or complete discovery. She referred to instances where the Company had claimed not to have certain categories of documents, but had subsequently disclosed them. One of those instances related to 431 documents concerning the Company's quarterly budgets, which the Company uploaded after the issue of the summons, having previously asserted that it did not create quarterly budgets. In paragraph [102], she said this:

> "in my judgment, the Company has not misunderstood the case or mis-conceptualised it. What it is saying is that a lot of categories of information do not exist and never have existed in document form, which the Dissenters say is incredulous and incapable of relief. The position taken by the Company may well be strange. By itself, that is not sufficient for the Dissenters to discharge the burden of demonstrating objectively that the documents exist. However, in light of the Company's inconsistent positions, coupled with its cavalier approach to previous aspects of the discovery process, in my judgment there has been an insufficiency of discovery. If anything, the Company may have mis-conceptualised the discovery process. This insufficiency has been established, based on the specific facts, as well as the surrounding circumstances. It is such that I cannot say that I find the Company's statements that it has given complete and full disclosure reliable. I make a distinction between credibility and reliability, because I am not saying that there has been deliberate concealment or deletion, but rather that the discovery process has not been handled with the care required in order for the Court to ensure that its Orders are carried out and that the discovery process is carried out fairly".

18. Again, we do not think that the judge's approach to this aspect of the matter can be validly criticised. There clearly were grounds on which she was entitled to conclude that, despite the Company's assertions to the contrary, complete disclosure had not been given. She was right also to recognise that there were exceptions to the general rule that an affidavit verifying discovery is conclusive. This has been clear in England and Wales since at least 1912: see *British Association of Glass Bottle Manufacturers Ltd v Nettlefold* [1912] AC 709, 714, where Viscount Haldane said this:

> "But while it is true that as a general rule you cannot go behind the affidavit in the absence of admissions in that or some other document, the rule is qualified where the basis on which the

affidavit of documents has been made turns out to have been wrong. If the party making the affidavit has misconceived his case, so that the Court is practically certain that if he had conceived it properly, and had acted upon a proper view of the law, he would have disclosed further documents, then the Court can refuse to recognise an affidavit as conclusive, and order a further affidavit".

19. It is, in our view, also important to recognise that the rationale of the conclusivity presumption does not apply in the special circumstances of a section 238 petition. As identified in *Lonrho v Fayed (No 3)*, the rationale is that allegations of suppression of documents are capable of being relevant not only to discovery but to the substantive issues in the litigation. That was obviously the case in *Lonrho v Fayed* itself, where the issue was what was the ultimate source of funds for the purchase of House of Fraser and the object of the specific discovery application was to establish that the asserted source of funds was a fabrication. In such circumstances, it is obviously unsatisfactory that a substantive issue should be decided at an interlocutory stage. It is also the case that, in ordinary litigation, an absence of discovery can be dealt with by the drawing of adverse inferences: if the court is satisfied that a document that must exist has not been disclosed, the court may if appropriate conclude that its contents are harmful to the interests of the party failing to disclose it. In the case of a section 238 petition, however, neither of these considerations applies. The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information. If that information is lacking in some material respect, the court is not prejudging any substantive issue by ordering its disclosure. Nor can the absence of information be dealt with by drawing adverse inferences: the court needs to know what the information is, and concluding that it has been deliberately withheld does not help the court identify its contents.

20. In the present case, having identified inconsistencies and problems with the Company's discovery, the judge was fully entitled to order further disclosure. There is no real prospect of this ground of appeal succeeding.

*Ground 3: no jurisdiction to order an IT audit*

21. This ground is based partly on the assertion that appointing an expert to conduct or supervise discovery undermines the principle of conclusivity, and we have already stated our views on that topic. However, the Company goes further, and contends that the order for a forensic audit, requiring the Company to preserve all its electronic data and devices and submit them to examination by an external expert, is outside the powers of the court under its discovery jurisdiction and its inherent jurisdiction. The Company submits that the order "is a highly intrusive form of injunctive relief akin to an *Anton Piller* order but without the safeguard of a supervising solicitor. Relief of that kind was unjustified and wholly inappropriate in this case and would not be granted in reliance solely on specific discovery rules in any Commonwealth jurisdiction".

22. The judge dealt with this issue at paragraphs [108] to [115] of her judgment. She quoted from Hollander, *Documentary Evidence* (12th ed, 2015), paragraph 8.18, including the following passage:

> "It is obvious that an order requiring a party to give access to his opponent to enable disclosure to be effected is an exceptional remedy and gives rise to serious issues which need addressing. Thus in *Nucleus Information Systems v Palmer*[1] Lewison J was told that the applicant did not accept that the other party had given proper disclosure of the relevant contents of his home computer, and sought an order that he should have access to the computer in order to search through his lawyers. The judge refused direct

[1] [2003] EWHC 2013 (Ch)

access to the computer, pointing out that it raised ECHR and privilege issues.

In *Mueller Europe Ltd. v Central Roofing (South Wales) Ltd.*[2] the issue was lack of the relevant expertise rather than deliberate failure. It had become apparent that the relevant individual from the defendant did not have the expertise to perform a meaningful search for back-up tapes, which had been previously ordered. Coulson J held that he had power to order that the search be carried out by a suitably qualified IT consultant on behalf of that party in order to ensure that the orders of the Court were effectively complied with…

From this line of cases, it is apparent that the court has power to order inspection of a computer by an expert, or that disclosure be given in whole or part by an expert rather than the party, but that this is an exceptional order which will only be given when the particular circumstances justify it, and normally after there has been a failure to comply with disclosure orders."

23. The judge then said that the court had inherent jurisdiction to order discovery by means of a forensic audit. That would be in keeping with the overriding objective of dealing with cases justly and in a way that was proportionate to the amount of money involved, the importance of the case, and the complexity of the issues. The case was exceptional, not only because of the central importance of discovery in section 238 proceedings and the role of the company in that process, but also because of the Company's inconsistent and cavalier approach to discovery. The case was analogous to the *Mueller* case where there was a lack of expertise in carrying out the discovery process. An order for a forensic audit was necessary to avoid a denial of justice to the Dissenting Shareholders and to permit the court to appraise the fair value of the Dissenting Shareholders' shares. Although the order was undoubtedly intrusive, it was justified in this case.

---

[2] [2012] EWHC 3417 (TCC); [2013] TCLR 2

24. As we have indicated, part of the Company's challenge to this part of the Order was based on the assertion that it went far beyond specific discovery as contemplated by Order 24, rule 7 – which, so the Company said, was the jurisdiction invoked by the Dissenting Shareholders' summons. We agree that rule 7 would not, on its own, justify an order for the disclosure exercise to be conducted by a third-party expert. However, the Dissenting Shareholders' summons was also expressly intended to procure compliance with defined paragraphs of the Consent Order, which they contended – and the judge plainly accepted – had not been complied with by the Company. The court has an inherent jurisdiction to ensure that its orders are observed, and it was that jurisdiction that the judge exercised, as her references to the inherent jurisdiction (paragraph [110]) and the insufficiency of discovery under previous orders (paragraph [112]) demonstrate. The Company relied on cases concerned with the court's inherent jurisdiction to order security for costs, such as *Dyxnet Holdings Limited v Current Ventures II Limited* [2015 (1) CILR 174] and *In re Bancredit Cayman Limited* [2009 CILR 578], to demonstrate that the exercise of the inherent jurisdiction, in the words of Lord Scott of Foscote in the latter case at [9], "is subject to what has become the settled practice of the court"; and from that base it was contended that the court "cannot simply invent orders that are otherwise unknown to the laws of these Islands and which are highly and unjustifiably intrusive. ...The discretion must be exercised not merely in a generally judicial manner, but in a manner which accords with the settled practice of the Court, as circumscribed or extended by primary or secondary legislation".

25. Although the judge did not rely on it, there was in fact an available basis in the Grand Court Rules for the order she made. Order 24, rule 20(1) provides as follows:

> "Where the Court has made an order for discovery (either of documents or by way of oral examination) against any party and such party fails to comply, the Court may make such order as it thinks just, including, in particular, an order that the action be dismissed or, as the case may be, order that the defence be struck out and final judgment entered accordingly".

This power not only in terms gives a wide discretion as to the orders that may be made, but extends to striking out the case of the defaulting party. The inherent jurisdiction of the court to deal with deficiencies in discovery, to the extent that it is necessary to invoke it, cannot be less wide. On either basis, there was a clear jurisdictional basis for the order the judge made. She had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the Company complied with its disclosure obligations. She recognized that the order was intrusive and exceptional, and put in place protections for the Company – in particular the provision in paragraph 11 preserving privilege. There are in our judgment no realistic grounds for believing that a challenge to this part of the order could succeed on appeal; and we do not regard the exceptional nature of the order as giving rise to a point of general importance sufficient to justify an appeal.

26. According to a note made by the Company of the judge's reasons for refusing leave to appeal, she said that she doubted whether an appeal would have a real prospect of success because it involved a pure question of discretion and also involved an exercise of her discretion in relation to case management issues. In this, as in her decision generally, we consider that the judge was plainly correct. She had a sound jurisdictional basis for the order she made, identified the correct considerations, and reached a decision that is clearly within the bounds of her discretion. An appeal against the decision would have no reasonable prospect of success.

27. As presaged in paragraph 3 of these reasons, we come back to the possibility of abuse of the autonomy that is of necessity to be given to experts in section 238 proceedings. In paragraph 63 of her judgment, the judge recorded a submission by leading counsel for the Company "that section 238 fair value claims must not be allowed to become a carte blanche for dissenters to conduct a "drains up" inspection of the entire business, regardless of relevance to fair value". We think there is a danger that the liberty given to the experts to define what is relevant to value could be abused, and even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records. At paragraph 114 of her judgment, the judge said that she wished to make it clear that she was not at all holding that an order for appointment of a forensic expert would be appropriate in every section 238 proceeding; and again she was right to do so. It is, however, observable that such orders have been made in at least two cases – this one, and *In the matter of Shanda Games Limited*[3] (although in the latter case the order was made by consent) - and we are concerned that they may become accepted practice. We stress that they are to be regarded as exceptional remedies, not common currency in section 238 petitions.

Martin JA

Newman JA

Morrison JA

---

[3] Unreported, Segal J, 25 April 2017

# **EXHIBIT 3**

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**

**CICA 12 of 2017**
**(Cause FSD 14 of 2016 (NSJ)**

**IN THE MATTER OF SHANDA GAMES LIMITED**

**BETWEEN**

**SHANDA GAMES LIMITED**

**Appellant**

**AND**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC – SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR AND ON BEHALF OF CROWN/MASO SEGREGATED PORTFOLIO**

**Respondents**

Before:

The Right Honourable Sir John Goldring, President
The Honourable John Martin QC, Justice of Appeal
The Honourable Dennis Morrison, Justice of Appeal

Appearances:

For the Company's Re-Open Appeal
Ms. Madeline Heal, Mr. Paul Madden and Mr. James Elliott of Harneys on behalf of the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms. Gemma Freeman of Maples and Calder

For the Company's Substantive Appeal
Mr. Philip Jones QC instructed by Mr. Paul Madden and Mr. James Elliott of Harneys for the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms Gemma Freeman

**CICA 13 of 2017**
**(Cause FSD 14 of 2016 (NSJ)**

**IN THE MATTER OF SHANDA GAMES LIMITED**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC – SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR AND ON BEHALF OF CROWN/MASO SEGREGATED PORTFOLIO**

**Appellants**

**AND**

**SHANDA GAMES LIMITED**

**Respondent**

Appearances: Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms. Gemma Freeman of Maples and Calder for the Appellants
Mr Philip Jones QC instructed by Mr. Paul Madden and Mr. James Elliott of Harneys for the Respondent

Date of Hearing: 4 and 5 September 2017

Date of Delivery: 6 March 2018

Judgment Finalised: and approved 9 March 2018

**JUDGMENT**

MARTIN JA:

*Introduction*

1. A shareholder in a Cayman-registered company who dissents from a merger or consolidation of the company under ***Part XVI of the Companies Law*** is entitled under section 238 of that Law to be paid "*the fair value of his shares*" as determined by the court, together with a fair rate of interest. These appeals raise important questions about the methodology to be applied in determining the fair value and fixing a fair rate of

interest, and about the extent to which principles developed in other jurisdictions with similar regimes may legitimately be applied to a section 238 determination.

2. On 18 November 2015 Shanda Games Limited ("**Shanda**"), a Cayman-incorporated company, merged with Capitalcorp Limited in the culmination of a take-private transaction led by Shanda's principal shareholders and management. At the EGM held on that date to authorise the merger, 99.3% of Shanda's shareholders that voted did so in favour of the merger. Under the terms of the merger, they received US$3.55 per share (or US$7.10 for each American depository share ("**ADS**"), those shares equating to two ordinary shares). Certain shareholders ("**the Dissenting Shareholders**") dissented from the merger: they are the respondents to the petition by Shanda seeking determination of the fair value of their shares that gives rise to these appeals.

3. On 17 May 2017 Segal J made an order on Shanda's petition, determining the fair value of the Dissenting Shareholders' shares to be US$8.34 per share (US$16.68 per ADS) – more than double the merger price - and the fair rate of interest to be 4.295%. This resulted in an order for payment to the Dissenting Shareholders of US$73,575,995 plus interest of US$2,788,801. Shanda appeals with leave of the judge against the judge's refusal to discount the value of the Dissenting Shareholders' shares to reflect their minority holdings, and against his decision on the rate of interest. The Dissenting Shareholders appeal, again with the leave of the judge, against aspects of the methodology adopted by the judge to determine the fair value of the shares.

4. Shanda also took issue with the refusal of the judge to admit further expert evidence and defer his decision on value until after the evidence had been heard, and filed a notice of appeal without leave. On 4 September 2017 we determined that leave was necessary and refused it, alternately dismissing the appeal if we were wrong about the necessity for leave. My reasons for this are incorporated in this judgment.

*Background*

5. In his commendably careful and comprehensive judgment, the judge set out in detail the history of the companies, the merger and the proceedings. For the purpose of these appeals, it is unnecessary to say more than the following.

6. Shanda was incorporated in the Cayman Islands on 12 June 2008. It is an online game developer, operator and publisher. It is one of China's largest video game companies, offering a diverse portfolio of popular online and mobile games primarily in China, as well as in overseas markets.

7. As at 31 December 2014, Shanda had an aggregate of 537,832,318 ordinary shares outstanding, comprising Class A and Class B shares including Class A ordinary shares represented by the ADSs. The ADSs were publicly listed on the US NASDAQ Global Select Market from September 2009 until Shanda was taken private in November 2015. Each Class B ordinary share was convertible into one Class A ordinary share but carried ten times as many votes. At the conclusion of the merger the Dissenting Shareholders were between them the registered owners of 8,822,062 Class A ordinary shares, representing some 1.64% of the issued share capital.

8. The merger was effected under the provisions of ***Part XVI of the Companies Law***. Those provisions, which were introduced in 2009, in their current form have the effect that a merger or consolidation ordinarily requires authorisation only by special resolution of the shareholders of each constituent company – that is to say, by a two-thirds majority. As will be seen, this provides a simpler method of effecting a merger, consolidation or take-over than other regimes contained in the ***Companies Law***, which require majorities of 90% or 75% and contemplate intervention by the court.

9. Section 238 (which forms part of Part XVI) contains a procedure for dissenting from a merger. It was complied with in the present case. One consequence of dissent is, by subsection (7), that from a period no longer than 40 days after the meeting approving the merger the dissenting shareholder ceases to have any of the rights of a member except the rights to be paid the fair value of his shares as determined by the court, to participate in the petition and to institute proceedings disputing the validity of the merger. A first step towards arriving at the fair value of the dissenter's shares is the making by the company of an offer for the dissenter's shares at a specified price that the company determines to be their fair value (subsection (8)); but that cannot occur before the dissenting shareholder has lost his rights as member by virtue of subsection (7). Such an offer was made in the present case by Shanda but was rejected by the Dissenting Shareholders.

10. Shanda's petition was issued on 4 February 2016.

11. Each side engaged an expert. Shanda's expert was Professor Gregg A. Jarrell ("Professor Jarrell"), a tenured Professor of Economics and Finance at the University of Rochester's Simon Business School, where he has been a member of the faculty since 1988. He holds a Ph.D. in Business Economics from the University of Chicago (1978), with major concentrations in Industrial Organization and Finance, as well as an MBA (1976) from the University of Chicago. The Dissenting Shareholders engaged William Inglis ("Mr. Inglis"), a Senior Managing Director in the Singapore office of FTI Consulting, a global expert services firm specialising, amongst other matters, in expert witness services and litigation support. Mr. Inglis is a Chartered Accountant and since 1989 has specialised in valuation and the quantification of loss in the context of legal disputes.

12. The hearing of the petition took place in November 2016 over eight days, of which five were taken up by the expert evidence. At all stages of the petition, up to and including the hearing, the attorneys acting for Shanda were Conyers Dill & Pearman ("Conyers"). On 20 January 2017, however, Shanda gave the Court and the Dissenting Shareholders notice that it had changed its attorneys and was now represented by Harneys.

13. On 20 March 2017 the judge circulated a draft judgment. He had signalled his intention to do so at various stages over the preceding weeks, but because of an administrative error by the court, Harneys were unaware of this. On the same day, but before the draft was circulated, Shanda, acting by Harneys, issued a summons seeking liberty to reopen its case and to introduce additional expert evidence. The judge dismissed this summons on 25 April 2017. He gave reasons for his decision on 27 July 2017. As already stated, Shanda appealed against the judge's dismissal of the summons ("the reopen application"), contending that leave was unnecessary – although it applied for leave if in fact it was necessary. Also on 25 April 2017, the judge formally released his substantive judgment. On 6 May 2017 he produced a note on the fair value calculation; on 16 May 2017 he issued a further judgment dealing with the fair rate of interest; and on 17 May 2017 he made the order referred to in paragraph 3 above embodying his various decisions.

14. As I have said, both Shanda and the Dissenting Shareholders appealed against that order. I deal in turn with the reopen application, Shanda's substantive appeal and the Dissenting Shareholders' appeal.

*The reopen application*

15. Following their replacement of Conyers as Shanda's attorneys, Harneys commissioned Jaime d'Almeida ("Mr. d'Almeida") to review the trial transcripts and the reports and evidence of Professor Jarrell and Mr. Inglis. Mr. d'Almeida subsequently provided a fresh expert opinion, which concluded that the evidence from Professor Jarrell was so inadequate, both in its own methodology and approach and in its failure adequately to challenge Mr. Inglis's work and conclusions, that the court had been misled at trial. The basis of Shanda's summons was that Mr. d'Almeida's evidence was necessary if the court was to make a proper and just decision as to fair value.

16. The reasons given by the judge for refusing to allow Shanda to reopen its case and adduce the evidence of Mr. d'Almeida, which were again expressed in a clear and comprehensive judgment that extended to 69 pages, may be summarised as follows.

(1) The court had jurisdiction to admit new evidence and reopen the trial after judgment had been handed down in draft. The principle to be applied when deciding to exercise the jurisdiction was the overriding objective to deal with cases justly and at proportionate cost. Although the application was made to the trial judge, the court should take into account the ***Ladd v Marshall*** factors restricting reliance on new evidence on appeal - which, even applied more leniently than on an appeal, meant that powerful factors or strong reasons would be needed to justify the application. When applying the overriding objective after a judgment had been handed down, the court needed to take into account the question of reconsideration and the prejudice caused by depriving a successful party of a judgment; and in the context of applications to admit new evidence after trial, whether or not a judgment had been handed down, there was a balance to be struck between on the one hand the court's desire (and the parties' entitlement) to have a decision based on the true factual position and on the other the need for finality in litigation.

(2) The court had to "*consider and weigh in the balance in particular the reasons for the application, the conduct of the parties, the delay between the conclusion of the trial and the making of the application, the prejudice to the applicant as a result of not allowing the new evidence to be admitted and the trial re-opened, the prejudice to the other party of being deprived of the judgment or the further costs and delays of having to deal with new evidence and a new hearing and the need to secure the "just, most expeditious and least expensive determination of every cause or matter on its merits (see paragraph 2.2 of the Preamble to the Grand Court Rules). The need for justice to other litigants and a fair allocation of the court's resources must be taken into account*".

(3) A number of factors weighed strongly in favour of dismissing the summons. They were as follows:

a. The issues dealt with in Mr. d'Almeida's report had been the subject of detailed submissions and cross-examination during the course of a long trial conducted by leading counsel. Many if not most of the difficulties faced by Professor Jarrell during his cross-examination were crystal clear during the trial because he was candid and straightforward about the limited nature of his evidence and preparation and his failures fully to understand parts of Mr Inglis's evidence. It had been Professor Jarrell's poor performance in the witness box on some issues that had presumably caused Shanda and its counsel to make a series of concessions and not to contest a significant number of issues at trial.

b. The trial had concluded on 17 November 2016, but Shanda had waited until 20 March 2017 to make its application. The fact that the court had not by then delivered its judgment was no excuse for the delay in a case where the problems with the expert witness and evidence were apparent at trial. The court's concern and criticism arose from Shanda's failure to act with sufficient expedition during or shortly after the trial, when the performance of the expert was visible and clear during the trial. Some delay was bound to be involved in instructing a new expert and awaiting the outcome of his work; but, even taking that into account, Shanda could have acted much more rapidly in bringing on an application to deal with the perceived deficiencies in, and problems with the expert evidence.

c. The judge accepted that Harneys had not been aware of his updates regarding the timing of the handing down of the judgment, and consequently did not take the view that the application was an abuse of process. He did, however, comment that it was a remarkable coincidence that the filing of the summons almost precisely coincided with the handing down of the draft judgment, and he said that he felt himself entitled at least to note that the filing of the summons could be viewed as a litigation tactic to delay the conclusion of the litigation.

d. If the summons were acceded to, the whole process of preparation of revised experts' reports – including the provision of further information, further meetings with management, and a further joint meeting of the experts – would have to be gone through again, and there would have to be another trial at which they could both be cross-examined. In many respects the proceedings would need to revert to the stage reached when the original directions order had been made. This would involve significant further cost to the parties, delays and significant further amounts of limited court time and resources.

e. The real thrust of Shanda's complaint was that Professor Jarrell had been negligent in the performance of his duties. The negligent performance of his duties by an expert would not generally be, and in the present case was not, sufficient to allow the party that selected him to re-open the trial and instruct a second expert (and in effect have a second bite at the cherry). The prejudice suffered by the party concerned could be remedied by making a claim against the expert. It would be disproportionate and unjust to make the other party suffer the consequences when both had been able to select whichever expert they chose.

f. Shanda had rightly accepted that it needed to demonstrate that the problems with the experts meant that the court's decision was unsafe. In this respect a section 238 petition was no different from other cases. Although the court had to determine the fair value for itself and form its own independent view, it was (both generally and in the present case) particularly dependent on the expert evidence to assist it. If it could be shown that the expert opinion evidence was fundamentally flawed the

court's decision-making would of necessity be unsafe because there would be no other evidence on which the court could have relied for the purpose of forming its view.

g. Shanda had asserted that both Professor Jarrell and Mr. Inglis had failed properly to deal with a number of critical issues, with the result that their valuations were fundamentally flawed and their evidence was so seriously deficient that the court had been materially misled by the entire corpus of opinion evidence going to value and its determination of fair value was as a result unreliable. However, Mr. d'Almeida's report did not establish that Mr. Inglis's evidence on the material matters he identified was so deficient and incompetently prepared as to be outside the range of reasonable professional opinions on the valuation issues. The court had been properly able to rely on Mr. Inglis's evidence, as well as on parts of Professor Jarrell's evidence. Although parts of Professor Jarrell's evidence were weak and unreliable, his failures did not undermine the credibility and reliability of all his evidence. On a number of issues he had demonstrated the expertise of a properly qualified expert and had given evidence that was reasonable and consistent with the academic and professional literature and accepted methodologies of those qualified in the field of financial valuation and statistical analysis. Nor did Professor Jarrell's failure to raise the points and challenge Mr. Inglis on the issues identified by Mr. d'Almeida mean that Mr. Inglis's evidence must be treated as unsafe.

h. There had been problems caused by serious deficiencies in the factual record that had required the experts and ultimately the court to make certain assumptions or inferences. That had been largely the fault of Shanda; but it was not in any event a sufficient reason for concluding that the expert evidence given at trial was unsafe as a whole or to a material extent. Mr. Inglis had dealt with the evidential deficiencies properly and reasonably and had produced an opinion that was reasonable and reliable and based on reasonable assumptions informed by accepted professional practice. The fact that Shanda had belatedly found an expert who was prepared to support a much lower value for the shares was not sufficient to justify the conclusion that the evidence

at trial was seriously compromised and flawed and that the judgment was unsafe. It would be wrong to permit Shanda to indulge in opinion shopping and to impose on the Dissenting Shareholders the further costs and delays associated with further evidence and a new trial (as well as to cause them the significant prejudice resulting from being deprived of the judgment already delivered).

17. Shanda filed a notice of appeal on 9 August 2017, and on the same day filed a summons in the Grand Court seeking leave to appeal. That summons was not pursued; but in its initial skeleton argument in support of the reopen application Shanda sought leave to appeal from the Court of Appeal, albeit only in paragraphs 50 to 53 of the 54-paragraph document. The Dissenting Shareholders formally objected to the appeal being pursued without leave; and Shanda devoted its reply skeleton (but not its oral submissions, which were directed to the merits of the reopen appeal) to the issue of whether leave was or was not required.

18. Section 6 of the ***Court of Appeal Law*** (2011 Revision) provides that, subject to certain exceptions not presently relevant, no appeal shall lie from an interlocutory judgment of the Grand Court without the leave of that court or of the Court of Appeal. Shanda's contention was that the order dismissing the application to reopen the hearing was not an interlocutory order but a final order. This startling proposition was argued in the reply skeleton in the following way.

A. Rule 12(3) of the ***Court of Appeal Rules*** (2014 Revision) provides that "*a judgment or order shall be treated as final if the entire cause or matter would (subject only to any possible appeal) have been finally determined whichever way the court below had decided the issues before it*".

B. Rule 12(4) provides that "*for the purposes of sub-rule (3), where the final hearing or the trial of a cause or matter is divided into parts, a judgment or order made at the end of any part shall be treated as if made at the end of the complete hearing or trial*".

C. Properly analysed, the petition fell into two parts or stages: identification of the relevant valuation principles, followed by the determination of the fair value by reference to those principles.

D. Shanda's summons was made "*so that Mr d'Almeida's report could be admitted into evidence at the first stage, but taken into account at the second stage i.e. the stage at which the court (with the assistance of the experts) would determine the actual dollar amount representing fair value*" (original emphasis).

E. "*It was no part of the Company's case on the Summons that there should be a re-hearing of the first stage. It sought only to re-open its case prior to the conclusion of the first stage to adduce evidence to be taken into account later*" (original emphasis).

F. If the judge had allowed Shanda's summons, "*the first stage would still have been at an end at that point. Any expert evidence in reply by the Dissenters and/or cross-examination by them of Mr d'Almeida would have happened as part of the second stage. Clearly the first stage was also at an end upon the Summons being dismissed. In other words, whether or not the orders sought in the Summons were granted, either way the first stage of the trial of the petition was at an end*".

G. The Dissenting Shareholders were wrong to classify the order as having been made on a summons for directions, since the purpose of such a summons was to make preparations for trial. They were also wrong to classify the order as one made on an application for a new trial or rehearing; all that Shanda wanted to do was to add to its evidence before judgment. None of the deeming provisions in Rule 12 applied.

19. It is in my view plain that the order was interlocutory. Whilst it is true that the judge determined the fair value and the fair rate of interest separately, with separate evidence being admitted on the latter, and that he left the calculation of Shanda's value to the parties in the light of his determination of the relevant principles, the suggestion that the hearing of the petition was otherwise divided into stages is wholly artificial. So also is the suggestion that any evidence in rebuttal, or cross-examination of Mr d'Almeida, would have been heard at the stage of turning valuation principles into actual value, rather than at the stage where the expert evidence was being taken. The refusal to allow Shanda to adduce further evidence was a decision about the conduct of an aspect of the trial, and the judge's order was not in any respect determinative of the parties' substantive rights. Leave to appeal was required.

20. Leave to appeal will not be granted unless there is a real prospect of the appeal succeeding, or there is a point at issue that should be considered by the Court of Appeal in the public interest. Shanda contends that it is entitled to leave on both bases.

21. Shanda's contentions were founded on what it said was the nature of section 238 proceedings. The purpose of such proceedings was to establish a fair value for all the shares, and the court's determination of that value was binding on the entire world. Although in fact in the present case all shareholders who had dissented from the merger were parties to the proceedings, that would not always necessarily be the case; and any shareholder who had dissented from the merger but had elected not to participate in the litigation would be entitled to receive the same fair value for his shares as was due to those shareholders who had litigated. It followed that the proceedings were not ordinary litigation, and the Court's task was not just to do justice between the parties but to determine the fair value of the shares for the benefit of all. That in turn meant that the Court was to have regard to anything which might assist it to arrive at the fair value; and accordingly the only real issue on the reopen application was whether or not Mr d'Almeida's evidence was relevant to the Court's determination of fair value. It was submitted that it plainly was relevant, particularly but not exclusively in areas where the judge had not accepted the evidence of either Professor Jarrell or Mr. Inglis. The judge had mischaracterised the reopen application as being an application to adduce fresh evidence after judgment, and had therefore required Shanda to satisfy a stricter test than was appropriate. The fact that he had delivered a judgment in draft did not make the situation one where a formal judgment had been delivered, so that questions of recalling his decision and disappointing the expectations of the successful party did not arise. Nor were ***Ladd v Marshall*** considerations relevant, even in the modified form in which the judge had dealt with them, since the trial was not at an end. Although the judge had gone on to consider Mr. d'Almeida's evidence, he had done so only in his judgment refusing the reopen application. What he should have done was to appreciate that he was being asked to admit additional evidence during the course of the trial; and had he done so he would have realised that the evidence would assist him in his only task, that of determining fair value, and that any prejudice to the Dissenting Shareholders could be met by an appropriate award of costs.

22. I do not accept the fundamental premise of Shanda's argument. Whilst it is true that section 238 requires determination of the fair value of the shares, the significance of the determination is limited: the only persons affected by it are the company and dissenting shareholders, whether or not they participated in the litigation. A shareholder who consented to the merger or accepted the merger price cannot claim to be entitled to a different price depending on the outcome of the section 238 proceedings. Essentially, the proceedings affect only those who have taken issue with the merger price, so that there is in reality a lis between them and the company. The purpose of the proceedings is to resolve that lis, and in that respect a section 238 petition is no different from ordinary litigation. Moreover, Shanda's argument ignores the process by which the determination of fair value is to occur. Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of section 238 proceedings is no different in nature from carrying it out in ordinary inter-partes litigation. In ordinary litigation, and in section 238 proceedings, the court will determine generally, or on an issue by issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts. The process, however, is one that will be familiar to most judges. The fact that the outcome of the process in a section 238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input.

23. Shanda's argument came very close to amounting to an assertion that the judge had no real discretion and was obliged to take into account any evidence relevant to fair value

presented to him before formal delivery of his judgment. As I have pointed out above, however, the judge's decision related to the conduct of an aspect of the trial, and was plainly a matter for his discretion. It seems to me impossible to fault his exercise of that discretion. Even accepting, as the judge did, that Harneys had not been kept informed of the progress of his draft judgment, Shanda's application was made extremely late. As the judge said, it must have been apparent during the course of the hearing that there were significant problems with Professor Jarrell's evidence; indeed, the only possible explanation for the engagement of Mr. d'Almeida was that Shanda had recognised those problems. Nevertheless, the application was not made until just over four months after the conclusion of the hearing. Moreover, the judge was best placed to assess the extent to which he could place reliance on the evidence of Professor Jarrell and Mr. Inglis, and the extent to which the assistance to be derived from Mr. d'Almeida's evidence justified a resumption of the hearing. The passage from his judgment I have quoted in paragraph 16(2) above demonstrates that the judge had firmly in mind the relevant considerations; and, although on occasion he does appear erroneously to have regarded the application as one for a reopening of the trial after judgment, there was ample material to justify his conclusion that justice did not require him to accede to an application that was too late and too inadequate.

24. These considerations meant that there was no reasonable prospect of an appeal succeeding, and nothing in the nature of section 238 proceedings to justify an appeal, so that leave to appeal should not be granted. The same considerations justified dismissing the reopen appeal if, contrary to our view, leave to appeal was unnecessary.

*Shanda's substantive appeal*

25. Shanda's notice and grounds of appeal as originally drawn took issue with several aspects of the methodology used by the judge to arrive at his decision on the fair value of the Dissenting Shareholders' shares. All but one of these was abandoned, however, and before us Shanda's only contention (apart from in relation to interest) was that the judge should have discounted the value of the Dissenting Shareholders' shares to reflect the fact that they had only minority holdings ("the minority discount point").

<u>The minority discount point</u>

26. The shares held by the Dissenting Shareholders between them amounted to about 1.64% of Shanda's issued share capital. So small a proportion would give them virtually no influence, and still less control, over Shanda's affairs. They would not be able on their own to promote or resist any type of shareholder resolution. This lack of influence and control would ordinarily have an adverse impact on the market price of the shares; and Shanda argued before the judge that this should be reflected by way of a minority discount in the valuation of the Dissenting Shareholders' shares. The experts agreed that, if such a discount were to be incorporated in the valuation, it should be 23%. According to Shanda, this would mean that the value of the Dissenting Shareholders' shares would reduce by about US$16.9m.

27. The judge held that no minority discount should be applied. His reasoning was as follows.

(a) In Delaware and Canada, each of which had regimes similar to that contained in section 238 of the ***Companies Law***, it was clear that no minority discount was to be given. The shares of a dissenting minority were to be valued as a proportion of the value of the company, not as a block of shares offered for sale. In Delaware, this was in part a consequence of the rejection of market value as the measure of fair value.

(b) In ***Re Integra Group*** [2016] 1 CLR 192, Jones J in the Grand Court considered that there should be no minority discount, although the point had not been argued or live.

(c) The purpose of the fair value standard was to ensure that the dissenting minority was fully protected. That meant that they should be compensated for the full value of their interest in the company, which was their proportionate share in the capital and value of the company.

(d) This approach was consistent with one aspect of the legal nature of a share and the rights of a shareholder, namely that a shareholder owned an undivided share in the share capital of the company.

(e) The full value of a dissenting shareholder's interest included the right to a distribution of his share of the company's assets and value following a sale or other realisation of the company's business. This was equivalent to the value of a partner's interest in a partnership, which was based on a notional sale of the

business as a whole to an outside purchaser and the distribution to the partners of their share of the partnership property.

(f) The English and Bermuda cases relied on by Shanda, to which I refer below, were distinguishable.

28. Shanda's principal contention was that the judge should not have followed the Delaware (and Canadian) jurisprudence, but should instead have looked to the English authorities dealing with the compulsory acquisition of shares by way of a scheme of arrangement or a "*squeeze-out*" or in a claim of unfair prejudice – all of which applied or permitted a minority discount. There was nothing in jurisprudential terms to distinguish between a merger, a squeeze-out and a scheme of arrangement as a mechanism for compulsory purchase of shares, and similar principles should apply to all three. The judge should also have had regard to authorities from Bermuda and the British Virgin Islands, both common law jurisdictions, which again recognised the possibility of a minority discount. The Delaware jurisprudence, which was to the effect that a dissenting shareholder was entitled to his proportionate interest in the overall fair value of the corporation appraised as a going concern, was influenced by public policy considerations that had no place in the Cayman Islands, or in England and Wales. It had never been part of the public policy of the Cayman Islands or of England and Wales that there was anything unjust in the compulsory purchase of shares for less than the amount a shareholder would receive on the sale of the company's business and the distribution of the proceeds. Moreover, the language of the Delaware statute required valuation of a dissenter's "*shares of stock*" and so placed the emphasis on the totality of the stock. By contrast, the statutory criterion in section 238 was "*the fair value of his shares*", which focused on what the dissenter owned. A shareholder who had a minority shareholding should receive the fair value of what he possessed, namely a minority shareholding. Applying conventional principles of statutory construction, there was no justification in the wording of the section for valuing the company rather than the shares themselves. Unless the shares, as opposed to the company, were valued, there would be no means of giving effect in the valuation to differences in the rights and obligations attaching to different classes of shares, for example preferential rights to distributions of income and capital or to votes (such as the voting rights of the class B shares in the present case), or liability to calls; but there was no justification for leaving such differences out of account. If it was right to take them into account, however, then the

difference between a majority and a minority shareholding should likewise be taken into account in the valuation exercise.

29. The principal contentions of the Dissenting Shareholders were as follows. Section 238 required determination of the "*fair value of the shares*", and the focus should be on the expression "*fair value*", not on "*the shares*". Fair value was different from market value, and different from the value at which shares might trade on a stock exchange. The United Kingdom, Bermuda and BVI authorities were distinguishable. There was no provision in the United Kingdom legislation relating to schemes of arrangement, squeeze-out acquisitions or unfair prejudice petitions that required the court expressly to apply a standard of fair value; but that was the criterion in the Delaware and Canadian legislation, and on the grounds both of similarity of the statutory language and because Delaware, like the Cayman Islands, was a substantial financial centre the Delaware jurisprudence should be followed. That was the course taken in ***Integra***, and the judge was right to follow it. The Delaware principle of valuing the shares as a proportion of the value of the business represented the reality of the situation in a merger, where all the shares were being acquired, whether voluntarily or compulsorily, and the entirety of the business merged in the new structure.

30. In order to deal with these contentions, it is convenient first to consider the position in other jurisdictions.

*Delaware*

31. A number of states in the USA have appraisal regimes, but the one that is most used is the one in Delaware. The relevant statutory provision in Delaware is section 262 of the Delaware General Corporation Law. Subsection (a) provides that any holder of "*shares of stock*" in a Delaware corporation who dissents in defined circumstances from a merger "*shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock*" through a defined process. Subsection (h) provides that through that process "*the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value*".

32. The Delaware appraisal regime has been the subject of substantial authority. In relation to the minority discount point, the judge referred to and quoted from three of those authorities: ***Cavalier Oil Corp v Harnett*** 1988 WL 15816 at first instance, and 564 A.2d 1137 (1989) on appeal to the Delaware Supreme Court; ***Re Appraisal of The Orchard Enterprises Inc*** 2012 WL 2923305; and ***Re Appraisal of Dell Inc*** 2016 WL 3186538 (at first instance). Three points in particular emerge from these decisions. First, the concept of "*fair value*" in the Delaware jurisprudence, in the words of Laster V.C. in ***Dell***, "*derives more from judicial writings than from the appraisal statute itself*", and is "*a largely judge-made creation, freighted with policy considerations*". [***Dell*** has very recently been overturned in part on appeal by the Supreme Court of Delaware, primarily on the basis that insufficient weight was given to the merger price. However, the statement I have quoted was not affected.] Secondly, the object of a Delaware appraisal is to value the corporation itself and allocate to a dissenting shareholder "*his proportionate interest in the overall fair value of the corporation, appraised as a going concern*" (Jacobs V.C. in ***Cavalier***). Thirdly, and consequent on the second point, no allowance is to be made for the size of a shareholding. This point is stated most clearly by Walsh J in the Delaware Supreme Court in ***Cavalier***:

> "*In rejecting a minority or marketability discount, the Vice Chancellor concluded that the objective of a section 262 appraisal is "to value the corporation itself, as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder". We believe this to be a valid distinction.*
> *A proceeding under Delaware's appraisal statute, 8 Del.C. § 262, requires that the Court of Chancery determine the "fair value" of the dissenting stockholders' shares. The fairness concept has been said to implicate two considerations: fair dealing and fair price. Weinberger v. UOP, Inc., 457 A.2d at 711. Since the fairness of the merger process is not in dispute, the Court of Chancery's task here was to value what has been taken from the shareholder: "viz. his proportionate interest in a going concern."* ***Tri-Continental Corp. v. Battye, Del.Supr.,*** *74 A.2d 71, 72 (1950). To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations. See* ***Bell v. Kirby Lumber Corp.***, *Del.Supr., 413 A.2d 137 (1980). The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not required to apply further*

> *weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability. ...*
> *The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual shareholdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."*

*Canada*

33. The principal appraisal regime in Canada is that under section 190 of the ***Canada Business Corporations Act***, although there are also provincial appraisal statutes. Section 190 applies in a number of situations including a resolution by a corporation to carry out a going-private transaction or a squeeze-out transaction. Subsection (3) provides, so far as relevant, that "*a shareholder who complies with this section is entitled, when the action approved by the resolution from which the shareholder dissents ... becomes effective, to be paid by the corporation the fair value of the shares in respect of which the shareholder dissents*".

34. There has been less litigation about the Canadian provisions than about the Delaware provisions, apparently partly because Canada ordinarily allows only a reasonable rate of interest, whereas Delaware now ordinarily awards compound interest at 5% p.a. over the Federal Reserve discount rate, and partly because adverse costs orders are ordinarily available in Canada but not in Delaware. Moreover, although some Canadian provincial legislation allows a dissenter to acquire shares after the intended transaction becomes public knowledge, as does Delaware, the ordinary rule in Canada is that the dissenters must already have held their shares. These factors have historically made Canada less attractive to "*appraisal arbitrageurs*" (that is to say, speculators who

purchase shares with the intention of exercising appraisal rights to make a profit), and that in turn has resulted in a lower volume of litigation. However, it is well established in Canada, at least at provincial level, that no minority discount is to be applied in determining fair value. In ***Kummen v Kummen-Shipman Ltd*** (1983) 19 Man R (2nd) 92, a decision of the Manitoba Court of Appeal, the rationale for the exclusion of a minority discount was said to flow from the context in which appraisals of fair value take place: the shares are effectively being purchased by existing shareholders to consolidate their existing position.

*England and Wales*

35. England and Wales does not have an appraisal regime similar to section 238 or to those in Delaware and Canada. There are, however, two circumstances in which majority shareholders may acquire the shares of an unwilling minority; and each of these has a direct parallel in the Companies Law in this jurisdiction.

A. The first of these circumstances is known as a squeeze-out, under which the offeror in a proposed takeover that has been approved by 90% of the shareholders of the target company may acquire the remaining shares. The current provisions, which are contained in Chapter 3 of Part 28 of the Companies Act 2006, apply where the offeror has acquired or unconditionally contracted to acquire 90% in value and (if the shares are voting shares) by voting rights of the shares or class of shares; and on giving notice the offeror is entitled and bound to acquire the shares on the terms of the offer unless the court, on an application made by the shareholder under section 986, orders that the offeror is not entitled and bound to acquire the shares or that the terms on which he is entitled and bound to acquire them shall be such as the court thinks fit. Section 986(4) provides that the court may not require consideration of a higher value than that specified in the offer unless the holder of the shares shows that the offer value would be unfair. In their earlier, simplified form the squeeze out provisions were contained successively in section 155 of the *Companies Act 1929* and section 209 of *the Companies Act 1948*, and the relevant part of each of these was in identical terms to section 88 of the *(Caymanian) Companies Law*. They applied, as does section 88, where a scheme or contract involving the transfer of shares to another company had been approved by the holders of not less than 90% by value of the shares in the transferor company; and the

transferee company was then "*unless the Court thinks fit to order otherwise*" entitled to acquire the shares of any dissentients on the same terms as were offered to the approving shareholders. This formulation too imported considerations of fairness. Thus in *Re Hoare & Co Ltd* (1933) 150 LT 374 at 375 Maugham J, considering section 155 of the 1929 Act, said this:

> "*I have some hesitation in expressing my view as to when the court should think fit to order otherwise. I think, however, the view of the Legislature is that where not less than nine-tenths of the shareholders in the transferor company approve the scheme or accept the offer, prima facie, at any rate, the offer must be taken to be a proper one, and in default of an application by the dissenting shareholders, which includes those who do not assent, the shares of the dissentients may be acquired on the original terms by the transferee company. Accordingly, I think it is manifest that the reasons for inducing the court to "order otherwise" are reasons which must be supplied by the dissentients who take the step of making an application to the court, and that the onus is on them of giving a reason why their shares should not be acquired by the transferee company.*
>
> *One conclusion which I draw from that fact is that the mere circumstance that the sale or exchange is compulsory is one which ought not to influence the court. It has been called an expropriation, but I do not regard that phrase as being very apt in the circumstances of the case. The other conclusion I draw is this, that again prima facie the court ought to regard the scheme as a fair one inasmuch as it seems to me impossible to suppose that the court, in the absence of very strong grounds, is to be entitled to set up its own view of the fairness of the scheme in opposition to so very large a majority of the shareholders who are concerned. Accordingly, without expressing a final opinion on the matter, because there may be special circumstances in special cases, I am unable to see that I have any right to order otherwise in such a case as I have before me, unless it is affirmatively established that, notwithstanding the views of a very large majority of shareholders the scheme is unfair.*"

The fact that the offer price involved a minority discount did not make the scheme unfair. That was established in ***Re Grierson, Oldham & Adams Ltd*** [1968] Ch 17, in which Plowman J (dealing with section 209 of the 1948 Act) said this (at 35F-g, 36G-37A):

> "*Then it is said that the price of 6s. a share does not reflect the advantages to Holts by their obtaining complete control of the company. I agree with Mr Instone [for Grierson] that that might possibly be used as an argument to justify paying a shareholder with a controlling interest a larger price for the shares than the price paid to minority holders. But,*

*in my judgment,* ***it is not unfair to offer a minority shareholder the value of what he possesses, i.e., a minority shareholding.*** *... [O]n general principle, ... in my judgment, the element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares*" (emphasis added).

B. The second circumstance in which a minority shareholding may be acquired is under a scheme of arrangement. Such schemes are dealt with by Part 26 of the ***Companies Act 2006***. So far as material, section 899 provides for an arrangement between a company and its members that is approved by a majority in number representing 75% of the members by value to bind all members if sanctioned by the Court. Section 900 applies in the case of an application made under section 899 for sanction of a scheme of arrangement proposed for the purpose of the amalgamation of two companies involving the transfer of the whole or part of the undertaking of one of those companies to the other; and it allows the Court to deal with, among other things, the provision to be made for any persons who dissent from the arrangement. These provisions are mirrored in sections 86 and 87 of the (Caymanian) ***Companies Law***. Schemes of arrangement may be utilised in a wide range of circumstances, but are commonly used to effect a merger, consolidation or takeover. In ***Re Linton Park plc*** [2005] EWHC 3545 (Ch); [2008] BCC 17 Lewison J said this:

*"[5] A court will usually sanction a scheme if (1) the requirements of the statute have been complied with; (2) the class is fairly represented by those who attended the meeting and the statutory majority were acting bona fide; and (3) the scheme is one which an honest and intelligent person acting in his own interests as a member of the class might reasonably approve. Thus stated the third limb of the test is not whether the opposing shareholders or creditors have reasonable objections to the scheme. A shareholder or creditor may be equally reasonable in voting for or against the scheme. In such a case shareholder democracy or creditor democracy, as the case may be, should normally prevail. ...*
*[13] The third question is whether the terms of the scheme are fair. The issue here is the price of the shares, not the principle of the scheme. The philosophy underlying s.425 is that the members of the company are better able to pass judgment on what is in their best financial interests than a judge. There are safeguards in the requirement that not only a majority in number of the shareholders vote in favour of the scheme but also that they represent three quarters in value of the shares. Mr Kinch relies on the proposition that the price on offer is at a discount to net*

> *asset value which the independent directors did not take into account. The evidence, so far as it goes, shows that the independent directors did take into account the net asset value of Linton Park and also the net asset value of Camellia. Teller and Greenwood, the advisers to the independent directors, in addition reworked Mr Kinch's figures and concluded that the share price of both Linton Park and Camellia traded at a roughly equal discount to net asset value. This is clearly a question upon which different views are possible, indeed a question upon which different views may be equally reasonable. But whether the package on offer is a fair price for the shares is a matter which the shareholders are far better to able to judge than the court, and for that reason the court will be very slow to depart from the majority view".*

This case accordingly establishes that in ordinary circumstances the majority will be regarded as the best judge of the fairness of the price, even if that price is at a discount to the net asset value.

36. There is a further circumstance in United Kingdom law (although one not directly reproduced in Caymanian law) in which shares may be ordered to be transferred at a discount. In the context of a petition brought under section 994 of the ***Companies Act 2006*** on the grounds that the affairs of the company are being or have been conducted in a manner unfairly prejudicial to shareholders, section 996(2)(e) provides that the court may order the purchase of the shares of any members of the company by other members or by the company itself. The general rule is that the court will direct that the shares be purchased at a discount reflecting the size of the holding unless the case is one of quasi-partnership. The position was summarised in ***Irvine v Irvine (No 2)*** [2007] 1 BCLC 445 in a passage quoted in the Bermudan decision of ***Golar LNG Ltd v World Nordic SE*** (see paragraph 38 below); and was stated as follows in the Court of Appeal in ***Strahan v Wilcock*** [2006] EWCA Civ 13; [2006] BCC 320 by Arden LJ:

> *"[17] The burden of the dispute between the parties on this appeal is as to the basis of valuation in the buy-out order. Shares are generally ordered to be purchased on the basis of their valuation on a non-discounted basis where the party against whom the order is made has acted in breach of the obligation of good faith applicable to the parties' relationship by analogy with partnership law, that is to say where a "quasi-partnership" relationship has been found to exist. It is difficult to conceive of circumstances in which a non-discounted basis of valuation would be*

*appropriate where there was unfair prejudice for the purposes of the 1985 Act but such a relationship did not exist. However, on this appeal I need not express a final view on what those circumstances might be."*

Although some doubt has been cast on this general rule by two recent first instance decisions (***Re Blue Index Ltd*** [2014] EWHC 2680 (Ch) and ***Re Addbins Ltd*** [2015] EWHC 3161 (Ch), both proceeding on the basis that the oppressing majority should not ordinarily be rewarded for their oppressive conduct by receiving the benefit of a minority discount), it appears to me that the rule as I have described it is established at least at Court of Appeal level in England.

*Bermuda and BVI*

37. Bermuda and the British Virgin Islands also have appraisal regimes. In Bermuda, the relevant provision is section 103 of the ***Companies Act 1981***, which is in the following terms:

> *"103(1) The holders of not less than ninety-five per cent of the shares or any class of shares in a company (hereinafter in this section referred to as the "purchasers") may give notice to the remaining shareholders or class of shareholders of the intention to acquire their shares on the terms set out in the notice. When such a notice is given the purchasers shall be entitled and bound to acquire the shares of the remaining shareholders on the terms set out in the notice unless a remaining shareholder applies to the Court for an appraisal under subsection (2):*
>
> *Provided that the foregoing provisions of this subsection shall not apply unless the purchasers offer the same terms to all holders of the shares whose acquisition is involved.*
>
> *(2) A shareholder to whom notice has been given under subsection (1) may within one month of receiving the notice apply to the Court to appraise the value of the shares to be purchased from him and the purchasers shall be entitled to acquire the shares at the price so fixed by the Court".*

38. This provision was considered in ***Golar LNG Ltd v World Nordic SE*** [2011] Bda L R 9. Ground CJ held at [5] that the shares should be appraised at their fair value; and in relation to minority discounts he said this:

*"[23] This was a relatively small shareholding in a quoted public company. In such a case I consider that it is appropriate to apply a minority discount to any share value derived from the pro-rated NAV. It may be that in this respect the law of Canada has diverged from that of England, but if I had to choose I would choose to follow the latter. In that regard I have been helped by the review of the law conducted by Blackburne J in* ***Irvine v Irvine (No 2) [2007]*** *1 BCLC 445, and by his conclusion at 449 [11]:*

> *"a minority shareholding, even one where the extent of the minority is as slight as in this case [there the split was 50% plus and minus one share on each side], is to be valued for what it is, a minority shareholding, unless there is some good reason to attribute to it a pro rata share of the overall value of the company. Short of quasi-partnership or some other exceptional circumstance, there is no reason to accord to it a quality that it lacks".*

*Applying that to this case, this was not a quasi-partnership and there are no exceptional circumstances, and so a minority discount should be applied.*

*[24] It is also necessary to keep a sense of perspective, and bear in mind that the NAV is an entirely hypothetical figure which cannot easily be realised, particularly in a case such as this where the sudden sale of the entire tanker fleet at valuation is likely to be unachievable. The reality is that in a case such as this there is no possible way for the NAV to translate into money in a shareholder's pocket without incurring substantial break-up costs and associated losses. It is therefore appropriate to discount the NAV ...."*

39. In BVI the relevant provision is section 179 of the ***BVI Business Companies Act 2004***, which entitles a member of a company to payment of the fair value of his shares upon dissenting from a merger or consolidation, as well as in certain other circumstances. The appraisal mechanism is set out in section 179(9), which is in the following terms:

*"If the company and a dissenting member fail, within the period of 30 days referred to in subsection (8), to agree on a price to be paid for the shares owned by the member, within 20 days immediately following the date on which the period of 30 days expires, the following shall apply: (a) the company and the dissenting member shall each designate an appraiser; (b) the two designated appraisers together shall designate an appraiser; (c) the three appraisers shall fix the fair value of the shares owned by the dissenting*

*member as of the close of business on the day prior to the date on which the vote of members authorising the action was taken or the date on which written consent of members without a meeting was obtained, excluding any appreciation or depreciation directly or indirectly induced by the action or its proposal, and that value is binding on the company and the dissenting member for all purposes; and (d) the company shall pay to the member the amount in money upon surrender by him of the certificates representing his shares*".

In ***Olive Group Capital Limited v Mayhew***, [2016] ECSCJ No 167, a decision of the Eastern Caribbean Court of Appeal, it was held that the BVI appraisal provisions as a matter of law allowed for the application of a minority discount, but whether or not one should be applied in any given case was a matter for the appraisers to determine.

*The position in the Cayman Islands*

40. Apart from the present case, there are two Caymanian decisions that do or may bear on the question of the proper approach to minority discounts.

41. The decision of Jones J in ***Integra*** is directly to the effect that no minority discount is permissible in a fair value determination under section 238. More generally, since that decision the Delaware and Canadian jurisprudence has been regarded as relevant to such determinations. In his substantive judgment in that case at [16], Jones J cited from an article published in the Canadian Annual Review of Civil Litigation (2011) called *Fair Value – A Common Issue With Surprisingly Sparse Canadian Authority* by Clarke Hunter QC and Clarissa Pearce, which he said he had found to be helpful in a number of respects; and he remarked on the fact that the Canadian legislation was very similar to section 238. At [19] he set out a summary of the comparable United States legislation provided by the expert instructed by the dissenting shareholders and accepted it as a useful summary of the Delaware jurisprudence, which he said he thought could be relied on as a helpful guide to the meaning of "*fair value*" in section 238. At [20] he agreed with the following proposition, expressly based on Delaware and Canadian principles, from an article called *Dissenting Shareholders' Appraisal Rights in Cayman Islands Mergers and Consolidations* by Tony Heaver-Wren and Andrew Jackson:

"*Fair value is the value to the shareholder of his proportionate share of the business as a going concern, save where it is worth less on a net assets (i.e.*

*liquidated) basis as at the merger date: ex hypothesis the shareholder has bought into the company as a going concern, not in anticipation of participating in a liquidation, and it follows that, when he elects to dissent from a merger or consolidation brought about at the behest of the majority, he is thereafter deprived of his proportionate share of an active enterprise and is entitled to be compensated for it. In determining the measure of such compensation, the Court should be guided by the following considerations:*

*1.1 Fair value does not include any premium for forcible taking (i.e. expropriation of the shares).*

*1.2 It is neither appropriate nor permissible to apply a minority discount when making the determination."*

At [27] he expressed his conclusion as follows:

*"In conclusion, the Court is therefore required to determine the fair value of Integra's business as a going concern as at the Valuation Date, meaning at the point immediately before the merger was approved. The fair value of the Respondents' shares is their proportionate share of this amount without any minority discount or any premium for the forcible taking of their shares. There is no presumption that the fair value offer made by Integra on 2 July 2014 in accordance with section 238 (8) constitutes a minimum price and it is open to the Court to determine that the fair value is less than $10 per share".*

42. The second case (although the first in time) is the decision of the Privy Council on appeal from this court in ***CVC/Opportunity Equity Partners Ltd v Demarco Almeida*** [2002] 2 BCLC 108. That case arose in the following way. As I have indicated in paragraph 36 above, section 994 of the ***Companies Act 2006***, which gives a remedy in cases of unfair prejudice, has no direct parallel in Cayman law. In this jurisdiction, the only remedy available to a minority shareholder who alleges that the company's affairs have been conducted in a manner oppressive to him is to petition for the winding-up of the company on the just and equitable ground; although section 95(3) of the ***Companies Law*** now gives the court power to make a range of alternative orders, including an order for a buy-out of shares, on a just and equitable winding-up petition. A threat to present

such a petition will often have the effect that the majority shareholders make an offer to buy the shares of the minority in order to avert the risk that the company will be put into liquidation. The purpose of the offer will be to encourage the court to make an order for the acquisition of the shares under section 95(3). So long as the offer is of an "*appropriate*" amount, the court will restrain presentation of a petition. That is what happened in ***CVC/Opportunity***. There, the issue was as to the appropriateness of the offered price; and the outcome was that the minority shareholder was entitled to an offer that reflected his interest in the business as a going concern and was not subject to a minority discount. The opinion of the Board was delivered by Lord Millett, and it is necessary to quote a substantial part of what he said under the heading "*The basis of the valuation*":

> *"[36] The parties cannot be expected to agree upon the monetary value of Mr Demarco's interest. This is a matter of judgment and opinion, and their respective advisers may be expected to disagree. But there should be no difficulty in agreeing the basis of valuation and the machinery for resolving any disagreement.*
>
> *[37] There are essentially three possible bases on which a minority holding of shares in an unquoted company can be valued. In descending order these are: (i) as a rateable proportion of the total value of the company as a going concern without any discount for the fact that the holding in question is a minority holding; (ii) as before but with such a discount; and (iii) as a rateable proportion of the net assets of the company at their break up or liquidation value.*
>
> *[38] Which of these should be adopted as the appropriate basis of valuation depends on all the circumstances. The choice must be fair to both parties, and it is difficult to see any justification for adopting the break-up or liquidation basis of valuation where the purchaser intends to continue to carry on the business of the company as a going concern. This would give the purchaser a windfall at the expense of the seller.*
>
> *[39] If the going-concern value is adopted, a further question arises: whether a discount should be applied to reflect the fact that the holding is a minority one. An outsider would normally be unwilling to pay a significant price for a minority holding in a private company, and a fair price as*

*between a willing seller and a willing purchaser might be expected to reflect this fact. It would seem to be unreasonable for the seller to demand a higher price from an unwilling purchaser than he could obtain from a willing one. Small private companies commonly have articles which restrict the transfer of shares by requiring a shareholder who is desirous of disposing of his shares to offer them first to the other shareholders at a price fixed by the company's auditors. It is the common practice of auditors in such circumstances to value the shares as between a willing seller and a willing buyer and to apply a substantial discount to reflect the fact that the shares represent a minority holding.*

*[40] The context in which the shares fall to be valued in a case such as the present is, however, very different. Mr Demarco is not desirous of disposing of his shares; he would rather keep them and continue to participate in the management of the company. It is Opportunity's conduct in excluding him from management that has driven him, however reluctantly, to seek to realise the value of his investment. In this situation the case law in England is that normally the shares should be valued without any discount: see for example* ***Re Bird Precision Bellows Ltd*** *[1985] 1 BCLC 493; [1986] Ch 658;* ***Virdi v Abbey Leisure Ltd, Re Abbey Leisure Ltd*** *[1990] BCLC 342 ; and* ***O'Neill v Phillips*** *[1999] 2 BCLC 1, [1999] 1 WLR 1092. In* ***Re Bird Precision Bellows Ltd*** *[1985] BCLC 493 at 498, [1986] Ch 658 at 667 Oliver LJ cited with evident approval the observations of Nourse J at first instance where he said:*

> *'I would expect that in a majority of cases where purchase orders are made under s. 75 in relation to quasi-partnerships the vendor is unwilling in the sense that the sale has been forced upon him. Usually he will be a minority shareholder whose interests have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority. On the assumption that the unfair prejudice has made it no longer tolerable for him to retain his interest in the company, a sale of his shares will invariably be his only practical way out short of a winding-up. In that kind of case it seems to me that it would not merely not be fair, but most unfair, that he should be bought out on the fictional basis applicable to a free election to sell his shares in accordance with the company's articles of association, or indeed on any other basis which involved a discounted price. In my judgment the correct course would be to fix the price pro rata according to the value*

> *of the shares as a whole and without any discount, as being the only fair method of compensating an unwilling vendor of the equivalent of a partnership share. Equally, if the order provided, as it did in* ***Re Jermyn Street Turkish Baths Ltd.*** *[1971] 1 WLR 1042, for the purchase of the shares of the delinquent majority, it would not merely not be fair, but most unfair, that they should receive a price which involved an element of premium.'*

*To require Mr Demarco to submit not only to his exclusion from the company but to the acquisition of his shares at less than their going-concern value by a purchaser which intends to carry on the business is hardly less unfair.*

*[41] The rationale for denying a discount to reflect the fact that the holding in question is a minority holding lies in the analogy between a quasi-partnership company and a true partnership. On the dissolution of a partnership, the ordinary course is for the court to direct a sale of the partnership business as a going concern with liberty for any of the former partners who wish to bid for the business to do so. But the court has power to ascertain the value of a former partner's interest without a sale if it can be done by valuation, and frequently does so where his interest is relatively small: see* ***Syers v Syers*** *(1876) 1 App Cas 174 . But the valuation is not based on a notional sale of the outgoing partner's share to the continuing partners who, being the only possible purchasers, would offer relatively little. It is based on a notional sale of the business as a whole to an outside purchaser.*

*[42] In the case of a company possessing the relevant characteristics, the majority can exclude the minority only if they offer to pay them a fair price for their shares. In order to be free to manage the company's business without regard to the relationship of trust and confidence which formerly existed between them, they must buy the whole, part from themselves and part from the minority, thereby achieving the same freedom to manage the business as an outside purchaser would enjoy."*

43. The Dissenting Shareholders placed great reliance on this passage. They pointed out that they were no more "*desirous of disposing of* [their] *shares*" than Mr. Demarco had been in that case: under the terms of section 238(7) the consequence of their dissent

was that they automatically ceased to be shareholders in the Company, and the offer subsequently made to them by the Company was unacceptable. They were being forced to give up their investment in the Company, whereas following the merger the business would continue as a going concern. To require them to submit not only to their exclusion from the Company but to the acquisition of their shares at less than their going-concern value by a purchaser which intended to carry on the business would, just as in Mr. Demarco's case, be most unfair. The passage demonstrated that, at least so far as concerned minority discounts, the public policy of the Cayman Islands coincided with that of Delaware.

44. In my judgment, neither the passage I have cited, nor ***CVC/Opportunity*** read as a whole, supports the Dissenting Shareholders' case. The statements on which the Dissenting Shareholders rely are all premised on the existence of a relationship of trust and confidence that means the company is to be regarded as a quasi-partnership: see in particular paragraph [41], but also the references to quasi-partnership in the quotation from Nourse J's judgment in ***Bird Precision Bellows***, to exclusion from management in paragraph [40], and to the relationship of trust and confidence in paragraph [42]. As I have said when discussing the English unfair prejudice cases, it is established as a general rule that a minority discount will be applied unless the case is one of quasi-partnership; and ***CVC/Opportunity*** is consistent with that general rule. It is, however, only "*in the case of a company possessing the relevant characteristics*" that the shares will be valued as a proportion of the value of the company itself; and it is plain that Shanda is not a quasi-partnership company.

*Discussion*

45. As the authorities I have cited demonstrate, the position in relation to the availability of minority discounts differs between Delaware and Canada on the one hand and England and Wales and Bermuda (and to an extent BVI) on the other. In Delaware and Canada it is established that no minority discount is to be applied; in England and Wales, the fact that shares are to be acquired at a discount is no obstacle to a squeeze-out or scheme of arrangement, and the application of a discount is the general rule where shares are purchased in the context of an unfair prejudice claim unless the company is a quasi-partnership. The position in Bermuda follows the English rule in unfair prejudice cases, and BVI permits (although does not prescribe) a minority discount. Although

the English cases do not concern an appraisal mechanism, or deal with a statutory standard of fair value, they are concerned with fair value of the shares: see the explicit references to fairness in ***Re Hoare, Re Grierson***, paragraph [13] of ***Re Linton Park*** and in paragraph 38 of ***CVC/Opportunity***. The same applies in Bermuda (see paragraph [5] of ***Golar***) and explicitly in the BVI legislation.

46. In paragraph 75 of his judgment in the present case, the judge recorded that when section 238 was introduced the Honourable G Kenneth Jefferson noted, when moving the second reading of the ***Companies (Amendment) Bill 2009*** in the Legislative Assembly, that ".. *this Bill responds to requests from the private sector in relation to merger and consolidation provisions and reflects extensive consultation with the private sector as well as the review of Bermuda, BVI, Delaware and U.K. legislative precedents*" [Official Hansard Report for 20 March 2009]. In paragraph 76 he said that it therefore appeared that Delaware was one of the jurisdictions whose statutory merger law was reviewed, although there was no indication that section 238 was intended to implement or closely follow the Delaware model in particular; and in paragraph 79 he said that "*Delaware was perhaps particularly in mind since it was mentioned as being one of the jurisdictions whose laws had been reviewed and the jurisdiction with the most substantial and sophisticated jurisprudence in the area*". For my part, I do not think that the statement made in the Legislative Assembly provides any assistance in the interpretation of section 238. The jurisdictions said to have been reviewed do not necessarily provide consistent answers to the problems capable of arising from an appraisal regime, and in the case of minority discounts they provide different answers. Moreover, the appraisal regime to which section 238 bears most similarity is that of Canada, but its legislation is not said to have been reviewed. That is not to say that the Delaware jurisprudence is incapable of being of help in the interpretation of section 238: it is, as the judge remarked, frequently used and has given rise to a large number of cases and a well-developed jurisprudence. So long as that jurisprudence does not conflict with Caymanian law and practice, it is sensible to look to Delaware for assistance in solving problems that are novel to Cayman but not to Delaware. There is no point in trying to reinvent the wheel. I think, however, that the judge went too far when he said in paragraph 79 that "*when this Court comes to consider the meaning under Cayman law of the terms used in and language of section 238 it is entirely appropriate to have regard to and pay close attention to the decisions of the courts in*

*Delaware (and Canada)*", and that it was "*preferable, where possible, to ensure consistency of approach by focusing on one rather than a multiplicity of jurisdictions*".

47. As the judge himself recognised, again in paragraph 79, "*it will also be necessary always to take care and be satisfied that the law and practice developed by such other courts fits and is consistent with other relevant parts of Cayman law and practice*". The judge appears not to have been alerted to the possible relevance of the squeeze out and scheme of arrangement regimes, and in relation to English law was taken only to the unfair prejudice regime – which he held was clearly distinguishable, on the ground that it assumed a sale of the shares, whereas section 238 required an assessment of fair value and so was not predicated on a sale. Since the English cases are concerned with fair value, this does not seem to me to be an adequate ground of distinction. It is possible that, had the judge been directed to the other regimes, he would have taken a different view; but be that as it may, it appears to me that in relation to the question of minority discount the judge failed to ensure that his application of the Delaware rules was consistent with other relevant parts of Cayman law.

48. As is made clear by the quotation from ***Dell*** set out in paragraph 32 above, the Delaware approach to fair value is heavily influenced by, if not based on, considerations of public policy. The relevant policy appears to be that stated at the end of the quotation, also set out in paragraph 32 above, from ***Cavalier***:

> "*More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.*"

So stated, the policy is in direct conflict with what was said in ***Re Grierson*** (paragraph 35(a) above):

> "*Then it is said that the price ... does not reflect the advantages to Holts by their obtaining complete control of the company. ... But, in my judgment, it is not unfair to offer a minority shareholder the value of what he possesses,*

*i.e., a minority shareholding. ... [T]he element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares".*

49. In my judgment, it is the latter policy which should prevail. As I have pointed out, the squeeze-out provisions interpreted in ***Re Grierson*** and ***Re Hoare***, and the scheme of arrangement provisions considered in ***Re Linton Park***, are replicated in sections 86, 87 and 88 of the ***Companies Law*** in this jurisdiction. Those provisions are capable of being used to acquire the shares of a dissenting minority on a takeover, merger or consolidation. The position in the Cayman Islands is accordingly that there are now three mechanisms contained in the ***Companies Law*** by which the shares of dissentients may be acquired: by squeeze-out with a 90% majority, by scheme of arrangement with a 75% majority, and under section 238 with a two-thirds majority. Assuming, as I do, that the English approach to squeeze-out and scheme of arrangement acquisitions would be applied in the Cayman Islands, those two mechanisms allow a minority discount to be applied to the cost of acquisition of dissentients' shares. It seems to me unlikely in the extreme that the simplified merger and consolidation regime introduced as Part XVI of the ***Companies Law*** was intended to depart from that approach: it is to be presumed that the three mechanisms, contained in the same piece of legislation and capable of serving the same purpose in different ways, are to be construed from the same standpoint. Nothing in the wording of section 238 suggests that a different approach was intended; indeed, as Shanda pointed out, there is nothing in the wording of the section that suggests that the focus is to be on the value of the company rather than on the value of the shares. The absence of such wording is overcome in Delaware by the application of policy considerations; and in Canada the rationale for the exclusion of a minority discount is said to lie in the context, which is in effect that the majority are purchasing the shares of the minority in order to consolidate their existing position (see ***Kummen***, referred to in paragraph 34 above). However, that is also the context in which shares may be purchased by squeeze-out or scheme of arrangement, and in England that context does not have the effect of requiring the shares to be valued as a proportion of the value of the company itself.

50. For these reasons, it appears to me that section 238 requires fair value to be attributed to what the dissentient shareholder possesses. If what he possesses is a minority

shareholding, it is to be valued as such. If he holds shares to which particular rights or liabilities attach, the shares are to be valued as subject to those rights or liabilities. As a matter of mechanics, this can be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company; but failing to make such adjustments means that particular rights or liabilities will often be ignored, and the shares will be valued as something they are not. It follows that the judge (and Jones J in ***Integra*** before him) was wrong to hold that a minority discount should not be applied in the assessment of the value of the Dissenting Shareholders' shares. I would allow Shanda's appeal on the minority discount point.

Interest

51. Shanda's other complaint is about the judge's award of interest.

52. The rate of interest awarded by the judge was 4.295%, being the mid-point between 3.5% (being the rate at which he decided Shanda could have borrowed the amount representing the fair value of the Dissenting Shareholders' shares in order to pay it to them) and 5.09% (being the rate which he decided prudent investors in the position of the Dissenting Shareholders could have obtained, had they had the money to invest).

53. In adopting a mid-point approach the judge followed the approach taken by Jones J in ***Integra*** and by the Delaware courts. He recorded that Jones J had said that the provision for a fair rate of interest appeared to have been reproduced from an earlier version of section 262(h) of the ***Delaware General Corporations Law***, and then cited the following passage from ***Integra***:

> *"72. The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The 'legal rate' payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence.* ***(Cede & Co., Inc v. Medpoint Healthcare, Inc*** *2004 Del. Ch, Lexis 124 at page 21).*
>
> *73. The 'legal rate' under Delaware law is the equivalent of the 'prescribed rates' payable on judgment debts under the Judgment Debts (Rates of*

*Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula: 3- month LIBOR (or equivalent) rounded to the nearest one eighth per cent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US$ has been fixed at 2.375% since 1 February 2013....*

*76. The Respondents [dissenting shareholders] have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at 31 December 2013 but the notes do not disclose the results of its cash management operations. ... In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.*

*77. Counsel for the Respondents submits that the Court should adopt a mid-rate between the prescribed rate for US$ (2.375%) and Integra's assumed USS borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed USS borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a "fair rate of interest" which should be awarded to the Respondents from 2 July 2014 until payment."*

54. The judge also cited, as representing the proper approach for him to adopt, the following passage from the judgment of Noble VC in ***Cede v Medpoint Healthcare***, referred to by Jones J:

"*The award of interest serves two important purposes. First, 'it compensates the plaintiff for the loss of the use of his money during this period,' and thus*

*'endeavours to place the dissenting shareholder in the position she would have been in had the corporation promptly paid the value of her shares.' Second, 'it forces the surviving corporation to disgorge the benefit it received from having the use of the plaintiff s funds.' 'In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding.' In addition to looking to the company's cost of borrowing, or 'borrowing rate', the Court 'has historically examined the return that a prudent investor would have received if he had invested the judgment proceeds at the time of the merger.' The Court may also consider the legal rate of interest; indeed, 'the legal interest rate serves as a useful default rate when the parties have inadequately developed the record on the issue.' The Petitioners' argument that the interest rate should be based solely on the borrowing rate or the rate 'a prudent investor would require to provide a substantial unsecured loan to the Respondent' must be rejected. As noted above, this Court traditionally looks at both the 'prudent investor rate' and the 'borrowing rate' in fixing the interest rate and the Petitioners have provided no compelling argument as to why this Court should deviate from this practice. Awarding the proposed [unsecured loan] interest rate of 9.940% would grant an 'undeserved windfall' given the volatility of the market."*

55. The judge then said this, starting at paragraph 19 of the fair interest ruling:

*"The Vice Chancellor's explanation of the purpose of the statutory right to an award of a fair rate of interest seems to me to be consistent with the nature and purpose of the statutory jurisdiction and language - to protect the dissenting shareholders from the effects of the forced merger and in particular to compensate them for being out of their money and to fix a "fair" rate of interest. Furthermore, the need to take into account all relevant factors having regard to the facts of the case also seems to me to be what is required in order to ensure that a fair rate is used.*

*20. It also seems to me that the balancing of interests and positions involved in the midpoint approach is consistent with the statutory mandate to*

*establish a fair rate. Interest should address the dissenting shareholders' financial disadvantage of being out of their money. The disadvantage materialises either in loss of earnings on the funds or in the costs of having to borrow a loan to substitute for the funds not received. Equally the debtor gains a financial advantage through withholding the sums payable to the dissenting shareholders. In the meantime he or she can yield returns from investing the funds or avoid the cost of a loan. Therefore the non-payment of a sum of money results in what can be described loosely as an unjustified enrichment of the debtor. It follows that for the assessment of the financial consequences of the delay two different perspectives have to be borne in mind. The mid-point approach achieves this. In some respects the exercise which the Court is required to undertake is similar to that which the Court undertakes when exercising its discretion under section 34(1) of the* ***Judicature Law (2013 Revision)*** *to award interest on a debt or damages in respect of which a judgment is awarded.*

*21. I accept that the Court may have regard to the prescribed rate (that is the statutory rate of interest payable on judgment debts which is 2.375% for U.S. dollars, as set out in the Judgment Debts (Rates of Interest) Rules 2012) as a reference point, particularly in cases where there is no or insufficient evidence filed by the parties. However, it does not seem to me appropriate to place much weight on it. Had the intention been to use the prescribed rate section 238(11) could easily have referred to it. Furthermore, the statutory requirement to establish a fair rate, as I have noted, does seem to me to involve taking into account the purpose of the requirement to pay interest and to balance the position of and impact of the delay in payment on both the company (debtor) and the dissenting shareholders."*

56. It was common ground before the judge that the mid-point approach was the correct one to adopt. On appeal, however, Shanda asserted that that approach was inconsistent with the purpose of an award of interest under English (and hence Caymanian) law, and that the judge had accordingly erred in principle. He should instead have awarded a rate representing only the cost to the Dissenting Shareholders of being deprived of their money, which was conventionally to be assessed as equivalent to the rate which they would have had to pay to borrow money to replace the unpaid fair value of their shares.

The rationale for that conventional basis was that the payee could by borrowing an equivalent sum have done exactly the same as he would have done if the money had been paid, so that his loss was not the lost opportunity to deploy the money but the cost of making the borrowing. In the present case, neither party had led any evidence of the cost to the Dissenting Shareholders of borrowing: instead, working on the basis that the mid-point approach applied, they had supplied information about Shanda's cost of borrowing and the likely investment return to a prudent investor in the position of the Dissenting Shareholders. This meant that, if the Court of Appeal accepted that the judge had erred in principle, there would be no material on which it could arrive at a proper interest rate. It could therefore either remit the matter to the judge, or in default of anything else award interest at the judgment rate of 2.375% for US dollars.

57. The cornerstone of Shanda's argument on this point was the following passage from the judgment of Steyn J concerning interest on damages in ***Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd*** [1987] Lexis Citation 1106:

> "*The issue of the appropriate rates of interest must now be considered. The selection of an appropriate interest rate is a matter of discretion. But it is not an entirely open textured discretion. A practical and consistent approach has emerged. The purpose of the award of interest is to achieve restitutio in integrum. The enquiry does not focus, in a case such as the present, on the profit to the defendant of the use of the money. It is directed to an estimation of the cost to the plaintiff of being deprived of the money which he should have had. But for practical reasons courts will not allow an enquiry into the plaintiff's actual loss. To do so might sometimes involve enquiries, in relation to the ancillary relief of interest, approximating the length of the trial. Instead, in cases such as the present, courts award a commercial rate of interest or the rate which somebody in the position of the plaintiff would have had to pay to borrow the money. In the interests of a cost effective administration of civil justice, the courts must adopt a fairly broad brush approach to the award of interest. On the other hand, in the light of the overriding criterion of fairness, the courts are vigilant to ensure that the broad brush approach does not become too blunt an instrument. On this question I have been assisted by a judgment of Forbes J in* ***Tate &***

> ***Lyle Food and Distribution Ltd v Greater London Council*** *[1981] 3 All ER716, [1982] 1 WLR 149. In dealing with the approach to be adopted Forbes J said (at p 154C-E):*
>
> > *"I feel satisfied that in commercial cases the interest is intended to reflect the rate at which the plaintiff would have had to borrow the money to supply the place of that which was withheld. I am also satisfied that one should not look at any special position in which the plaintiff might have been: one should disregard, for instance, the fact that a particular plaintiff, because of his personal situation, could only borrow money at a very high rate or, on the other hand, was able to borrow at specially favourable rates. The correct thing to do is to take the rate at which plaintiffs in general could borrow money. This does not, however, to my mind, mean that you exclude entirely all attributes of the plaintiff other than that he is a plaintiff. There is evidence here that large public companies of the size and prestige of these plaintiffs could expect to borrow at 1 per cent over the minimum lending rate, while for smaller and less prestigious concerns the rate might be as high as 3 per cent over the minimum lending rate. I think it would always be right to look at the rate at which plaintiffs with the general attributes of the actual plaintiff in the case (though not, of course, with any special or peculiar attribute) could borrow money as a guide to the appropriate interest rate."*
>
> *That is, if I may say so, a sensible and practical approach. All I would respectfully add is that an issue as to the appropriate categorisation of a particular plaintiff involves the exercise of judicial discretion."*

58. I accept that this statement accurately represents the position in England. It is important, however, to appreciate that it is a statement about the principles to be applied in assessing interest on damages. Such an assessment can of course be made only when damages have been awarded, and damages can be awarded only when some right of the plaintiff has been infringed. The purpose of an award of interest will be to ensure that the plaintiff is put back, so far as money can, in the position he would have been in had his right not been infringed. That inevitably places the focus solely on the plaintiff: it is only his position that is of relevance. A section 238 determination, however, does not proceed on the basis that any right of the dissentient shareholder has been infringed by the company. The legislative concern is not to restore him to some anterior position

but to ensure that he receives fair value for what he is obliged by statute to give up. In my view, that has the effect when it comes to an assessment of the fair rate of interest of removing the entire focus from the dissentient and instead placing it on the entirety of the circumstances. When those circumstances are considered, it is right to say – as the judge did – that both the disadvantage to the dissentient and the advantage to the company should be taken into account. To adopt the mid-point approach is a logical way of balancing the advantage and disadvantage, with a fall-back reliance on the judgment rate – which must theoretically itself represent a rate deemed to be fair – if the evidence supports no other conclusion. Although it is possible to take the view that the cost of borrowing is a better measure of the dissentient's loss than the putative investment returns a prudent investor in his position could have achieved, both measures represent the dissentient's lost opportunity and consequently the disadvantage to the dissentient of being out of his money. Overall, it seems to me that Jones J and the judge were right to adopt the (former) Delaware practice in relation to the award of interest. That practice, as explained in ***Cede***, provides a principled approach that is not in conflict with Caymanian law or practice. Accordingly, I consider that the judge did not err in principle in his approach to the assessment of a fair rate of interest. It was accepted by Shanda that, if the judge had applied the right principle, there was evidence on which he was entitled to reach the conclusion he did about the fair rate.

59. For these reasons, I would dismiss Shanda's appeal in relation to interest.

*The Dissenting Shareholders' appeal*

60. The Dissenting Shareholders complain about three aspects of the judge's judgment, each of them relating to an element of the methodology to be applied in determining the fair value of Shanda's business, and hence of the Dissenting Shareholders' shares. These elements are (1) a component - known as beta - of the discount rate to be applied in the discounted cash flow analysis adopted by the experts as the appropriate method of valuing Shanda's business; (2) the measure of market capitalisation to which to apply a Small Stock Risk Premium (**"SSRP"**); and (3) the growth rate during the terminal period.

*Context*

61. Professor Jarrell and Mr. Inglis agreed that Shanda's business was to be valued by use of a discounted cash flow ("**DCF**") model. As its name indicates, a DCF analysis contains two main elements: a prediction of future cash flows, and the application to those cash flows of a discount rate so as to translate the future cash flows into a present capital value. In effect, the exercise is designed to identify how much it would have cost at the valuation date to buy an investment with a rate of return and a risk profile equivalent to that of the company's business.

62. As a result, the discount rate will generally be taken as the expected rate of return on equivalent investment opportunities in the capital markets, also known as the weighted average cost of capital ("**WACC**") of the company. The weighting exercise implicit in determining the WACC involves estimating the cost of equity of a company and its debt. It was common ground in the present case that Shanda would have no debt, so the only assessment required was of the cost of its equity. Assessment of the cost of equity is ordinarily done, and was in this case done, through use of a capital asset pricing model ("**CAPM**"). A CAPM starts by assessing the rate of return on a risk-free investment, and then adjusting that rate upwards to take account of risk factors. One such factor is systematic risk, which is the risk represented by the relevant market as a whole. This systematic risk is reflected in an equity risk premium; and the equity risk premium is in its turn multiplied by a factor, beta, which measures the risk represented by a particular investment relative to the risk of the market as a whole. A further factor which may be added is a size premium, reflecting the possibility that equity investors will require a higher expected return from small companies to compensate for the greater risk associated with them. Each of these factors has the effect of increasing the discount rate and consequently decreasing the value; but because beta is used to multiply one of the factors, rather than being added as a separate factor, small changes to it are capable of having large effects on the discount rate, and consequently on the value. I take as an example of the operation of a CAPM Mr. Inglis's initial report, in which he proposed a discount rate of 10.24% derived from a CAPM made up as follows: 2.27% as the risk-free rate, equal to the yield on 10-year US government bonds; plus 6.00%, being (a) an equity market risk premium of 6.00% as the expected rate of return of the market in excess of the risk-free rate, multiplied by (b) 1.00, his estimate of Shanda's equity beta, based on the betas of Chinese games companies listed on the NASDAQ; plus a small stock risk premium of 1.07%; plus 0.90% as a country

risk premium for perceived additional economic, financial, or political risk associated with investment in China. The values given by Professor Jarrell to the various factors were different; but the most significant difference was his use of a beta of 1.78 as opposed to Mr. Inglis's 1.00, a difference which is said on its own to have had the effect of reducing the value of each of Shanda's ADSs by US$9.06.

63. Predicting future cash flows typically involves estimating cash flow in two, or sometimes three, periods: a finite future period, at the end of which the company will ordinarily be expected to have achieved a steady state or maturity; perhaps a transitional period, designed to iron out possible future volatility in the cash flows; and a terminal period. Cash flows in the first period, and to some extent in the transitional period, will be based on, or at least have regard to, the company's past performance and its own estimates of its likely future earnings; whereas cash flows in the terminal period will usually be derived from a formula designed to project indefinitely into the future as a constant the rate of growth identified at the conclusion of the prior stage or stages, by which time the rate of increase or reduction in cash flow will have stabilised.

64. In the present case, the judge had to resolve disputes between the experts relating to whether cash flows should be estimated in two stages or three; as to whether cash flows in the first period should be based on the Company's own management projections or on figures derived from the performance of similar companies; as to how certain elements of the Company's business, in particular the likely performance of one of its Internet games, should be reflected in the cash flow estimates; and as to how the discount rate should be ascertained. Only three of his conclusions on valuation methodology are now disputed, all of them by the Dissenting Shareholders. The first two concern the judge's assessment of beta (**"the beta point"**) and the small stock risk premium (**"the SSRP point"**) in the ascertainment of the discount rate; the third of them arises out of his decision to adopt a three-stage approach to the assessment of cash flows (**"the transitional period point"**).

*The beta point*

65. As I have said, beta is a measure of the risk of a particular investment relative to the systematic risk of the market as a whole. Because it focuses on the special risk attaching

to a particular investment, it requires identification and assessment of particular elements of risk associated with that investment. In this case, the notional investment was Shanda's business, and the exercise involved identifying and valuing risk factors associated with that business. At paragraph 147 of his judgment, the judge identified six differences of approach to this topic between the experts as follows:

(a). *should Shanda's beta estimate be based solely on data relating to the period (and has Mr Inglis established that Professor Jarrell's beta estimate is unreliable because of his use of a measurement period) that ended prior to the public announcement of the First Buyer Group's proposal on 27 January 2014 (is Professor Jarrell's beta estimate out of date) (the staleness point)?*

(b). *should Shanda's beta estimate ignore (and has Professor Jarrell established that it is appropriate to use) data relating to the period of the China effect in U.S. markets occurring from early 2011 to late 2013 (the China effect point)?*

(c). *should Shanda's beta estimate be based only on directly measured betas or only on indirectly measured betas and if indirect betas can be used is the peer group selected by Mr Inglis sufficiently comparable so that they can be used in the estimate of Shanda's beta (the direct/indirect betas point)?*

(d). *what should the measurement period be – should it be 4.3 years or two years (the measurement period point)?*

(e). *should weekly or monthly returns be used (the weekly/monthly returns point)?*

(f). *if monthly returns are otherwise preferable, should Shanda's beta be estimated using monthly returns measured from month end to month end (the month end measurement point)?*

66. The judge considered these points in turn and expressed a conclusion on each of them as follows:

The staleness point: "*It seems to me this issue is finely balanced. Mr Inglis has raised a serious doubt as to the reliability of Professor Jarrell's use of and sole reliance on the pre-deal announcement data. Professor Jarrell's response does provide some evidence that Shanda's beta is unlikely to have*

*changed in the period between that announcement and the Valuation Date but that is not conclusive or completely convincing for the reasons given by Mr Inglis. The gap between the date of the observations and the Valuation Date and the failure to use any more recent data does in my view raise doubts about the reliability of Professor Jarrell's beta estimation. While it would be possible to show that there was no problem if there was sufficient evidence to demonstrate that Shanda's beta had or was likely to have remained constant (and I agree that the peer companies otherwise relied on by Mr Inglis to support his estimate of Shanda's beta are a good guide for doing so), Professor Jarrell's analysis, and the results of his comparison with the betas of the peer companies, did not seem conclusive or clear-cut".* (Paragraph 149(e))

The China effect point: *"Once again the evidence is finely balanced. But I am satisfied that there is sufficient evidence of the problem identified by Mr Inglis to raise material concerns that the data derived during the relevant period has been subject to exceptional and distorting effects such that it might be unreliable and result in an error in the beta estimate".* (Paragraph 150(f))

The direct/indirect betas point: *"In my view NetEase Inc (despite the revenue differences highlighted by Professor Jarrell) is sufficiently comparable with Shanda to be a useful and reliable peer company for the purpose of calculating Shanda's beta. Changyou also has a significant number of points in common and on balance I am satisfied that it is appropriate to use it in the estimate of Shanda's beta. I find it more difficult to assess, on the evidence, how close the comparison is with the U.S. companies but I have not been convinced by the evidence of Professor Jarrell that Mr Inglis's opinion is unreasonable and that they are of no assistance and therefore to be ignored."* (Paragraph 151(q))

The measurement period point: *"As with so many issues that arise in relation to the estimate of a company's beta, there are trade-offs between different approaches and it is necessary to make a judgment about which approach is most appropriate on the facts of the particular case. In this case Mr Inglis's use of the shorter two year period has been driven by his view that the data*

*relating to a longer period is tainted. As I have already noted, it seems to me that this is not an unreasonable view in the circumstances. The question then becomes whether a two year period is too short to be reliable and it seems to me to be clear from the cited textbooks and literature that it is not. The further question then arises as to whether the use of a 4.3 year period (ending with the public announcement in January 2014) is clearly preferable. I do not think it is, but neither is two year period clearly preferable either. While the longer period offers the benefits noted in the extract from Professor Damodaran's book quoted in paragraph 152(c) above, and is clearly a measurement period which can be reliable and consistent with the literature, it is in this case subject to the risks of error that Mr Inglis has identified and which I have found to be credible and incapable of being dismissed."* (Paragraph 152(d))

The weekly/monthly returns point: *"in the present case the R-squareds [one of two statistical bases for assessing the reliability of a beta estimate, the other being standard error] for the monthly betas were significantly higher than those for the weekly betas. This means that they support the view that the monthly betas* [used by Professor Jarrell] *capture more of the Shanda specific risk and are therefore more reliable. However the monthly betas have a higher standard error than the daily and weekly betas that* [Mr Inglis] *presents and therefore can be considered to be less reliable (since this weekly and daily data is likely to be closer to Shanda's true beta). I see that both these statistical measures are helpful in making the comparison between weekly and monthly measurement period but it seems to me that in this case neither is determinative. R-squared is focussing on how much risk comes from the company rather than the market; standard error focusses on how far away from the true beta the estimated beta could be. The monthly betas are strong on one measure and weaker on the other. However, that does not, in my view, mean that the application of the statistical measures entitles the Court to conclude that one is clearly to be preferred and more reliable than the other."* (Paragraph 153(d))

The month end measurement point: *"I have quoted the extract from Professor Jarrell's answer at length because it seems to me to involve a candid admission that he has been unable to dismiss or find a convincing*

*solution to Mr Inglis's challenge to his use of month end observations, which he agrees is "troubling" and which suggests that there is an arbitrary element in the estimate of beta on such a basis. It appears that this is not an issue that has yet been adequately addressed in the literature or seriously been raised before. The Court is not in a position to resolve the dispute but must assume that there is a material doubt over this approach to calculating betas. It is, on the other hand, correct to say, as Professor Jarrell does, that reliance on monthly betas calculated by reference to month end observations is a frequent and perhaps standard practice but that does not, to my mind, remove the risk that Professor Jarrell's methodology is subject to error."* (paragraph 154(b))

67. At paragraphs 155 to 160, the judge set out his conclusions on the beta point. It is sufficient to quote paragraphs 155 and 160, omitting at this stage a discussion of two Delaware cases (including a decision of Chancellor Bouchard in ***In re Appraisal of DFC Global Corp*** (2016) WL 3753123 (Del. Ch.):

"*155. I have carefully considered the opinions of both experts, their respective challenges to the reliability of each other's beta measurement and the extensive arguments and submissions made by Mr Meeson and Mr Levy and reached the following conclusions:*

*(a) it seems to me that both experts have adopted methodologies which are consistent with accepted practice and the literature and to that extent each is, prima facie, reliable. But each of their estimates is subject to certain risks and problems which the Court is unable to ignore or completely dismiss,*

*(b) as I have explained, in my view there are risks of error associated with a beta estimate for Shanda based solely on the use of (i) data gathered in the period before the announcement of the First Buyer Group proposal in January 2014; (ii) data gathered during the period between 2011 and 2013 affected by the US market undervaluation of the shares in Chinese companies and (iii) monthly betas based on month end observations. There are also risks of error associated with a beta estimate based solely on (i) a small peer group, some of whose members are only just comparable with Shanda and where there remains some room for argument as*

*to the extent of their compatibility since there are a number of points of difference between members of the group and Shanda and (ii) weekly betas measured over a two year period where on some statistical measures the weekly betas are clearly less reliable that the monthly betas.*

*(c) it therefore seems to me that in such circumstances it is not safe to rely on just one estimate on its own but preferable (as a way of reducing the risk of error and to take the widest sample available) to use and rely on both estimates. The right course is for the Court to use and combine both estimates and use the average of the two for its beta. It does seem to me to be more reliable in this case to blend and use both the directly and the indirectly measured betas. ...*

*160. In the present case, because the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta I consider that the preferable approach is to use an average of Mr. Inglis's beta of 1 and Professor Jarrell's beta of 1.78; that is 1.39. Had I used the blending approach applied by Chancellor Bouchard and simply added Professor Jarrell's directly measured beta to the seven peer companies identified by Mr Inglis the result would have been 1.2925. The difference in this case will no doubt have a not immaterial effect on the amount payable to the Dissenting Shareholders but for the reasons I have given I prefer and will adopt the former approach."*

68. Before I come to the Dissenting Shareholders' complaints about the judge's decision on the beta point, I think it desirable to point out some of the key features of the passage I have just quoted. First, as appears from paragraph 155(a), the judge took the view that both experts had adopted methodologies that were prima facie reliable, but the estimates of both were nevertheless subject to risks and problems that could not be ignored or completely dismissed. Secondly, paragraph 155(b) falls into two parts: the first part, from the beginning to the words "*month end observations*", identifies problems with views expounded by Professor Jarrell; the second part, from the words "*There are also risks of error*" to the end, does the same with views expounded by Mr. Inglis. Thirdly, the opening words of paragraph 160 make explicit that there were issues and uncertainties affecting the calculation of beta put forward by both experts. All of this is consistent with the phraseology used by the judge when setting out his

conclusions on the six differences of approach. In essence, the judge's position was that there was something to be said for the methodology and outcome adopted by each expert, but neither of them was immune from criticism. As he put it in paragraph 158:

> "*Of course, I have not concluded on the beta issue that each approach is realistic and without risk. Instead, I have taken the view that both approaches are essentially or prima facie reasonable but because of risks identified in relation to each the best approach, which minimises the risk involved, is to use and combine both estimates.*"

69. The Dissenting Shareholders contended that the judge was wrong to arrive at his figure for beta by averaging the beta figures put forward by the two experts. He should instead have disregarded Professor Jarrell's beta in its entirety and simply adopted Mr. Ingles' figure; but, if there was a basis for taking account of Professor Jarrell's beta figure, the judge should either have adopted the blending approach suggested by the Delaware jurisprudence or averaged the share values resulting from using each figure for beta. What he had in fact done had unduly favoured Shanda, since averaging the betas did not achieve an equal split in the ultimate value.

70. The foundation for the first part of the complaint, namely that the judge was wrong to place any reliance on Professor Jarrell's beta methodology or outcome, was the assertion that there was no credible support for Professor Jarrell's beta, whereas there was no criticism or identified error in Mr. Inglis's analysis. Professor Jarrell's evidence was described by the judge as "*not conclusive or completely convincing*", as not seeming "*conclusive or clear cut*", and on the month end measurement point as involving "*a candid admission that he has been unable to dismiss or find a convincing solution*" and as being unable to "*remove the risk that* [his] *methodology was subject to error*".

71. Whilst it is the case that these remarks were made by the judge about Professor Jarrell's evidence, their selection fails to give anything like the full picture. It is simply impossible to claim that the judge concluded all of the points of difference in favour of Mr. Inglis. The true position, as I have identified in paragraph 68, was that the judge had found the issues finely balanced, with appropriate methodologies adopted by both

experts but with both - not just Professor Jarrell - open to some criticism. Although I accept that the overall impression given by the judgment is that Professor Jarrell came off rather worse than did Mr. Inglis (an impression fortified by the attitude taken by Shanda on the reopen application), in relation to the assessment of beta honours were broadly even. In my judgment, the judge was in those circumstances entitled to approach the assessment of the appropriate beta figure by balancing the proposals put forward by the two experts.

72. The question then becomes whether he chose the correct method of balancing the opposing views. The Dissenting Shareholders contended that, because of the impact the choice of beta can have on the outcome of a DCF analysis, averaging the two figures unduly favoured Shanda – a result that, even on the basis that there was overall nothing to choose between the experts, could not have been the judge's intention. The first alternative proposed by the Dissenting Shareholders was a blending approach. This method, which involved blending the company's beta with that derived from a peer group, was adopted in ***DFC***, and was explained as follows in a passage quoted by the judge:

> *"I agree that using DFC's beta in isolation would expose the discounted cash flow model to measurement error. At the same time, the most comparable company to DFC is DFC itself, and in my view it is appropriate to factor DFC's beta into the analysis, a proposition that Dages supports and Beaulne did not rebut. The simplest way to do so is by adding it as a seventh beta in the peer analysis. Although commentary on this approach is somewhat sparse, constructing a beta that blends the company's beta with a peer group's betas finds some support in financial literature and this Court's precedent.*
>
> *In the Golden Telecom case, this Court supported the theory in two ways. First, the Court used as a peer group an index of NASDAQ-traded telecommunications companies, which the Court noted included the subject company itself. Second, and more importantly, the Court's final beta was a blend of the Company's observed beta, weighted 2/3, and the industry peer group's beta, weighted 1/3. By adding DFC as a seventh "peer" in the beta calculation, I am essentially performing the same exercise, albeit with a*

> *smaller peer group and a more modest weight applied to the subject company than in Golden Telecom, to arrive at a final beta weighted 14% (1/7) to DFC's beta and 86% (6/7) to the peer group's beta. Because DFC's own observed beta is a meaningful input alongside the betas of its peers, I consider this weighting preferable to the 0% weighting DFC would receive in the peer-only analysis. I therefore use DFC and its six peers to estimate DFC's beta."*

73. The judge's reason for rejecting this balancing method, given in paragraph 160, was that "*the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta*". As a matter of fact, the judge was plainly right about that: the direct/indirect beta point was one of the six differences between the experts, and it was only one element in their overall estimates of Shanda's beta. Using the blending method by adding Professor Jarrell's direct beta to the betas derived from Mr. Inglis's peer group would have meant that one component of the calculation was treated as determinative of the entire beta, and in my view the judge was entitled to take the view that some other method of resolving the overall difference between the experts would be preferable.

74. The Dissenting Shareholders' alternative suggestion, that the ultimate values put on the shares by the experts should have been averaged, also suffers from the defect that it places the focus too narrowly. Although the value attributed to beta has a significant effect on a DCF analysis, it is far from being the only element in the analysis. To average the outcome of the entire analysis to reflect an inability to resolve differences affecting one element of it lacks logic. Moreover, the experts had dealt with the components of the valuation on a step-by-step basis, and the judge had no sensible option but to resolve the differences arising at each step. Even so, it was important that he should keep a general eye on the likely effect, individual and cumulative, of his decisions; but it is apparent from paragraph 160 that he was aware of the potential impact of his decision to average beta, since he said that the difference between the result of averaging and the result of blending would no doubt have a not immaterial effect on the amount payable to the Dissenting Shareholders.

75. In the circumstances, it appears to me that the judge was entitled to take the view that he could not fairly distinguish between the beta figures suggested by the two experts and that in the absence of a more nuanced solution to the dilemma the most appropriate method of resolution was by averaging the two figures. Accordingly, I would dismiss the Dissenting Shareholders' appeal so far as it relates to the beta point.

The SSRP point

76. As I have indicated, a small stock risk premium reflects the greater risk perceived to be associated with investment in smaller companies. It is ordinarily calculated by reference to Ibbotson tables, now called Duff & Phelps tables. These tables divide companies into categories and ascribe a size premium to each category. There were originally three broad categories; but the tables now also have ten equally-populated portfolios, or deciles, based on the market capitalisation of listed equity securities from 1926 to 2014. There was no dispute between Professor Jarrell and Mr. Inglis that the tables should be used, but they differed in how to use them in two respects: what value to attribute to Shanda, and whether to place it within the broad categories or within the deciles. Professor Jarrell took the view that Shanda's value should be derived from its last market price before the price was affected by the merger, and that the resulting value should be placed in the appropriate decile. On that basis, he proposed a SSRP of 1.71. Mr. Inglis's position was that Shanda's value should be the value resulting from his DCF analysis, that value being placed in the appropriate broad category. That resulted in a SSRP of 1.07.

77. The judge accepted Professor Jarrell's figure. He quoted extracts from a further Delaware authority, ***Merion Capital LP v 3M Cogent, Inc*** 2013 WL 3793896 (Del. Ch. July 8, 2013), a decision of Parsons VC that points out that the Ibbotson tables look at the statistical relationship between market capitalisation and equity size premium and assume knowledge or estimation of a company's market capitalisation, which determines which decile the company falls into. At paragraph [175], he expressed his conclusion as follows:

> *"Vice Chancellor Parson's analysis and the commentary from the other Delaware cases seem to me to provide a convincing explanation of the basis of the Ibbotson tables and support Professor Jarrell's view that their*

*application must be based on the use of market capitalisation established before calculating and without reference to the expert's DCF."*

78. The Dissenting Shareholders contended that the judge had misunderstood Professor Jarrell's evidence, which was in fact that use of an appraised value resulting from a DCF calculation was an acceptable option. He had also misunderstood the effect of the Delaware authorities, and had failed to take into account the changes to Shanda's business occurring during the nearly 2 years between the last market valuation unaffected by the merger and the valuation date.

79. In his first report: Professor Jarrell explained his approach as follows:

> "*Because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices, I generally believe it to be most appropriate to rely on the unaffected market value of a subject-company when choosing a size premium, so that I am using exactly the same "apples-to-apples" basis that Duff & Phelps uses in the construction of those size premiums.*"

80. Having seen what Mr. Inglis said in his own first report, Professor Jarrell said this in paragraphs 71 to 73 of his supplemental report:

> "*71. In my opinion, when performing a valuation of a publicly-traded company such as Shanda, the first step in determining the appropriate decile size classification is to use the unaffected stock price of that company to obtain a market-based measure for the overall market capitalization of that firm's equity. As stated in the Jarrell Report, this is critically important because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices. Duff & Phelps does not perform separate DCF valuations for the thousands of companies in its study. Instead, it simply uses the market capitalizations indicated by publicly traded "unaffected" stock prices.*
> *72. If the Duff & Phelps' size classifications were somehow based on DCF-implied fair values, instead of on market trading prices of all publicly-*

*traded companies, then the boundaries of the size classifications would need to be elevated above what is reported by Duff & Phelps. Using Shanda's DCF-implied fair value to determine a size category that is based on trading prices of publicly-traded companies, as Mr. Inglis does, does not result in an apples-to-apples comparison. Mr. Inglis's mismatched comparison renders his selected size premium unreliable.*

*73. By using Shanda's unaffected stock price for the determination of its appropriate size premium, I am using exactly the same "apples-to-apples" basis that Duff & Phelps uses in the construction of those size premiums. In my opinion, this is a much more scientifically valid selection process for a publicly-traded firm than performing "circular" valuations."*

81. Notwithstanding these apparently clear statements, the Dissenting Shareholders suggested that Professor Jarrell had changed his position in cross-examination so as to accept that Mr Inglis's use of the fair value derived from his own DCF valuation was permissible. The relevant passage is as follows:

"*Q. Yes, there are three possibilities aren't there. There's market cap 22 months before the valuation date.*

*A. Yes.*

*Q. Then there is merger price -- and that, we say, is bad because nobody contends that that is actually the correct value of the company as at the valuation date.*

*A. Well, at least it is an objective measure of value.*

*Q. It is a measure, I agree with that.*

*A. But I agree with you.*

*Q. It is an objective measure but it is 22 months old and no one says that is the actual value as at the valuation date.*

*A. True.*

*Q. Then you have the merger price. Nobody says that's the actual value at the valuation date?*

*A. Correct.*

*Q. It is a measure but everyone says it is wrong.*

*A. Right.*

*Q. Then you can have -- the third alternative, it seems to me, is to use the appraised price as at the valuation date. So the court actually works out what is the value of the company at that date and to use that number to determine the size premium. Those are the only three alternatives, aren't they?*
*A. Sounds reasonable.*
*Q. It is a matter for his Lordship, I do not think we need spend a great deal of time --*
*A. All of this is a matter for his Lordship.*
*Q. I agree, but his Lordship can choose one of those three or he may come up with a fourth; it is his job to determine it.*
*A. Correct".*

82. I do not consider that this passage bears the weight the Dissenting Shareholders wish to place on it. To start with, it is confused: it is unclear whether the first six exchanges relate to the unaffected market price or to the merger price. The answer "*sounds reasonable*" is hardly a wholehearted acceptance of the proposition being put; and it is unclear whether the final answer, "*Correct*", relates to the whole proposition or merely to the suggestion that it is for the judge to determine matters. Moreover, nothing in the passage I have quoted or in Professor Jarrell's cross-examination taken as a whole suggests that he was intending in this apparently casual way to abandon his central thesis that only use of the unaffected market price was consistent with the way in which the Duff & Phelps tables were compiled.

83. Professor Jarrell had in fact identified precisely what was wrong with Mr. Inglis's proposal when he spoke in his supplemental report of circular valuations: what Mr. Inglis was doing was relying on the outcome of a DCF analysis in order to determine what small stock risk premium should be used in the course of the same DCF analysis. Mr. Inglis was asked about this in the following passage from his cross-examination:

*"Q. On the other hand, your DCF approach involves the illogicality of using your output to size one of your inputs.*
*A. I accept there is a theoretical issue there but in fact, and I have checked this, were I to apply Professor Jarrell's small company stock premium as*

> *opposed to my own, I would still be in the same range and still have the same small company stock premium. So while it is a theoretical issue, in this particular case, it is not an actual issue.*
>
> *Q. But isn't the reason for that that you are using the three broad categories of stock rather than the ten deciles?*
>
> *A. Yes, well, although funnily enough I have checked the ten decile one, and in fact it is the same conclusion and I would in fact have a slightly smaller company stock premium were I to use the ten decile one."*

84. This exchange was said to show that there was no circularity in fact. The argument was that, if Professor Jarrell's SSRP of 1.71 were substituted in Mr. Inglis's DCF calculation for Mr. Inglis's own 1.07, the outcome of the analysis would value Shanda in the same category or decile as Mr. Inglis had chosen in the first place. It was said that another way of demonstrating the point was to assume that the judge had taken Mr. Inglis's SSRP instead of Professor Jarrell's, the effect being to increase Shanda's appraised value from US$4.6 billion to US$4.9 billion without affecting the category or decile in which a company of that size fell. In my view, this is merely sleight of hand. In both cases, what is happening is that the ultimate result of the discounted cash flow analysis – whether that carried out by Mr. Inglis or that decided on by the judge – is being used to determine one of the factors in the analysis. That is where the circularity lies; and that it does make a difference in fact is demonstrated by the difference between the US$4.6 billion that Shanda was valued at on the basis of the judge's decision to adopt Professor Jarrell's SSRP and the US$4.9 billion that would have been the consequence of adoption of Mr. Inglis's SSRP. The judge approached the DCF analysis on a step-by-step basis, as did the experts, and he was entitled to resolve disputes at each step. He was well aware that the last unaffected quoted price for Shanda's ADSs was arguably out of date, since that was the thrust of the staleness point; but he had held that point to be finely balanced, with evidence going either way on the reliability of the market price; and I do not consider that he can be criticised for taking the view, which was supported by the Delaware authorities he cited, that the way in which the Duff & Phelps tables were compiled meant that the market capitalisation was the appropriate measure of Shanda's size and that the unaffected share price was sufficiently reliable to be used for the purpose of ascertaining the SSRP.

85. Accordingly, I would dismiss the Dissenting Shareholders' appeal on the SSRP point.

The transitional period point

86. I have explained the context of the transitional period point in paragraph 63 above. The judge adopted a three-stage estimation of future cash flows, as Mr. Inglis had proposed, and that approach is not in itself controversial; but the Dissenting Shareholders complain that the judge's failure to adopt Mr. Inglis's proposal in its entirety, in particular so far as concerns the length of the transitional period, has meant that the overall cash flow figures have been illegitimately understated.

87. The judge's reasons for adopting a three-stage approach were stated in paragraph 136 of his judgment as follows:

> "*As I have noted, the experts agree that a transitional period should be used when the projected revenue growth in the last year of the forecast period is much greater than the constant growth rate assumed for all years thereafter into perpetuity. In the present case, Shanda's forecast assumes growth of 18.5% in 2019 but since Shanda assumes that its business would enter steady state growth thereafter Shanda estimates a range of constant growth rates from 1% to 2%. The implicit drop in growth rate is dramatic and not credible. It seems to me that it is reasonable to treat the last year of the forecasts as being 2019 and to compare the projected growth rate for that year with the constant rates assumed for the perpetuity period. When that is done in the present case it is clear that the difference is large and therefore that the usual justification for a transitional period is satisfied*".

88. Having considered Professor Jarrell's and Mr. Inglis's respective proposals (two or three years in Professor Jarrell's case, if a transitional period were to be adopted at all, and ten years in Mr. Inglis's case) and the methodologies underlying them, the judge concluded at paragraph 140 that the preferable approach was to follow Mr. Inglis's basic methodology but to reduce the transitional period to five years. He did not, however, say anything about what impact, if any, this ruling would have on the rate of growth to be adopted in the terminal period – as to which Professor Jarrell had suggested a rate of 5.4% from 2020, Mr. Inglis a rate of 4.5% from 2029.

89. Following circulation of the judge's draft ruling, the parties corresponded with the court about the value to be attributed to the shares in the light of the judge's decisions as to the principles to be applied. Ultimately, the only issue on which they could not agree was as to the growth rate in the terminal period, and it is accordingly necessary only to set out what was said about that issue.

A. The correspondence started with a letter dated 28 March 2017 from Maples and Calder (for the Dissenting Shareholders), which included the following statement:

"*Inglis's Terminal Growth Rate of 4.5% related to a period in time running from after 2029 into perpetuity; Jarrell's Terminal Growth Rate of 5.4% related to a period of time running from after 2019/2020 into perpetuity; the terminal period following a 5 year transition period runs from after 2024 into perpetuity. Inglis has therefore taken the midpoint between his previous Terminal Growth rate and Professor Jarrell's terminal growth rate.*" Attached to the letter were a letter and worksheet prepared by Mr. Inglis, in the former of which he explained that "*Because the terminal period (after 2024) is between mine (after 2029) and Professor Jarrell's (after 2019/2020), I use the midpoint of our terminal growth rates of 4.95%*".

B. Harneys (for Shanda) dealt with these materials in a letter dated 6 April 2017, enclosing an amended worksheet, and stating:

"*From a review of Mr Inglis's worksheet, it would appear that Mr Inglis applied an average of his own and Professor Jarrell's long-term growth rate, presumably as it resulted in a higher-growth rate and, as a consequence, a higher ADS per share. The long-term growth rate has been amended to 4.5% which is consistent with the contents of his Lordship's draft judgment* ".

C. On 12 April 2017 Maples and Calder responded as follows:

"*That leaves a single issue between us, which per point 1 of your letter is the terminal growth rate ("TGR"). This accounts for the remaining different US$0.47 per ADS. Mr Inglis has used a TGR of 4.95% which is the midpoint between his own TGR at trial of 4.5% and Professor Jarrell's TGR of 5.4%. This is not, as you unfairly "presumed", because it resulted in a higher growth rate and so a higher fair value. Rather, Mr*

*Inglis has very clearly explained why he adopted that approach. To reiterate, Mr Inglis's TGR at trial related to a terminal period running from 2029 (i.e. using a 10 year terminal period), whereas Professor Jarrell's evidence at trial supporting a 5.4% TGR related to a period running from 2019/2020. However, in the draft judgment, Segal J has rejected Mr Inglis's contention for a 10 year terminal period, and has instead found that it is appropriate to "reduce the terminal period to five years", such that the terminal period runs from after 2024 (see paragraph 140). You are therefore incorrect when you assert that the TGR of 4.5%, which was self-evidently tied to the rejected 10 year terminal period, is "consistent with its Lordship's draft judgment". To the contrary, that amounts to an attempt on your client's part to take the "good" without the "bad". In light of the above, we invite your client either to accept this change, or to explain clearly why it is not accepted."*

D. Harneys replied on 19 April 2017, saying this:

> "*As for your clients' approach to the terminal growth rate (TGR), our client does not agree that this is correct. It appears that your clients/Mr Inglis are conflating the terminal period and the applicable TGR. Paragraph 140 of the draft judgment reads as follows:*
>
> > *"In these circumstances it seems to me that the preferable approach is to follow Mr Inglis's basic methodology and to reduce the terminal period to five years as calculated by Mr Inglis".*
>
> *In order to give effect to this paragraph, Mr Inglis's methodology must be applied (i.e. the TGR of 4.5%) to the reduced terminal period of five years. At no point in the draft judgment is there a suggestion that the difference in TGR be split and a mid-point applied when calculating the TGR."*

E. Also on 19 April 2017, Maples and Calder wrote to the Court, attaching and summarising the relevant correspondence and saying this:

> *"This morning, 19 April, we received a belated response from Harneys to our 12 April letter, which suggested that our clients and Mr Inglis had conflated the issue of the terminal and applicable TGR. To the extent this brief letter adds anything of substance to the discussion, it misses the point. The length of the terminal/transitional period and therefore the*

*start date of the period covered by the TGR are inextricably linked. The 4.5% number that Mr Inglis had previously used was based on a period of time starting after the end of a 10 year transitional/terminal growth period. The Honourable Judge has not accepted Mr Inglis's 10 year transitional/terminal growth period, but has instead applied a transitional/terminal period of 5 years. As Mr Inglis has explained (and as it set out in the above-mentioned correspondence), that finding then has an impact on the TGR as it now begins 5 years earlier than the period for which his 4.5% TGR relates. As Mr Inglis has explained he has applied a TGR of 4.95% in the calculation being the midpoint of his TGR which related to a period of time starting after a 10 year transitional period and Professor Jarrell's TGR which began after no transitional period. The Petitioner and its advisors have wholly failed to address that point, such that they must now be taken to have no further answer to it."*

90. The judge dealt with this issue in his Note dated 6 May 2017, and upheld Harneys' contentions. In paragraph 3 of the Note, he said this:

"*My conclusion was that there should be a transitional period of 5 years (to 2024) with the terminal period starting thereafter and that Mr Inglis's methodology and calculations (as presented in his evidence at trial) as to the revenue during the transitional period and the growth rate during the terminal period should be applied. That results in a growth rate of 4.5% during the terminal period. I have held that Shanda enters a steady state after 2024 and it seems to me that the growth rate that Mr Inglis had used at trial for Shanda during that period (i.e. in a steady state) still should be applied. This is 4.5%. Therefore the fair value is US$16.68 per ADS. I did not intend that, as a result of my decision that the transitional period be reduced to 5 from 10 years, there should, nor do I consider it to be necessary for there to, be a revision to Mr Inglis's evidence and opinion on the growth rate for the terminal period. It seems to me once a date is established on which Shanda enters a steady state (earlier on my view than on Mr Inglis's approach) the projected growth rate for the terminal period can then be*

*applied and it is appropriate to use Mr Inglis's estimate as given in his evidence at trial".*

91. The Dissenting Shareholders complained that in reaching this conclusion the judge had failed to have proper regard to, or properly to apply, the evidence in relation to the growth rate. The only evidence as to the appropriate terminal growth rate in a transitional period of five years was that provided by Mr. Inglis in the post-hearing correspondence; and in the absence of contrary evidence from Professor Jarrell (or Mr. d'Almeida) the judge was bound to accept Mr. Inglis's view.

92. I do not accept that the judge was wrong on this aspect of the matter. The express foundation for his view was the evidence given by Mr. Inglis at trial. That evidence was directed to a terminal period starting after a transitional period of 10 years, but nowhere in his evidence did Mr. Inglis suggest that the growth rate he proposed would be different if the transitional period were shorter. The material he supplied after circulation of the draft judgment cannot sensibly be described as evidence: although it may no doubt be inferred that he thought that the growth rate of 4.95% was appropriate, that rate was no more than the product of a mechanical exercise of averaging the rates that he and Professor Jarrell had originally proposed. In their reply skeleton, the Dissenting Shareholders sought to provide a more reasoned basis for the 4.95% figure. They pointed out that both Mr. Inglis and Prof Jarrell had arrived at their original figures by using the OECD long-term projections of GDP for China (and, in Prof Jarrell's case, for Korea), and suggested that – since China's GDP was projected to decline gradually over time – the earlier the starting point for the terminal period the higher the growth rate. That was because basing the growth rate on a 10 year terminal period took into account declining performance in the latter years of that period, whereas the adoption of a five-year period automatically included only the superior performance in the earlier years and excluded the later declining performance. However, this material was not available to the judge; and, even before us, was not evidence but submission. In circumstances where the only material capable of informing the judge's decision was Mr. Inglis's evidence at trial (which cast no doubt on the validity of a growth rate of 4.5% in a terminal period starting after five years of transition) and his subsequent adoption without stated reasons of an average of the experts' original proposals, I consider that the judge was entitled to reach the conclusion he did.

93. Accordingly, I would dismiss the Dissenting Shareholders' appeal so far as it relates to the transitional period point.

*Disposition*

94. We have already dealt with the reopen application by refusing leave or, if leave was not required, by dismissing it.

95. As to Shanda's substantive appeal, I would allow it so far as concerns the minority shareholding point but dismiss it so far as it relates to interest.

96. I would dismiss the Dissenting Shareholders' appeal.

GOLDRING P:

I agree.

MORRISON JA:

I agree.



# **EXHIBIT 4**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSES NO.: FSD 76 OF 2017 (RJP)**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED**

**BETWEEN:**

QUNAR CAYMAN ISLANDS LIMITED

**Petitioner**

**-and-**

GRAND COURT - CAYMAN ISLANDS

1. MASO CAPITAL INVESTMENTS LIMITED
2. BLACKWELL PARTNERS LLC – SERIES A
3. ATHOS ASIA EVENT DRIVEN MASTER FUND
4. FMAP ACL LIMITED
5. SENRIGAN MASTER FUND
6. PAG ASIA ALPHA LP
7. PAG QUANTITATIVE STRATEGIES TRADING LIMITED
8. PAG-P ASIA FUND L.P.

**Respondents**

IN OPEN COURT

Appearances:

For Qunar Cayman Islands Limited: Terence Mowschenson QC, in London and Lachlan Greig in Cayman.

For PAG Asia Alpha LP, PAG Quantitative Strategies Trading Limited and PAG–P Asia Fund LP: Nigel Meeson QC in London and Erik Bodden in Cayman.

For Athos Asia Event Driven Master Fund and FMAP ACL Limited: Paul Girolami QC in London and Tony Heaver-Wren and Andrew Jackson in Cayman.

For Maso Capital Investments Limited and Blackwell Partners LLC – Series A: Robert Levy QC in London and Rocco Cecere in Cayman.

For Senrigan Master Fund: Paul Girolami QC in London and Shaun Maloney in Cayman.

Before: The Hon Justice Raj Parker

Heard: 23 June 2017

Draft Judgment Circulated: 17th July 2017

Judgment Delivered: 20th July 2017

## HEADNOTE

Section 238 Companies Law (2016 Revision)-approach of Court to determination of Petitions-discovery obligations of parties-whether dissenting shareholders can be ordered to give discovery-discovery by the Company and requests by experts for further information-number of experts-judge's discretion to limit number of experts-the overriding objective

## JUDGMENT

### Introduction

1. Qunar Cayman Islands Ltd (the Company) seeks determination of the fair value of the Company's shares pursuant to a dissenters' action under section 238 of the Companies law (2016 Revision).

2. There are eight dissenters in total. They have formed four groups. One group of dissenters are known as Maso (and Blackwell), the others are Athos, Senrigan and PAG. They are all separately represented.

3. The Athos dissenters own 31.4% of the total shares of all Dissenters, Senrigan dissenters own 16.5%, PAG dissenters own 35.6% and Maso 16.5%.

4. There are two Summonses for Directions. The first is issued by Maso and Blackwell (Maso) (FSD 73 of 2017) and the second by the Company (FSD 76 of 2017). The two sets of proceedings have been consolidated by agreement bearing the number and title cause FSD 76 of 2017).

### Background

5. The Company is a Cayman Islands exempted limited company. Its operations and business have mainly been conducted in the People's Republic of China (the

PRC). It has described itself in a Public Filing as "one of the leading mobile and online commerce platforms for travel in China". The Company which had been listed on NASDAQ since 2013, was the subject of a "take private" transaction which was announced on 23 June 2016 and concluded on 28 February 2017.

6. On 19 October 2016 the Company entered into an Agreement and Plan of Merger with Ocean Management Holdings Ltd and Ocean Management Merger Sub Ltd (the Merger).

7. On 24 January 2017 the Company gave notice of an Extraordinary General Meeting (EGM) to be held on 24 February 2017 to consider, amongst other things, the approval of the Merger.

8. The Merger was approved at the EGM and on 28 February 2017 the Plan of Merger was filed with the Registrar of Companies in the Cayman Islands.

9. The Dissenters have taken all the necessary steps to object to and dissent from the Merger.

The Summonses

10. There are a number of areas of disagreement over directions. Two of them are: whether the Dissenters should be ordered to give discovery; and whether they should be given leave to instruct one expert jointly, or be given leave to instruct one expert each.

11. There are also disputes in a third area concerning the scope of the Company's discovery obligations and the way it should give discovery. I will deal with this last point first as a matter of principle.

GRAND COURT - CAYMAN ISLANDS -

Approach to discovery

12. Mr Levy QC who represents Maso, appeared last year for dissenting shareholders in a case which dealt with directions under section 238: *In the matter of Homeinns Hotel Group* (FSD 75 of 2016, unreported 12 August 2016). That was heard by Mangatal J. He referred me to the submissions he made in that case.

Her Ladyship's judgement was delivered on 12 August 2016 and in material part provides as follows at paragraph 20:

"In my judgement, overall, the draft order presented by the dissenting shareholders... in relation to discovery appears more consonant with the requirements of the Court in adjudicating an application under section 238. In particular, it does appear to me that the discovery order should contemplate the documents listed at paragraph... which the (Company) has readily to hand and which must be relevant. The discovery order in a section 238 application is somewhat unusual, in that it is the Company that will have the documents and information relevant to the determination of fair value. I accept the submission

of Mr Levy QC in paragraph... of his skeleton argument. In particular, I accept that the experts and the Court are to have regard to all relevant documents and information, not just publicly available information. Further in my judgement it is not appropriate to make a standard order under order 24 of the GCR for disclosure by both parties. In my judgement, it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery."

13. Mr Levy QC relies on her Ladyship's decision and also referred to a number of other section 238 cases: (*Perfect World; Shanda; Mindray; Bona; Qihoo).*which have had, in his submission, some tried and tested similar directions. He submits that the Court should not limit in advance the types of documents which the expert should be entitled to see and to call for and that the Company should be required to list all relevant documents at the outset.

14. Those directions, in so far as relevant and in summary, have provided for:

-The establishment of an electronic data room;

-The Company to upload to the data room certain specific classes of relevant documents which came into being in the course of the take - private process (which by definition, will have been a transaction that closed relatively recently and should therefore be readily to hand so far as the Company is concerned);

-The Company also to upload all other documents relevant to fair value (NB no obligation to do so by Dissenters);

-Experts to ask questions of and request further documents from the Company;

-The Company has the ability, within 7 to 21 days of such a request, to apply to the Court to be relieved of the obligation to comply; and

-There are to be meetings between the experts and the Company's management.

15. He submits that the Maso Dissenters' summons seeks an order which is in materially similar terms and there is no good reason for the Court to depart from these directions.

16. He also referred me to the judgment of Jones J in *In the matter of Integra Group* (FSD 92 of 2014, unreported 28 August 2015).

17. In that case, which was the first time that the Court had been called upon to value a company's shares in connection with a merger carried out in accordance with part XVI of the Companies Law, Jones J helpfully set out the jurisdiction and general approach of the Court (under section 238), from which I respectfully derive the following propositions:

-Dissenting shareholders are not required to accept a merger or consolidation agreement which has been approved by the requisite majority. Instead they are entitled to dissent and demand payment for the fair value of their shares;

GRAND COURT - CAYMAN ISLANDS

-The effect of having given notices of dissent is that they cease to have any of the rights of shareholders, except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the Court for the determination of the fair value;

-The information contained in the Company's own books and records is highly relevant to any appraisal of its fair value as a going concern (and in the context of establishing an electronic data room) all the relevant material to that issue should be uploaded and be available for inspection by the experts (and those instructing them), subject to giving appropriate confidentiality undertakings;

-The experts are the best judges of what information is or is not relevant for their purposes and so a Company should not control what information should be made available to the experts, based upon its own assessment of relevance; and

-Section 238 does not dictate any particular valuation methodology. It is well established in both Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community, and are otherwise admissible in Court.

18. In addition to these general propositions, I also accept Mr Levy QC's submission that in determining fair value the Court is not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically require access to relevant historical data, documents and information relating to the Company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to trading in the future and not only those that have been publicly disclosed (or disclosed to advisers in the course of the take-private process).

GRAND COURT - CAYMAN ISLANDS -

19. In *In the matter of Shanda Games Limited* (FSD 14 of 2016, unreported, 25 April 2017) Segal J said at paragraph 55 of his judgment:

"The Directions Order also provided that all additional documents or information needed and requested by the parties experts would be made available within fourteen days of receipt of a request and easily accessible to them via the data room (or sent to them directly if uploading to the data room was impossible). By this means it was envisaged that (the Company) would make full disclosure of all relevant documents and information on a timely basis (although the directions order did not refer to the discovery procedures and obligations in GCR O. 24 and there was at this stage no consideration as to whether GCR O.24 applied to a section 238 petition, the effect of the Directions Order, made by consent, was that (the Company) assumed an obligation to make disclosure in terms similar to those contained in GCR O.24, and in some respects in wider terms)."

20. Mr Mowschenson QC, on behalf of the Company, submits that the Company should give discovery of documents that are relevant to the Court's determination of fair value by reference to specific categories of documents in accordance with Order 24 rule 3. He argues that there is no power to order general discovery in actions begun by Petition.

21. He submits that Order 24, rules 3 and 8 provide the tools with which a Court should regulate disclosure to what is necessary or which relates to matters in question. The overriding objective in the Preamble to the GCR, paragraph 1, requires a Court to ensure that the substantive law is rendered effective and that it is carried out consistently with the saving expense and dealing with the matter proportionately. He relies on the first and second affidavits of Mr Reid in support of his argument to limit discovery in the first instance to certain categories of documents which according to Mr Reid would be

"sufficient... to produce a robust valuation analysis".

He argues that the categories of documents in Schedule A of the Company's draft order has been agreed by the Maso Dissenters' expert, Mr Arboit, in his first affidavit dated 9 June 2017 at paragraph 23, and that they should not be given a second tranche to cover other documents relevant to fair value without more. Further documents would only be provided on request by an expert.

*Decision*

22. The Company should give discovery by uploading all documents that are relevant to fair value, after having first uploaded to the data room the specific classes of documents which came into being in the course of the take private process, which it should have readily available. This is the usual order and I can see no good reason to depart from it in this case.

23. Whilst directions given in particular cases are not to be regarded as precedents, I am cognizant that there have been a number of cases in which orders for directions have been made which have been consistent with regard to the Company giving discovery on a "catch all" general basis, after it has given the specific discovery agreed. I do not accept Mr Mowshenson QC's submission that there is no power under the GCR to order general discovery in actions begun by petition.

24. GCR Order 1, rule 2 sets out specific circumstances where the rules will not apply.

Then by sub paragraph (1):

"Subject to the following provisions of this rule, these rules shall apply in relation to all proceedings in this Court".

See also Quin J in *Qihoo* at paragraph 69.

25. This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.

26. I bear in mind that the Company will know what documents it has, whilst the dissenting shareholders will not. They are essentially outsiders and if the Company is to be properly valued as a going concern they must have access to the information that the Company has, both with regard to its existing business and future projections.

27. Whilst the question of relevance is primarily one for the experts, the Company should have a general obligation to produce information and documents of relevance to value based upon which the experts can, if they deem it necessary, ask for further specific information.

28. It is not appropriate therefore to limit the Company's discovery to the documents listed in schedule A of the Company's draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they are asked for. In addition and as is well known, discovery is an ongoing obligation. In this regard I prefer the evidence of Mr Arboit to that of Mr Reid.

29. Moreover, in case there is any doubt, the documents should be disclosed in the prescribed form i.e. by way of List (Form 16). In that way schedule 1 part 1 to the list could be satisfied by incorporation by reference of the data room index, but as is also well-known, part 2 of the list requires the identification of documents which the Company objects to produce (usually on the grounds of privilege).

30. Schedule 2 also requires the Company to identify relevant documents which it has had, but has not now, in its possession, custody or power (because they have been lost or destroyed or for some other reason). The Company is also required to state whether and when any such documents were last in its possession or power, what has become of them, and in whose possession they are now.

As Jones J stated in *Integra*

"The Canadian Courts have emphasised ... "the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgement that can be brought to bear on all the evidence and all the factors. I emphasise: it is a question of judgement. No apology need be offered for that. Parliament has decreed that fair value be determined by the Courts not by a formula that can be stated in the legislation".

GRAND COURT - CAYMAN ISLANDS -

31. Since the Company will likely hold all the relevant information which will go to a determination of fair value, it is therefore necessary not to limit in any way the Company's obligation to discover and produce it for the Court's assessment.

32. Another related issue was argued by Mr Mowschenson QC for the Company concerning whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the Company, to state (and if necessary verify) why the information and documents were relevant to the determination of fair value and necessary for the expert to complete his report and/or where appropriate, whether the expert's request can be limited.

33. He said that it is a matter of proportionality and raises an important issue for case management in these types of cases.

34. He argues that dissenting shareholders regularly make time-consuming, futile and successively onerous requests for information and there needs to be some kind of protection mechanism for companies facing such a barrage.

35. Mr Levy QC submits on his part that companies regularly give inadequate disclosure and any attempt to limit disclosure should be viewed with skepticism by this Court.

36. I approach this case on the basis that all parties will comply with orders of the Court. They will in their conduct ultimately be regulated by the Court, in the sense that the Court will rule, as it must when asked to do so, on all matters relating to law and procedure leading up to the trial. No doubt the communications between experts doing their best to assist the Court and the parties will involve clarification and explanations relating to the relevance of requests.

37. I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr Mowschenson QC has suggested, in order to give the Company some added protection. Since the question of fair value is a matter for the Court's judgement to be reached in light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to embarrass or harass the Company, the Court will step in if asked to do so. Likewise, the Court will step in if the Company is unreasonably delaying or failing to give proper discovery.

38. I do not think it is necessary to provide for these eventualities in an order which protects the Company in advance as there is a risk that the dissenting shareholders' expert would be overburdened with having to justify by reference to relevance and necessity each and every request made.

39. The experts' overriding duty is to assist the Court and that should ensure that all requests are proportionate and of relevance to the fair value issue and not any other issue. I accept there may be different approaches and what one expert considers necessary and relevant another expert may not. That does not mean that the dissenting shareholders' expert should have to justify each and every request.

GRAND COURT - CAYMAN ISLANDS -

40. This could in my view lead to further interlocutory applications and could result in scarce Court resources being taken up with matters which could and should be dealt with by parties who have instructed expert professionals to assist them in the presentation of their cases.

41. All parties will have liberty to apply to the Court at any stage if the process is not being followed or is being circumvented in some way.

42. There had been some debate about the costs occasioned by the setting up of the data room which by the time the hearing concluded was effectively agreed so I say no more about that.

43. I turn now to the second issue, namely number of experts, and whether all the dissenters should be given leave to instruct only one between them, or one each.

*Number of experts*

44. Mr Levy QC, who was in the minority on this issue, argues that he cannot be made to instruct one expert jointly with anyone else and that he is entitled to his own expert; he should not be forced to rely on the expert of another party or to have imposed upon him the terms of instructions of a particular expert, to include funding. He submits that it would be inconsistent with the FSD Guide section 16, and the right to a fair trial to force him to do so.

45. Section 16 is to the effect that where the use of a single joint expert is not considered appropriate (and none of the parties advocates a single joint expert) then "each party will generally be given leave to call one expert in each different field requiring expert evidence". That he says is consistent with Phipson on Evidence 18th edition paragraphs 33-35 that:

> "the prevailing judicial attitude appeared to be to allow the parties to call the experts of their choice just as they could call the factual witnesses of their choice".

46. The Company and the other dissenters all agree that there should be two experts, one for the Company and one to be instructed jointly by all of the dissenters.

GRAND COURT - CAYMAN ISLANDS -

*Decision*

47. The Court in its discretion may give leave for a party to be allowed to call expert evidence. The Court may also limit expert evidence by Order 38 rule 4. The discretion is exercised not merely as a matter of case management, efficiency and economy (in accordance with the overriding objective), but also of course, to ensure a fair trial so that each party has a proper opportunity to put forward its case and test the other party's case.

48. It was apparent in argument that the Maso dissenters wish to retain their own expert to achieve a greater degree of control over the instruction of and

communications with that expert, than a joint instruction of an expert with the other dissenters would afford them.

49. It seems to me that both in the interests of ensuring that the overriding objective is achieved at trial, and because the other dissenters should be entitled to instruct an expert in whom they too have complete confidence and to whom they have at least equal access and transparency in communications, one expert jointly (and severally –in case one or more parties wishes to settle before trial) instructed for all three camps should be ordered. No confidence issues were raised by Mr Levy QC over the expert that the other two parties were content to instruct.

50. The Athos and Senrigan and PAG dissenters between them hold all but 16.5% of the shares whose fair value falls to be determined and if the Court were to grant the Maso dissenters leave to call its own expert, Mr Meeson QC and Mr Girolami QC for the other three camps say that they would require their own experts. That would in all likelihood lead to five experts, (one for the Company and one for each dissenter group) all trying to assist the Court. That in my view is not a sensible way to proceed in this case. After all it is the duty of experts under Cayman Islands law to help the Court on matters within their expertise, and that is paramount and overrides any obligation to the party from whom they may have received instructions or by whom they are paid. Given that their evidence should be and should be seen to be independent work product uninfluenced by the pressures of litigation or any party, so that they can provide independent assistance to the Court by way of an objective and unbiased opinion, there is no room for them in any way taking on the features of an advocate for their client.

51. In circumstances where no good reason relating to the sole issue in the case has been put forward for the Maso dissenters to instruct their own expert, in my judgment, their desire to have their own expert should yield to the interests of the other dissenting shareholders who are prepared to jointly instruct an expert.

52. I am told by Counsel that the identity of the expert is not the issue, so that should not produce an immediate practical problem. The issue although put forward as one of principle by Mr Levy QC, seemed to me to be around access and instructions, which should be capable of resolution.

53. Furthermore, I take the view that one expert instructed by all dissenters is likely to be of most assistance to the Court, especially in relation to interactions with the Company's expert and will be in keeping with the overriding objective.

54. I was not persuaded by Mr Levy QC that his client had the right to call an expert of its choice. In my view this is a case management decision for a judge to take, balancing the competing interests of all parties involved in the trial, namely the other dissenters and the Company. I am not persuaded that Mr Levy QC's clients will be prejudiced by an Order for the appointment of a single joint expert on behalf of all dissenters who all share a common interest in the determination of a fair value for their shares. They may be business competitors, but their interests should be aligned in this case.

I turn now to the final issue.

GRAND COURT · CAYMAN ISLANDS ·

*Should the dissenters be ordered to give discovery?*

55. Mr Mowschenson QC submits that section 238 petitions are adversarial civil proceedings between the parties and Order 24 rule 3(1) provides that the Court may order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to give discovery.

56. He points to the notes to the Supreme Court Practice 1999 which confirm that, unlike the provisions for automatic discovery in rule 2 (1), Order 24 rule 3 is not limited to an action with pleadings and allows a party to apply for discovery by list. He accepts that (just as he submits that Order 24 rule 3 (3) limits discovery in actions begun by petition to documents or classes of documents as may be specified in the order for directions for the Company), so he too is limited in applying for specific discovery of documents against the dissenters. I have already decided that discovery in section 238 cases begun by Petition is not so limited and that the Company should give discovery of all relevant documents in its possession.

57. He submits that Mangatal J's decision in *Homeinns* did not determine once and for all the question of whether dissenters should be required to give discovery by list of documents relevant to fair value in their possession. He seeks a narrower class of documents he says than would be required by an order for standard discovery under Order 24 rules 1 and 2.

58. He relies in particular on a Delaware decision in *(In Re Appraisal of Dole Foods Company, Inc. C.A. No 9079 - VCL (Del.Ch.Dec. 9 2014) (Dole))* which apparently was not cited to Mangatal J

*Dole* is a decision of the Court of Chancery, in Delaware. Vice Chancellor Laster ordered discovery of the material sought by the company from the dissenting shareholders and gave reasons in support of his decision. Mr Mowschenson QC submits that much of the Vice Chancellor's reasoning is of general application, including that:

-Pre-litigation valuations are relevant to the central issue in appraisal proceedings, namely the fair value of the company (page 7-8);

-Such materials are also relevant to issues facing the experts such as the appropriate inputs and considerations for valuation methodologies (page 8);

-They are also potentially relevant to witness credibility, for example dissenter advanced positions in litigation that were at variance with its own pre-litigation views. The information might be useful for purposes of cross-examination or rebuttal of expert testimony;

-The Court may consider a wide range of factual evidence in support of its decision, including the market price, merger price, other offers, prices at which knowledgeable insiders sold their shares, internal corporate documents and valuations prepared for pre-litigation purposes (page 10);

GRAND COURT - CAYMAN ISLANDS

-Where the Court relies primarily on court-appointed experts to determine fair value, factual evidence relating to valuation is often relied on as a cross check or reality check and may bear on witness credibility; and

-Experts themselves often referred to other valuation work in their own report, for example by citing other valuations to demonstrate the reasonableness of their inputs (page 15).

59. From this decision Mr Mowschenson QC argues that there are persuasive reasons that, as a matter of principle, the dissenters' discovery is relevant to the issue of fair value and ought to be ordered. He points to the decision of Segal J in *Shanda* as support for the proposition that although Delaware authorities are not binding on this Court, section 238 uses the same core concepts and terms as well as similar procedural mechanisms and that Delaware in particular has a well-developed jurisprudence. He urged me to follow *Dole*.

60. Mr Levy QC submits that by definition the dissenters are all outsiders and will not have the detailed information the experts will require to fulfil their duties. All of the information will be based upon the Company's own books and records and will be "inside" valuation materials rather than a valuation based on publicly available materials.

61. Moreover, he relies on the decision of Mangatal J which he says is an end of the matter, unless I am convinced that she was wrong; see *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2013] 1 BCLC 73 and *Re China Shanshui Cement Group Limited* [2015 (2) CILR 255].

62. He submits that it is well established that judges of one division should speak with the same voice – see *In re Howard* (1961) 1 CH 507 – and that this is clearly sensible for reasons of certainty and comity.

63. He relies on the affidavit evidence of Mr Margules to show that the procedure for giving disclosure in Delaware is radically different to that which pertains in the Cayman Islands. Relying on *Morelle Ltd v Wakeling* (1955) 1 All E R 708 CA he submits that Mangatal J's decision was not given *per incuriam* because *inter alia* the Delaware authority in *Dole* was not binding on this Court.

*Decision*

64. I am prepared to accept that in a hypothetical case discovery from dissenters may be ordered by this Court for specific documents that are in the dissenters' possession, but not the Company's.

GRAND COURT - CAYMAN ISLANDS

65. The Court would require very clear grounds upon which to make such an order which would be solely directed towards assisting the Court in determining fair value. The Court would, under Order 24 rule 8, have to be satisfied that discovery was necessary under rule 3 and would not make an order if it was not necessary either for disposing fairly of the cause or matter or for saving costs. The overriding objective would also need to be satisfied to ensure that the substantive law was rendered effective and that it is carried out consistently with saving expense and dealing with the matter proportionately.

66. It would not be a ground upon which to make such an order that the material might be of assistance to the Company in seeking to undermine the credibility of the dissenters or its witnesses. The reasoning in *Dole* is not of much assistance when one is applying Cayman law and procedure on this question.

67. For example, material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of merger, is irrelevant and of no assistance to the Court in determining fair value in this jurisdiction.

68. So although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds. No such grounds are being advanced by Mr Mowschenson QC in this case.

69. I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value. Once an expert has the company's full records I do not see that anything helpful could be gained by reviewing third-party valuations. It may be that the dissenters being hedge funds and private equity firms have used securities analysts to gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities, as Mr Reid suggests. Those analysts would not have access to all of the Company's information, but will have access to a large amount of information that is generally available in respect of publicly listed companies, including investor relations information. I do not agree with Mr Reid's view that the views of these securities analysts relying on those sources of information

"are potentially highly relevant to the issue of the fair value of the company".

70. I prefer the evidence of Mr Arboit which he gives in his first affidavit at paragraphs 53 and 54 to the effect that the documents listed in the Company's request for information relating to the dissenters' investment in the Company and internal analyses are not relevant to the determination of fair value of a publicly listed company's shares. He does not consider that any analysis produced by the dissenting shareholders to be relevant to valuation and he would not factor their analysis into his own valuation - he states ... "in order to ensure that my valuation was wholly my own".

71. He goes on to say that analyses produced by dissenting shareholders are no doubt produced for a variety of purposes and are likely to be informed by their own methodologies.

72. I agree with Mr Arboit's evidence in this regard. Moreover the motivations and views of the dissenting shareholder are unlikely to assist the Court in its rather narrow exercise of adjudication, informed as it will be by the expert evidence.

73. Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery where parties seek to undermine each other's cases through evidence obtained in discovery or other related interlocutory proceedings, which may be designed to assist in the cross examination of witnesses.

GRAND COURT - CAYMAN ISLANDS -

74. In this case the witnesses facing cross examination on previous inconsistencies or matters related to their investment strategies, would be on the dissenting shareholders' side if the Court ordered them to give discovery. Those matters are irrelevant to the Court's task and may indeed be inadmissible in a section 238 trial.

75. As to *Dole,* of course I take into account and pay close attention to the decisions of the Courts in Delaware (and Canada for that matter) to assist me in determining matters of substantive law, given the similarity of the jurisprudence and the actual words used in section 238. However, I derive little assistance in relation to procedural matters such as discovery where the Delaware jurisdiction is so different. As Segal J said in *Shanda*:

> "However, it will also be necessary always to take care and be satisfied that the law and practice developed by such other Courts fits and is consistent with other relevant parts of Cayman law and practice".

76. Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a section 238 case. This is in keeping with the approach taken both in *Integra* and *Homeinns.* It follows that in my respectful opinion that Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way pursuant to a standard direction under Order 24 of the GCR in the context of a section 238 appraisal action.

*Conclusion*

77. No doubt Counsel will be able to agree an order reflecting my decision in relation to the three issues which have arisen on this application.

THE HON. JUSTICE RAJ PARKER
JUDGE OF THE GRAND COURT

GRAND COURT - CAYMAN ISLANDS -

# EXHIBIT 5

**[2009 CILR 342]**

**PHOENIX MERIDIAN EQUITY LIMITED**

***v.***

**LYXOR ASSET MANAGEMENT S.A. and SCOTIABANK & TRUST (CAYMAN) LIMITED**

*Grand Court*

(Smellie, C.J.)

**22 May 2009**

*Injunctions—anti-suit injunctions—injunction against foreign proceedings—on application to enjoin foreign proceedings, to show compelling reason to prevent other party from invoking legitimate right under foreign law (e.g. "unconscionable" to allow it to proceed)—not "unconscionable" to seek Title 28 depositions under US law if witness not amenable to Cayman discovery and since US courts aware of dangers of oppression*

The plaintiff brought an action against the defendant to recover the value of its investment in a group of funds administered by the defendant.

The defendant withheld a sum from the plaintiff's funds which it claimed it was entitled to do on behalf of its parent company, for the part it had played as investment adviser and leverage financier to the funds. The claim had only recently been clarified, having previously been pleaded as a penalty for early redemption, and consequently the plaintiff sought full and frank disclosure of all relevant information through the discovery process. The key witnesses were officers of the parent company resident in the United States and, since they were not parties to the proceedings, they could not be subject to oral interrogation under O.24, r.16 of the Grand Court Rules.

The plaintiff therefore resorted to the discovery process under §1782 of Title 28 of the US Code to seek oral depositions from the defendant's key

witnesses resident there. The defendant applied for an injunction restraining the plaintiff from continuing proceedings in the United States to compel the employees of the principal to give depositions.

The plaintiff submitted that it should be allowed to pursue the request to obtain depositions because (a) the defendant had changed its pleadings so considerably that they were inconsistent with the earlier affidavits of the witnesses; (b) it would provide significant benefits for the forthcoming trial in the Cayman Islands; and (c) Cayman law could not be invoked here and there were several significant and legitimate reasons why they wished to seek depositions from these officers.

The defendant objected to allowing the taking of the depositions on the ground that they would be unconscionable since (a) the witnesses to be deposed were due to testify at the Cayman trial and it would therefore amount to unwarranted and oppressive double cross-examination and the procedure could discourage them from attending the trial; (b) they were working towards the trial and it would be an unnecessary distraction; and (c) the inquiry was too broad and intrusive.

**Held,** dismissing the application:

The application seeking to enjoin the Title 28 proceedings would be refused since the defendant had not established that it would be unconscionable to allow the plaintiff to proceed and thus, given the need to show a compelling reason to prevent a party from availing itself of a right it enjoyed under foreign law, their legitimate right to invoke that procedure had not been overridden. The key witnesses were not amenable to the full Cayman discovery process under O.24, r.16 of the Grand Court Rules since they were not parties to the action, and as the US courts were well aware of the dangers of vexation and oppression (including the risk of the plaintiff's conducting a "fishing expedition") under the procedure, it would not be unconscionable for the plaintiff to seek these depositions under US law. Moreover, there was no suggestion that Cayman law regarded double cross-examination as an abuse of process (since O.24, r.16 provided for pre-trial discovery by way of depositions) and, further, it had been established that witnesses could be subject to pre-trial cross-examination under O.26, r.5(2) on the basis of their written interrogatories (para. 14; para. 19; paras. 25–26; para. 28; para. 30).

**Cases cited:**

(1) *Benfield Holdings Ltd. v. Richardson*, [2007] EWHC 171 (QB), referred to.

(2) *Cotorro Trust, In re*, 1997 CILR 1, referred to.

(3) *Intel Corp. v. Advanced Micro Devices Inc.* (2004), 542 U.S. 241; 124 S. Ct. 244; 159 L. Ed. 2d 355, considered.

(4) *Lemos v. Coutts & Co. (Cayman) Ltd.*, 1992–93 CILR 460, referred to.

(5) *Nokia Corp. v. Interdigital Technology Corp.*, [2004] EWHC 2920 (Pat), considered.

(6) *Omega Group Holdings Ltd. v. Kozeny*, [2002] CLC 132, referred to.

(7) *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487; [1986] 2 Lloyd's Rep. 317, *dicta* of Lord Brandon of Oakbrook followed.

(8) *Unilever Plc v. ABC Intl.*, 2008 CILR 87, referred to.

**Legislation construed:**

Grand Court Rules 1995, O.24, r.16: "(1) In an action begun by Writ, the Court may make an order for discovery by oral examination of any party or, if the party is a body corporate, any officer thereof . . ."

O.26, r.5(2): "Where any person on whom ordered interrogatories have been served answers any of them insufficiently, the Court may make an order requiring him to make a further answer, either by affidavit or on oral examination as the Court may direct."

*G. Halkerston* and *Ms. M. Hudson* for the plaintiff;

*C.D. McKie* and *J.F. Pennay* for the first defendant;

The second defendant did not appear and was not represented.

1. **SMELLIE, C.J.:** This is an application by the first defendant ("Lyxor") for injunctive relief restraining the plaintiff ("Phoenix") from continuing proceedings in the United States instituted by Phoenix in which certain persons resident in the United States would be compelled to give depositions. Those persons are Samuel Rosenberg and Anthony Phlipponneau or any other officer, director, managing agent or employee of SG Americas Securities LLC ("SGAS"), resident in the United States. SGAS is an affiliate entity of Société Générale ("SG") and is incorporated and operating in the United States.

2. The background is as follows. Phoenix sues Lyxor in these proceedings before this court in respect of what Phoenix claims is the full value of its investment in a group of Phoenix Investment Funds administered by Lyxor. The dispute is over the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG. This large sum is in respect of what SG now claims as an "undisclosed margin" or profit to which it is entitled for its part as investment adviser and leverage financier to the Phoenix funds.

3. Lyxor's claim on behalf of SG has only recently been clarified in the pleadings. Until then, it was rather differently pleaded in terms of a penalty or levy which SG was entitled to impose because of Phoenix's early redemption of its investments. Not surprisingly, Phoenix seeks to examine every aspect of SG's claim and has required, through the discovery process, full and frank disclosure of any information in Lyxor's possession or control relating to SG's claim. Lyxor has provided extensive

witness statements and/or affidavits, from Mr. Rosenberg in particular, in support of its discovery.

4. A complicating feature of the case is that while Lyxor asserts the claim on behalf of its principal, SG, the relevant institutional information is held by SG which is itself not a party to this action. And, while Lyxor claims to have made full and frank disclosure, the issues which Phoenix seeks to explore by way of the depositions in the United States are matters within the knowledge of Messrs. Rosenberg and Phlipponneau (and perhaps others), who are officers of SGAS (and, in the case at least of Mr. Rosenberg, of SG itself) but not of Lyxor.

5. That being the nature of the inter-relationships, the witnesses—Mr. Rosenberg and Mr. Phlipponneau—are not immediately amenable to the process by which this court can compel officers of companies, which are parties to proceedings before it, to submit to oral interrogation by way of discovery under O.24, r.16 of the Grand Court Rules. Phoenix has therefore resorted to the discovery process available by way of notice under §1782 of Title 28 of the US Code. By that process, Phoenix seeks to depose Messrs. Rosenberg and Phlipponneau on a range of 11 separate topics relating to SG's business as investment adviser and financier, not just of Phoenix's funds, but—to the extent relevant to SG's claims—also to its dealings with other clients.

6. Phoenix argues that it should be allowed to pursue the depositions of Messrs. Rosenberg and Phlipponneau because Lyxor has significantly changed its case in a manner which is inconsistent with the earlier sworn affidavit of its chief witness, Mr. Rosenberg. It contends that the deposition of Mr. Rosenberg and his colleague, Mr. Phlipponneau, will provide significant "litigation benefits" to Phoenix (and, it is hoped, this court) in the trial to take place here in this action.

7. Lyxor objects to the Title 28 depositions on the grounds of oppression and prejudice. On its behalf, Mr. McKie argues that as Messrs. Rosenberg and Phlipponneau have both given witness statements in these proceedings and will be attending to testify at the trial, the proposed depositions are unconscionable for three main reasons:

(a) They will subject Mr. Rosenberg and Mr. Phlipponneau to unwarranted double cross-examination and the trial in this court will suffer from that unwarranted duplication. Such interrogation of the proposed witnesses would be oppressive and could discourage them from attending the trial out of concern of being submitted to the same process again.

(b) The parties are working flat out to prepare for this complex trial, albeit now postponed from May 2009 to September 2009. It is unnecessary and undesirable for there to be the distraction of depositions.

(c) The area of inquiry defined by the 11 topics is far too broad and intrusive.

8. Lyxor's summons now before me, by which it seeks to restrain Phoenix from pursuing the Title 28 depositions, raises an important issue of Cayman civil procedure. This is whether the Cayman courts should intervene to prevent depositions in the United States, ordered by the US court to be given by deponents who are residents there, when the deponents are potential witnesses in a Cayman action in respect of which it is clear that the Cayman court is the only appropriate forum for the ultimate trial of the action.

9. While the case law on this point has developed in other places in the Commonwealth, it is a point of first impression for this court—the question whether an anti-suit injunction should be issued to restrain foreign proceedings reported to have arisen before only in the context of cases where there were disputes over the *forum conveniens* (see *In re Cotorro Trust (2)*, *Lemos v. Coutts & Co. (Cayman) Ltd. (4)* and *Unilever Plc v. ABC Intl. (8)*). In the first two of those cases, the foreign proceedings were restrained on the basis that the Cayman Islands were the proper forum. In the *Unilever* case, arbitration proceedings in Paris were restrained on the basis that the defendant, ABC International, a Cayman company, was seeking vexatiously to compel the plaintiff to submit to those arbitration proceedings.

10. In the context of this application, there are competing discernible issues of principle involved. Unlike the position in many other Commonwealth jurisdictions including England, Cayman civil procedure does allow—pursuant to O.24, r.16 of the Grand Court Rules—oral discovery by way of depositions prior to trial. This is, however, as already noted, limited to officers of companies which are parties to the proceedings before the court. So, while it may not be said that Cayman law is hostile to witnesses being cross-examined prior to trial, such a procedure remains unusual. No case concerning this procedure has been reported since O.24, r.16 of the Grand Court Rules was amended in September 2003 to permit this mechanism.

11. Apart from O.24, r.16 of the Grand Court Rules, there is, generally, no power by which the Cayman courts, on behalf of parties to the actions before it, can compel persons who are not parties to give a full measure of pre-trial discovery, where it includes both the disclosure and production for inspection and copying of documents, as well as the giving of oral or written testimony. In this regard, Cayman law and procedure differs essentially from that of several foreign jurisdictions, including the United States.

12. This court must therefore be alive to the natural concerns of practitioners about the possibility of such pitfalls as duplication of effort and

oppression arising from the use of pre-trial depositions. These are considerations which are identified by Lyxor here as militating against the Title 28 proceedings from the perspective of the court in ways which, perhaps, would not trouble the US or other foreign courts where such pre-trial depositions are routine.

13. But the further issue of principle is the other side of the coin: it raises the question to what extent it is desirable or appropriate that a party to litigation before our courts should be prevented from availing itself of a statutory right which it may have under foreign law (here US federal law). The right here is one to apply for an order that persons resident in the foreign jurisdiction, who are themselves not parties to the action before this court and so not amenable to its process, should give pre-trial discovery by way of deposition evidence relevant to the issues in dispute before this court.

14. Framing the competing issues of principle in this way brings into stark relief the competing and equally important concerns which must be considered. It is plain from the outset that where a party has a right to avail itself of a legitimate foreign process, there must be a very compelling reason to prevent it from doing so—something more than just the philosophical differences of approach to litigation existing between jurisdictions.

15. The way in which the English courts have come to terms with the problem is, as ever, of highly persuasive value. The *dicta* of Lord Brandon of Oakbrook from the leading case of *South Carolina Ins. Co.* v. *Assurantie Maatschappij "De Zeven Provincien" N.V.* (7) sets the now classical framework for the consideration of the principles ([1987] A.C. at 40):

". . . [T]he power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable."

And he continued (*ibid.*, at 41):

"It is difficult, and would probably be unwise, to seek to define the expression 'unconscionable conduct' in anything like an exhaustive manner. In my opinion, however, it includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court."

16. Here, Lyxor, for the reasons already summarized above, does not rely

on what Lord Brandon of Oakbrook describes as situation (1) but rather on situation (2). I will come below to examine the arguments more fully, but before so doing there are further points of principle relevant to this application which may be gleaned from Lord Brandon's speech. They are conveniently summarized in *Nokia Corp.* v. *Interdigital Technology Corp.* (5), as adopted and applied by Pumfrey, J. ([2004] EWHC 2920 (Pat), at para. 25):

"(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case . . .

[(and directly from Lord Brandon ([1987] A.C. at 42):

'Subject, however, to the help of the court in these various ways [*e.g.* pursuant to Orders 24 and 38], the basic principle underlying the preparation and presentation of a party's case in the High Court is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used.']

(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process.

(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English [Cayman] court . . .

(e) It is for the US court hearing the §1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court."

17. With those ground rules in mind, the main question arising in the present application is whether to allow the Title 28 deposition to proceed would be "unconscionable," within the meaning identified by Lord Brandon's situation (2). Mr. Halkerston, on behalf of Phoenix, refutes the suggestion of unconscionableness. He emphasizes the fact that, as neither Messrs. Rosenberg nor Phlipponneau is an officer of Lyxor, O.24, r.16 of the Grand Court Rules cannot be invoked by this court in aid of Phoenix's quest for information. He argues that there are several significant and legitimate litigation reasons why Phoenix wishes to seek depositions from those witnesses as officers of SGAS/SG. These include—

(a) identifying how Lyxor's/SG's valuation process of the Phoenix funds operated for the purpose of assisting Phoenix's expert witnesses to complete their reports for the trial. As Lyxor's witnesses have had access to SG's witnesses and processes in compiling their evidence, Phoenix should have the mutual benefit of access for the preparation of its expert evidence. This access is said to be confined only to certain levels of seniority of internal control at SG;

(b) given the degree of urgency which attended the preparation for this trial when the Title 28 proceedings were first instituted, exacerbated by the recent and important amendment to Lyxor's defence, the taking of depositions would be less prone to delay than the alternative means of written interrogatories available through this court's process. The taking of depositions would allow for the "drilling down" several levels of questions in one day, which would take several weeks (if not months) in the interrogatories process, pursuant to O.26 of the Grand Court Rules, and would also save the additional costs and court time likely to be taken by the interrogatories process;

(c) identification of the witnesses and documentation which would assist the case. For example, the identification of other clients of SGAS/Lyxor who may be expected to have had similar issues with this type of product because Lyxor and SG rely on market practice for the implication of the right to charge the undisclosed margin. Finding this information out at the trial in live evidence will not allow Phoenix the chance effectively to marshal this further evidence before the court;

(d) identifying the interaction between SGAS/SG and third parties involved in the Phoenix deal, particularly in relation to certain "kickbacks" which were allegedly paid; and

(e) identifying how the SGAS/SG/Lyxor audit process was conducted and the information which was or which was not available to PwC, the auditors of the funds.

18. Lyxor's complaint, that the Title 28 depositions would be merely duplicative of the testimony to be given at the trial, must be viewed in the context of what it is that Phoenix hopes to achieve by the depositions. It is acknowledged by Lyxor that Messrs. Rosenberg and Phlipponneau are indeed the officers who are privy to the kind of information to be elicited. While the scope of the 11 issues is criticized for being too wide, there is no denial of their general relevance to the trial.

19. As the depositions are to be regarded as part of the discovery process—a concept not yet readily embraced by Cayman lawyers—they may not be restrained simply for being duplicative in and of themselves. Moreover, on the basis of the *South Carolina* (7) principles, and bearing in mind that O.24, r.16 of the Grand Court Rules provides for pre-trial

discovery by way of depositions, I may not proceed on the basis that Cayman law regards double cross-examination as being, in and of itself, an abuse. Indeed, it is worth noting here again that it is well-established that for the purposes of eliciting full answers to written interrogatories, witnesses can be submitted to pre-trial cross-examinations, limited though that may be (see O.26, r.5(2) of the Grand Court Rules).

20. While it has been intimated that Messrs. Rosenberg and Phlipponneau may be daunted or discouraged by the Title 28 process from coming to testify again at the trial, Mr. McKie did not positively assert that that would be so. Such an assertion—given their seniority within SGAS and their importance as witnesses to Lyxor's case—would be surprising to say the least. The fact that they remain amenable to giving evidence before this court does not, however, diminish the concerns about unconscionableness.

21. There are proper concerns over the proportionality of what is sought by Phoenix when compared to the obvious inconvenience, costs and potential oppressiveness of the Title 28 depositions, especially if framed as widely as proposed. Messrs. Rosenberg and Phlipponneau have both given extensive witness statements (and/or affidavits) in this case and are required to attend the trial which is now postponed from this month to September 2009. Between now and then, there is, arguably, time enough for Phoenix to be able, by the written interrogatories process available through this court, to elicit the sworn information which it may properly require to complete the discovery process before the trial.

22. Accordingly, while I am sympathetic to Phoenix's concern at having been met with what it describes as the *volte-face* of Lyxor's change of defence, that circumstance must be weighed against allowing Phoenix to unleash the full brunt of the Title 28 process against key witnesses upon whom Lyxor must rely for its defence. The Title 28 process, if allowed to go unchecked, could result in the kind of real forensic unfairness which was perceived by the English courts in comparable circumstances in *Omega Group Holdings Ltd.* v. *Kozeny* (6) and *Benfield Holdings Ltd.* v. *Richardson* (1).

23. I have particularly in mind, as did Langley, J. in *Benfield Holdings* ([2007] EWHC 171 (QB), at para. 23), that English (Cayman) procedures provide for proofs of witness statements or affidavits which must contain the truthful account of evidence which witnesses may give orally. Evidence to be relied upon must be disclosed beforehand in statements or affidavits. Thus, Phoenix must be told just what evidence it is that Lyxor relies upon for its (and SG's) defence. Like any other litigant, Phoenix should be able to prepare for cross-examination by reference also to the documentary disclosure which has been given. If gaps in the evidence appear, Phoenix should be able to put specific interrogatories to Lyxor

requiring binding responses or may put requests for specific further disclosure of documentary evidence.

24. In other words, it seems to me that I am obliged to consider whether a comparable forensic objective to that sought by the Title 28 process can be achieved by means of the ordinary process of this court without exposing the witnesses to what is perceived to be the potential inconvenience, cost and oppression of the Title 28 process. The mere fact that witnesses have committed their positions to witness statements is not in and of itself a bar to Title 28 depositions. The question is whether there are proper concerns about vexatiousness and oppression.

25. However, the US courts are shown to be alive to such concerns. They have the power to control the scope. They have determined that it must ordinarily be a matter for them to control their own process (see *Intel Corp.* v. *Advanced Micro Devices Inc.* (3)). In the same vein, the US court will also be able to determine the extent, if at all, to which the application should be curtailed for being "fishing"—another objection raised by Lyxor.

26. And while the US courts have no separate direct interest in the application itself or the outcome of the proceedings in the court to be assisted by them, I may not proceed on the basis that they might fail to protect the witnesses from oppression. The evidence on US law indicates that very similar objections to those raised by Messrs. Rosenberg and Phlipponneau before this court as to oppressiveness can be raised before the US court.

27. Mr. McKie, in his usual careful arguments, also points out—as was observed in *Intel* (3)—that where the parties to a Title 28 proceeding are the same as those in the foreign proceedings, the need for assistance is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence. This view of the approach likely to be taken by the US court has been recognized as a factor to be considered by the English courts when deciding whether to injunct deposition proceedings: see *Nokia* (5) ([2004] EWHC 2920 (Pat), at para. 22).

28. However, the involvement of Messrs. Rosenberg and Phlipponneau in these proceedings as key witnesses on behalf of Lyxor seeking to advance what is ultimately SG's case, but being themselves not amenable to the process of this court as officers of SG, is a circumstance of a different kind. Treating them as parties who are fully amenable as contemplated by the *Intel* case would not be a realistic approach to take. Yet, this is a premise upon which Lyxor bases its objection to Phoenix's Title 28 application. It is, I conclude, a false premise.

29. It was also proposed in the arguments that without Lyxor having the reciprocal ability to examine Phoenix's witnesses, the Title 28 procedure must be inherently unfair. While there is no case law authoritatively to that effect, one may accept that, in broad terms, "equality is equity." In accepting this, Mr. Halkerston did offer that Phoenix's main factual witness—its principal and director Mr. Al-Ibrahim—would make himself amenable, pursuant to O.24, r.16 of the Grand Court Rules. As Title 28 would not apply to him because he is not a resident of the United States, that offer of reciprocity under O.24, r.16 of the Grand Court Rules can hardly be described as unreasonable.

30. In conclusion, I am not satisfied that Lyxor has established the threshold test of unconscionability for the grant of the injunction so as to override Phoenix's legitimate right to invoke the Title 28 procedure. On balance, in the exercise of discretion, I therefore refuse the order for the injunction.

*Application dismissed.*

*Appleby* for the plaintiff; *Maples & Calder* for the first defendant.